# Exhibit 1

E-filing

**FILED**

OCT 2 4 2003

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Evelyn Santos,

        Plaintiff,

v.

Household International, Inc. *et al.*,

        Defendants.

No. C03-1243 MJJ

**ORDER DENYING PLAINTIFF'S
MOTION FOR REMAND AND
GRANTING DEFENDANTS' MOTION
TO COMPEL ARBITRATION**

## INTRODUCTION

Before the Court are two motions. The first, brought by Plaintiff Evelyn Santos ("Santos") seeks to remand this action to state court. Defendants Household Bank *et al.* (collectively, "Household") oppose Santos' motion on the grounds that her claims "arise under" federal law by virtue of the National Bank Act, 12 U.S.C. §§ 85-86, and the doctrine of complete preemption.

The second motion, brought by Household, seeks to compel arbitration of the parties' dispute and an order staying the proceedings in this action pending such arbitration. Santos opposes Household's motion on the grounds that the contract between Household and Santos, which contains the arbitration clause at issue, is unconscionable. For the reasons that follow, the Court DENIES Santos' motion for remand and GRANTS Household's motion to compel arbitration.

1                          **FACTUAL BACKGROUND**

2       In June 2000, Santos agreed to accept a MasterCard credit card from Household Bank with a

3    $500 credit limit. While Santos does not remember having been presented with a statement

4    containing an arbitration provision or signing an agreement, Household records show that Santos

5    accepted the Cardmember Agreement and Disclosure Statement by using the card for purchases

6    and/or advances. Declaration of Stephanie Jimenez in Support of Motion to Compel Arbitration and

7    for Stay ("Jimenez Decl."), at 1.

8       The Cardmember Agreement and Disclosure Statement contains a choice of law provision

9    stating that federal law and the laws of the state of Nevada will govern any contractual disagreements

10   that arise between the parties. The agreement also states that if a party elects arbitration to resolve a

11   dispute arising out of the contract then the right to litigate such a dispute before a judge will be

12   waived. In addition, the agreement contains provisions prohibiting class actions and requiring that

13   arbitration disputes be kept confidential.

14      On February 11, 2003, Santos filed a class action lawsuit in Contra Costa Superior Court

15   challenging the allegedly "unfair, unlawful, and deceptive business practices of defendants

16   Household Bank and Household Credit Services, Inc . . . in California involving the issuance and

17   servicing of Household Bank MasterCard credit cards." Complaint ¶ 1.

18      On March 24, 2003, Household removed the case to federal court "because [the complaint]

19   advances a claim that Household Bank, which is a national bank, charged excessive interest. Any

20   such claim, even if a plaintiff seeks to characterize it as a claim under State law, is by virtue of the

21   National Bank Act, 12 U.S.C. sections 85-86, and the doctrine of 'complete preemption,' deemed to

22   arise under Federal law - and it is therefore removable under 28 U.S.C. § 1441." Defendant's

23   Opposition to Motion to Remand ("Remand Opp.") at 1-2. In construing the Complaint as

24   advancing a claim for usury, Household focuses on paragraphs 12 and 26 of Santos' complaint.

25      In paragraph 12 of the complaint, Santos alleges that:

26      defendants imposed an over limit fee on plaintiff on July 20, 2000. At that time,
        plaintiff was below her credit limit and, pursuant to the terms of the agreement
27      (which provides that an over limit charge will only be assessed when a 'New
        Balance' exceeds the credit limit), no charge should have accrued. Further, the
28

                                        2

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

over limit charges, in reality, are a form of interest[1] and, as such, are unconscionably high.

In paragraph 26 of the complaint, Santos alleges that Household routinely "imposed unconscionable and/or unwarranted over limit fees."

On May 2, 2003, Santos moved to remand. Household opposed the motion and filed their own, requesting that the Court enforce the arbitration provision in the contract.

## A.    MOTION TO REMAND

### 1.    Legal Standard

A plaintiff may challenge removal by a motion to remand. *See* 28 U.S.C. § 1447. The party invoking the federal court's removal jurisdiction bears the burden of establishing federal jurisdiction. *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988) ("The burden of establishing federal jurisdiction is upon the party seeking removal . . . ."). Courts strictly construe the removal statute against removal jurisdiction. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). Any doubt about the propriety of removal is resolved in favor of remand. *Id.*

Here, removal is premised upon federal question jurisdiction, 28 U.S.C. § 1441(b): "Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties."

### 2.    Analysis

#### a.    Complete Preemption

The Supreme Court recently clarified when removal is proper under the complete preemption doctrine: "When the federal statute completely pre-empts the state-law cause of action, *a claim which comes within the scope of that [federal] cause of action*, even if pleaded in terms of state law, is in reality based on federal law. This claim is then removable under 28 U.S.C. § 1441(b), which

---

[1] 12 C.F.R. § 7.4001(a), which is promulgated under 12 U.S.C. § 85, defines what the term "interest" may mean under § 85. Section 7.4001(a) reads as follows:

The term "interest" as used in 12 U.S.C. 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: . . . overlimit fees.

3

1 | authorizes any claim that 'arises under' federal law to be removed to federal court." *Beneficial*
2 | *National Bank v. Anderson*, 123 S. Ct. 2058, 2063 (2003) (emphasis added).

3 |     In *Beneficial*, the Supreme Court held that an action filed in a state court to recover damages
4 | from a national bank for allegedly charging excessive interest in violation of both "the common law
5 | usury doctrine" and an Alabama usury statute should be removed to a federal court because it
6 | actually arises under federal law—the National Bank Act. 123 S. Ct. at 2060. The *Beneficial* Court
7 | found that the National Bank Act, specifically sections 85-86,[2] provided the exclusive cause of action
8 | for usury claims against national banks. *Id.* at 2064. Thus, there was "no such thing as a state law
9 | claim of usury against a national bank." 123 S. Ct. at 2064.

10 |     In this case, the dispositive question is whether 12 U.S.C. §§ 85-86 provide "the exclusive
11 | cause of action" against national banks for any of Santos' claims. *See Lippitt*, 340 F.3d 1033 at *21.
12 | If so, the cause of action necessarily arises under federal law and the case is removable. If not, her
13 | complaint does not arise under federal law and is not removable. *Id.*

14 |         **b.**    **Plaintiff's Complaint**

15 |     On its face, Santos's complaint raises six state causes of action seeking to enforce California
16 | consumer protection statutes. In Santos' reply memorandum in support of her motion to remand
17 | ("Remand Mot. Reply") Santos states that she "is not seeking to enforce liabilities or duties created
18 | by the National Bank Act [in its regulation of usury]. Rather, she is seeking to enforce California
19 | consumer statutes. In doing so, plaintiff's Complaint focuses on defendants' behavior relative to
20 | advertising, over limit charges and contractual relations. Not one of the causes of action is
21 | dependent upon a finding of usury." Remand Mot. Reply at 3.

22 |     However, Santos stated at oral argument that one of her contentions was that the $29 over
23 | limit fee was unconscionable because it was a flat rate fee that was too high and bore no proportional
24 | relationship to the costs encountered by the credit card company in dealing with over limit situations.
25 |
26 |
27 |    [2] Section 85 regulates the rates of interest national banks can "take, receive, reserve, and charge
28 | on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt." Section 86 creates a cause of action for "usurious" transactions, defined as "the receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section [12 USC § 85]."

<div align="left">United States District Court<br>For the Northern District of California</div>

1  Santos' statements at oral argument helped to clarify the complaint. Paragraph 12 alleges
2  that the over limit charges are "a form of interest" and "unconscionably high." Remand Opp. at 2.
3  At oral argument Santos reiterated her argument that the over limit fees are too high. Santos also
4  cleared up ambiguity regarding Paragraph 26, which states that "defendants routinely imposed
5  unconscionable and/or unwarranted over limit fees." By "unconscionable and/or unwarranted,"
6  Santos means both 1) that the *amount* of the over limit fee is unconscionable and 2) that charging an
7  over limit fee when the account is not over limit is unconscionable.

8  The above demonstrates that Santos is directly asserting a usury cause of action. The
9  National Banking Act provides "the exclusive cause of action" against national banks for this type of
10  claim. *Beneficial*, 123 S. Ct. at 2064. Thus, the cause of action necessarily arises under federal law
11  and the case is removable. *See Lippitt*, 340 F.3d 1033 at *21.

12  **B.    MOTION COMPEL ARBITRATION**

13  **1.    Legal Standard**

14  Section 4 of the Federal Arbitration Act ("FAA") permits "a party aggrieved by the alleged
15  failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to]
16  petition any United States District Court . . . for an order directing that . . . arbitration proceed in the
17  manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has
18  failed to comply with a valid arbitration agreement, the court must issue an order compelling
19  arbitration. *Cohen v. Wedbush, Noble Cooke, Inc.*, 841 F.2d 282, 285 (9th Cir. 1988).

20  In determining whether to issue an order compelling arbitration, the court may not review the
21  merits of the dispute, but must limit its inquiry into (1) whether the contract containing the
22  arbitration agreement evidences a transaction involving interstate commerce, (2) whether there exists
23  a valid agreement to arbitrate, and (3) whether the dispute(s) fall within the scope of the agreement to
24  arbitrate. *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 477-78 (9th Cir. 1991). If the
25  answer to each of these queries is affirmative, then the court must order the parties to arbitration in
26  accordance with the terms of their agreement. 9 U.S.C. § 4.

27  **2.    Analysis**

28  Santos' sole contention is that the contract itself is unconscionable and therefore raises the

5

1    issue, under prong two of the *Standard Fruit* test, of whether there exists a valid agreement to

2    arbitrate. She advances two-part argument. First, she claims that the contract is procedurally

3    unconscionable because the agreement is an adhesion contract. Second, she contends that the

4    contract is substantively unconscionable because (1) the agreement attempts to ban class actions and

5    (2) the agreement requires that any award be kept confidential. Plaintiffs' Opposition to Defendant's

6    Motion to Compel Arbitration ("Opp. to Mot. to Compel") at 3.

7            While the FAA establishes a strong public policy favoring arbitration for the purposes of

8    avoiding unnecessary expense and delay of litigation, the United States Supreme Court has

9    interpreted Section 2 of the FAA to mean that "states may regulate contracts, including arbitration

10   clauses" if a contract is found to be unconscionable. *Allied-Bruce Terminix Cos. v. Dobson*, 513

11   U.S. 265, 281 (1995). Nevada law[3] will not enforce contracts, including arbitration clauses, that are

12   unconscionable, *see Burch v. Second Judicial District Court*, 49 P.3d 647, 649 (Nev. 2002), and

13   requires that both procedural and substantive unconscionability be present in order for a court to

14   exercise its discretion to refuse to enforce a contract on unconscionability grounds. *Id.* at 650.

15           **a.      Procedural Unconscionability**

16           Under Nevada law, adhesion contracts[4] are not procedurally unenforceable per se. *Mallin v.*

17   *Farmers Insurance Exchange*, 108 Nev. 788, 808 (Nev. 1992).[5] Rather, to determine whether an

18   agreement is procedurally unconscionable, a court must evaluate how the parties negotiated the

19   contract and the circumstances of the parties at that time. *Circuit City Stores, Inc. v. Mantor*, 335

20   F.3d 1101, 1106 (9th Cir. 2003) (interpreting Nevada law). Courts must consider the following to

21

22

23   [3]The contract at issue here has a choice of law provision stating that the agreement will be governed by federal law and the laws of the state of Nevada. Santos "accepts the choice of law provision . . . ." Opp. to Mot. to Compel at 2.

24

25   [4]An adhesion contract is a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it. *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003).

26

27   [5] In *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003), the Ninth Circuit held that adhesion contracts are by definition procedurally unconscionable. However, the *Ting* court was referring to California legislative intent when it held that an adhesion contract is procedurally unconscionable. *See*

28   *Ting*, 319 F.3d at 1148. As noted earlier, Santos has accepted that Nevada law governs for the purposes of this motion. Opp. to Mot. to Compel at 2.

United States District Court
For the Northern District of California

determine whether a contract is procedurally unconscionable: (1) whether the contract is oppressive and (2) whether the contract contains surprise. *Id.*

A court can find that the contract is oppressive when there is an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice. *Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1106 (9th Cir. 2003). For example, in *Burch v. Second Judicial District Court*, 49 P.3d 647, 650 (Nev. 2002), the court found that the contract was oppressive because the Burches were not sophisticated consumers and the disclaimers in the contract were not conspicuous. The court reasoned that the Burches did not understand the terms of the contract because they did not have the opportunity to read the entire contract and thus did not have a meaningful choice to decide if they wanted to agree to the terms in the contract, including the arbitration clause. *Id.*

Unlike in *Burch*, here Santos offers no evidence to demonstrate that the arbitration clause in the contract is oppressive. Household mailed Santos a Cardmember Agreement and Disclosure Statement establishing the terms of the contract now in dispute. Santos accepted the terms of the agreement by using the card for purchases and/or advances. (Jimenez Decl. at 1). Thus, unlike in *Burch*, Santos appears to have had ample time to look over the contract and decide whether she should enter into it. Therefore, this was not an oppressive contract.

Another factor courts look to in determining whether a contract is procedurally unconscionable is surprise, defined as the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms. *Circuit City Stores, Inc.*, 335 F.3d at 1106.[6] Here, unlike in *Burch*, the language regarding arbitration was conspicuous as the text was in capital letters, making this provision stand out.[7] Therefore, because this contract is not oppressive and does not contain surprise, the Court finds that

---

[6] Santos does not discuss the issue of surprise in her Opposition.

[7] The following portion of the arbitration provision is highlighted in capital letters: "The parties acknowledge that they had a right to litigate claims through a court before a judge or jury, but will not have that right if either party elects arbitration. The parties hereby knowingly and voluntarily waive their rights to litigate such claims in a court before a judge or jury upon election of arbitration by either party." (*See*, Cardmember Agreement and Disclosure Statement).

7

United States District Court
For the Northern District of California

1  the contract is not procedurally unconscionable.

2  **b.    Substantive Unconscionability**

3  Nevada law requires that both procedural and substantive unconscionability must be present

4  in order for a court to exercise its discretion to refuse to enforce a contract as unconscionable.

5  *Burch,* 49 P.3d at 650. As noted above, Santos has not demonstrated procedural unconscionability.

6  However, even assuming that she could make this showing, she would still need to demonstrate

7  substantive unconscionability. As explained below, this she cannot do.

8  Santos claims that two provisions in the agreement render the contract substantively

9  unconscionable—the confidentiality provision and the provision prohibiting class actions.

10  **1.    Confidentiality Provision**

11

12  Santos contends that the agreement is substantively unconscionable because it requires that

13  the results of any arbitration must be kept confidential. In *Ting,* the court held that confidentiality

14  provisions usually favor companies over individuals because plaintiffs are unable to mitigate the

15  advantages inherent in being a repeat player. *Ting v. AT&T,* 319 F.3d 1126, 1152 (9th Cir. 2003).

16  Thus the court in *Ting* was concerned with the fact that the unavailability of arbitral decisions would

17  have the effect of preventing potential plaintiffs from obtaining the information needed to build a

18  case of intentional misconduct or unlawful discrimination against AT&T, and therefore held that

19  confidentiality provisions compel a finding of substantive unconscionability. *Id.*

20  Unlike in *Ting,* however, here Household has agreed to waive the confidentiality provision in

21  light of Santos' objection to it. Household's Reply in Support of Motion to Compel Arbitration

22  ("Reply to Motion to Compel") at 5. This eliminates the *Ting* court's concern that potential

23  plaintiffs would not be able to obtain confidential information to build a case against the stronger

24  party—here, Household. Thus, because the waiver addresses the concerns of the *Ting* court, Santos

25  has not established substantive unconscionability.

26  **2.    Provision Prohibiting Class Actions**

27

28  Santos also contends that an agreement attempting to ban class actions is substantively

8

1   unconscionable since a credit card company is not going to bring a class action against its customers

2   and thus such an agreement is manifestly one-sided. Opp. to Mot. to Compel at 4. Santos relies on

3   *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094 (2002), a California case, and *Ting v. AT&T*, 319

4   F.3d 1126 (9th Cir. 2003), in which the Ninth Circuit construed California law, for this proposition.

5   However, cases construing Nevada law (which governs this case) have never made such a finding,

6   and the weight of authority is to the contrary.[8] *See, e.g., Edelist v. MBNA America Bank*, 790 A.2d

7   1249, 1260-61 (Del. 2001); *Gras v. Associates First Capital Corp.*, 786 A.2d 886, 893 (N.J. 2001);

8   *Hutcherson v. Sears Roebuck & Co.*, 793 N.E.2d 886, 896 (Ill. 2003); *Pyburn v. Bill Heard*

9   *Chevrolet*, 63 S.W.3d 351, 365 (Tenn. 2001). *See also Snowden v. Checkpoint Check Cashing*, 290

10  F.3d 631, 638-39 (4th Cir. 2002); *Metro East Center for Conditioning and Health v. Quest*

11  *Communications, Inc.*, 294 F.3d 924, 927 (7th Cir. 2002); *Randolph v. Green Tree Financial Corp.*,

12  244 F.3d 814, 817 (11th Cir. 2001); *Johnson v. West Suburban Bank*, 225 F.3d 366, 369 (3rd Cir.

13  2000).

14      Santos therefore fails to establish that the contract is substantively unconscionable. Because

15  Santos has not shown that the contract at issue is procedurally or substantively unconscionable, the

16  arbitration clause therein is enforceable.

17  <center>**CONCLUSION**</center>

18      For the reasons stated above, the Court **DENIES** Santos' motion to remand and **GRANTS**

19  Household's motion to compel arbitration. The proceedings in this Court are hereby stayed pending

20  such arbitration.

21      **IT IS SO ORDERED.**

22

23  Dated: October 24 2003

    MARTIN J. JENKINS
    UNITED STATES DISTRICT JUDGE

24

25

26

27

28      [8] The Court notes that even in California the subject is unresolved. The issue is currently pending before the California Supreme Court.

<div style="writing-mode: vertical">**United States District Court** For the Northern District of California</div>

<center>9</center>

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-4469-CIV-HUCK/BROWN



VIVIAN BUFFINGTON, individually and
on behalf of all other similarly situated,

       Plaintiff,

vs.

HOUSEHOLD BANK (Nevada), N.A.,
a Nevada corporation,

       Defendant.

_____/



## ORDER GRANTING MOTION TO STAY
## PROCEEDINGS AND TO COMPEL ARBITRATION

    This case is before the Court on Defendant, Household Bank (Nevada), N.A.'s ("Household Bank") Motion To Stay Proceedings and Compel Arbitration ("Motion"). Household Bank seeks to require the Plaintiff, Vivian Buffington, to arbitrate her claims against it pursuant to an amendment in the parties' Cardmember Agreement adopting an arbitration clause. Buffington counters that the arbitration agreement is unenforceable as a matter of federal law, that Buffington has not knowingly waived her right to a jury trial, that Household Bank has not established that the amendment to the Cardholder Agreement containing the arbitration clause was sent to Buffington and others, that there is no mutually of assent to the amendment, that the amendment may not be applied retroactively, that the arbitration agreement is procedurally and substantively unconciounable, and that the three available arbitral bodies are structurally biased and economically unfeasible. For the reasons discussed below, Household Bank's Motion is GRANTED.



1

## Background

Buffington, individually and on behalf of a putative class, has sued Household Bank for damages resulting from its alleged excessive finance charges, late fees and other penalties charged. Buffington claims that these fees are in violation of their Cardmember Agreements, and in violation of certain regulatory requirements, including the Federal Truth In Lending Act ("TILA"). In summary, Buffington claims that Household Bank improperly concealed the actual costs of the credit charged under the Cardholder Agreement. The members of the putative class are Household cardholders subject to the terms of the standard Cardholder Agreement, which the cardholders sign upon opening their accounts. The Cardmember Agreement provides that it is governed by federal law and Nevada state law. The agreement includes a "Change of Terms" provision allowing amendments to its terms and conditions. Nevada law allows such provisions.

Household Bank amended its standard Cardmember Agreement to include an arbitration clause in its newly issued cards. In addition, on or about February, 2000, Household Bank sent to its existing cardholders a written notice entitled "NOTICE OF CHANGE IN TERMS - IMPORTANT INFORMATION" which amended the existing agreements by adopting, effective April 1, 2000, an arbitration of claims agreement. The arbitration agreement provides:

> ARBITRATION
> You agree any claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise, constitution; statute; common law; or equity and whether pre-existing, present or future), including initial claims, counter-claims, cross-claims and third party claims, arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire agreement ("Claim"), shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the applicable rules of procedures of the arbitration administrator selected at the time the Claim is filed.

2

* * *

THE PARTIES ACKNOWLEDGE THAT THEY HAD A RIGHT
TO LITIGATE CLAIMS THROUGH A COURT BEFORE A
JUDGE OR JURY, BUT WILL NOT HAVE THAT RIGHT IF
EITHER PARTY ELECTS ARBITRATION. THE PARTIES
HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THEIR
RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT BEFORE
A JUDGE OR JURY UPON ELECTION OF ARBITRATION BY
EITHER PARTY.

Upon receipt of this notice, Buffington and the putative class members had the option of continuing or terminating their Cardmember Agreements. They opted to continue using their cards pursuant to the terms of the amended Cardmember Agreements.

### Discussion

Under the Federal Arbitration Act ("FAA"), arbitration agreements are enforceable in federal courts if two prerequisites are present: 1) the arbitration agreement conforms to general principles of contract law and 2) an absence of a federal principle which precludes the enforcement of the arbitration agreement. The Court finds that the Cardmember Agreement was properly amended to incorporate the arbitration clause, and it is enforceable under applicable Nevada principles of contract law. The Court also finds that there is no federal principle which precludes the enforcement of Household Bank's properly implemented arbitration agreement.

In opposing Household Bank's Motion on the basis that the arbitration agreement was unenforceable under federal law principles, Buffington relied primarily on *Baron v. Best Buy Co., Inc.*, Case No. 99-1297-CIV-KING, United States District Court, Southern District of Florida ("*Baron I*"). In fact, in her opposition memorandum Buffington observed that *Baron I* held unenforceable an "arbitration clause virtually identical to Household's in a TILA class action" (Opposition p. 1). In that observation, Buffington was correct. Her reliance on *Baron I* was, at that time, justifiable. However, soon after Buffington filed her memorandum, the Eleventh Circuit Court

3

of Appeals reversed *Baron I*. *Baron v. Best Buy Co.*, No. 99-14028 (11th Cir. June 1, 2001) ("*Baron II*"). The Eleventh Circuit held that an arbitration clause contained in a credit card agreement, which submitted TILA claims to arbitration before the National Arbitration Forum, was enforceable. In so holding, the Eleventh Circuit rejected the very arguments asserted by Buffington here. This Court is bound to follow *Baron II* and rejects Buffington's various arguments claiming that the subject arbitration agreement is unenforceable by virtue of federal law principles. The Court also notes that recently, in a well reasoned decision, the District Court for the Central District of California rejected most of the same arguments raised by Buffington here and compelled arbitration pursuant to this identical Cardmember Agreement arbitration clause. *Stuart v. Household Retail Serv., Inc., S.A. CV,* 99-987AHS (Dec. 14, 2000).

*Baron II* and *Stuart* are consistent with the pro-arbitration policy enunciated by the FAA and federal decisions. In the context of another TILA case, the Supreme Court recently reaffirmed the "liberal federal policy favoring arbitration agreements" as reflected in the FAA and again "rejected generalized attacks on arbitration that rest on 'suspicion of arbitration' as a method of weakening the protections afforded in the substantive law to would-be complainants," including TILA protection. *Green Tree Financial Corp. - Alabama v. Randolph*, 531 U.S. 79, 89-90 (2000).

Buffington also maintains that she and the putative class did not knowingly waive their right to a jury trial, and that they are not bound by what she describes as a unilateral modification of the agreement, which lacks mutuality of assent. Buffington further contends that, even if the arbitration claim were properly incorporated into the agreement, that clause is unenforceable.[1] However, the

---

[1] As previously noted, *Baron II* rejected most of Buffington's enforceablity arguments raised here. In another recent decision, the Eleventh Circuit held that an agreement to arbitrate claims, including TILA claims, is enforceable even if enforcement may preclude plaintiff from maintaining a class action. *Randolph v. Green Tree Financial Corp. - Alabama*, 244 F.3d 814 (2001).

4

record before the Court establishes to the Court's satisfaction that Household Bank sent the NOTICE OF CHANGE IN TERMS to Buffington and the putative class members, which notice adequately informed them of the arbitration clause amendment and that they consented to the amendment by continuing to use their credit cards pursuant to the amended terms of the Cardmember Agreement.

Finally, the Court rejects Buffington's contention that the proposed arbitral bodies are structurally biased and economically unfeasible. The Cardholder Agreement gives the party initiating arbitration the right to select one of three arbitral organizations, the National Arbitration Forum ("NAF"), the American Arbitration Association ("AAA") and JAMS. Buffington has the burden of establishing that each of these organizations are biased and so uneconomical as to deny her a fair forum for determining her claims. See *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79 (2000); *Baron II*. Buffington does not, in any respect, challenge the adequacy of JAMS. In addition, *Baron II* found that the plaintiff there, in a TILA context, failed to demonstrate an arbitral bias or other disqualification of NAF. In doing so, the Eleventh Circuit took into account the Supreme Court's emphasis of the " 'liberal federal policy favoring arbitration agreements' embodied in the FAA." *Baron II*. The Court considers Buffington's generalized attack on all three arbitral associations to fly in the face of that federal policy favoring arbitration, which of necessity relies on arbitration forum such as the NAF, AAA and JAMS.

Finally, the Court has reviewed the rules and fee schedules of the NAF and AAA, submitted by Buffington, and finds that they do not reflect a bias or expense which would deny Buffington an adequate forum in which to resolve her dispute with Household Bank. For example, the NAF not only sets forth a reasonable fee schedule, but provides that those fees may be awarded to the prevailing party, and permit waiver of fees for indigent litigants.

5

## Conclusion

The Court finds that Buffington and the putative class's Cardmember Agreement were properly amended, under applicable Nevada law, to include an arbitration clause which, if invoked, requires the parties to submit the claims asserted here to binding arbitration. The arbitration clause is enforceable under Nevada law. The Court further finds that there is no federal principle which precludes the enforcement of the parties' arbitration agreement. Therefore, it is

ORDERED that Household Bank's Motion to Stay Proceedings and Compel Arbitration [DE # 13-1 & 13-2] is GRANTED. The parties shall submit the claims in this case to arbitration in accordance with their agreement to arbitrate these claims and this case is stayed pending the completion of arbitration.

The Clerk of the Court is directed to mark this case CLOSED and DENY all pending motions as MOOT. This administrative action does not affect the substantive rights of the parties. Should further proceedings become appropriate in this Court, the parties may move to re-open the case.

DONE AND ORDERED in Chambers, Miami, Florida, August 17, 2001.

Paul C. Huck
United States District Judge

Copies furnished to:
Tod Aronovitz, Esq.
Lloyd R. Schwed, Esq.
Christopher R. Lipsett, Esq.

6

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-4470-CIV-HUCK/BROWN



.LED by _____ D.C.

AUG 1 7 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

DOMINICA GARCIA, individually and
on behalf of all other similarly situated,

    Plaintiff,

vs.

HOUSEHOLD BANK (SB), N.A.,
a Nevada corporation,

    Defendant.

_____/



CLOSED CIVIL CASE

## ORDER GRANTING MOTION TO STAY
## PROCEEDINGS AND TO COMPEL ARBITRATION

    This case is before the Court on Defendant, Household Bank (SB), N.A.'s ("Household

Bank") Motion To Stay Proceedings and Compel Arbitration ("Motion"). Household Bank seeks

to require the Plaintiff, Dominica Garcia, to arbitrate her claims against it pursuant to an amendment

in the parties' Cardmember Agreement adopting an arbitration clause. Garcia counters that the

arbitration agreement is unenforceable as a matter of federal law, that Garcia has not knowingly

waived her right to a jury trial, that there is no mutually of assent to the amendment, that the

arbitration agreement is unconscionable and thus unenforceable, and that the three available arbitral

bodies are structurally biased and economically unfeasible. For the reasons discussed below,

Household Bank's Motion is GRANTED.



## Background

Garcia, individually and on behalf of a putative class, has sued Household Bank for damages resulting from its alleged excessive finance charges, late fees and other penalties charged. Garcia claims that these fees are in violation of their Cardmember Agreements, and in violation of certain regulatory requirements, including the Federal Truth In Lending Act ("TILA"). In summary, Garcia claims that Household Bank improperly concealed the actual costs of the credit charged under the Cardholder Agreement. The members of the putative class are Household Bank cardholders subject to the terms of the standard Cardholder Agreement, which the cardholders sign upon opening their accounts. Garcia opened an account with Household Bank by signing a credit card application in April of 2000, in which she agreed to be bound by the terms of the Cardholder Agreement. The Cardholder Agreement contains an arbitration provision, which provides:

> ARBITRATION
> Any claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise) arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire agreement ("Claim"), shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the Code of Procedure of the National Arbitration Forum in effect at the time the Claim is filed.
>
> * * *
>
> THE PARTIES ACKNOWLEDGE THAT THEY HAD A RIGHT TO LITIGATE CLAIMS THROUGH A COURT, BUT THAT THEY AGREE TO HAVE AN ELECTION TO RESOLVE ANY CLAIMS THROUGH ARBITRATION, AND THAT THEY HEREBY WAIVE THEIR RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT BEFORE A JUDGE OR JURY UPON ELECTION OF ARBITRATION BY EITHER PARTY.

Garcia received another copy of the Cardholder Agreement a short time later with her permanent credit card, which she opted to use pursuant to the terms of the Cardmember Agreement.

### Discussion

Under the Federal Arbitration Act ("FAA"), arbitration agreements are enforceable in federal courts if two prerequisites are present: 1) the arbitration agreement conforms to general principles of contract law and 2) an absence of a federal principle which precludes the enforcement of the arbitration agreement. The Court finds that Garcia knowingly and voluntarily waived her right to a jury trail when she entered into the Cardmember Agreement, and it is enforceable under applicable principles of contract law. The Court also finds that there is no federal principle which precludes the enforcement of the arbitration agreement.

In opposing Household Bank's Motion on the basis that the arbitration agreement was unenforceable under federal law principles, Garcia relied primarily on *Baron v. Best Buy Co., Inc.*, Case No. 99-1297-CIV-KING, United States District Court, Southern District of Florida ("*Baron I*"). In fact, in her opposition memorandum Garcia observed that *Baron I* held unenforceable an "arbitration clause virtually identical to Household's in a TILA class action" (Opposition p. 1). In that observation, Garcia was correct. Her reliance on *Baron I* was, at that time, justifiable. However, soon after Garcia filed her memorandum, the Eleventh Circuit Court of Appeals reversed *Baron I. Baron v. Best Buy Co.*, No. 99-14028 (11th Cir. June 1, 2001) ("*Baron II*"). The Eleventh Circuit held that an arbitration clause contained in a credit card agreement, which submitted TILA claims to arbitration before the National Arbitration Forum, was enforceable. In so holding, the Eleventh Circuit rejected the very arguments asserted by Garica here. This Court is bound to follow *Baron II* and rejects Garcia's various arguments claiming that the subject arbitration agreement is unenforceable by virtue of federal law principles. The Court also notes that recently, in a well reasoned decision, the District Court for the Central District of California rejected most of the same arguments raised by Garcia here and compelled arbitration pursuant to this identical Cardmember

3

Agreement arbitration clause. *Stuart v. Household Retail Serv., Inc., S.A. CV,* 99-987AHS (Dec. 14, 2000).

*Baron II* and *Stuart* are consistent with the pro-arbitration policy enunciated by the FAA and federal decisions. In the context of another TILA case, the Supreme Court recently reaffirmed the "liberal federal policy favoring arbitration agreements" as reflected in the FAA and again "rejected generalized attacks on arbitration that rest on 'suspicion of arbitration' as a method of weakening the protections afforded in the substantive law to would-be complainants," including TILA protection. *Green Tree Financial Corp. - Alabama v. Randolph,* 531 U.S. 79, 89-90 (2000).

Garcia maintains that she and the putative class did not knowingly waive their right to a jury trial, and that they are not bound by what she describes as a unilateral modification of the agreement, which lacks mutuality of assent. Garcia further contends that, even if the arbitration claim were properly incorporated into the agreement, that clause is unenforceable.[1] However, the record before the Court establishes to the Court's satisfaction that Cardmember Agreement adequately informed Garcia and the putative class members of the arbitration clause, and that they consented to the this term by signing the agreement and using their credit cards pursuant its terms.

Finally, the Court rejects Garcia's contention that the proposed arbitral bodies are structurally biased and economically unfeasible. The Cardholder Agreement gives the party initiating arbitration the right to select one of three arbitral organizations, the National Arbitration Forum ("NAF"), the American Arbitration Association ("AAA") and JAMS. Garcia has the burden of establishing that each of these organizations are biased and so uneconomical as to deny her a fair forum for

---

[1] As previously noted, *Baron II* rejected most of Garcia's enforceablity arguments raised here. In another recent decision, the Eleventh Circuit held that an agreement to arbitrate claims, including TILA claims, is enforceable even if enforcement may preclude plaintiff from maintaining a class action. *Randolph v. Green Tree Financial Corp. - Alabama,* 244 F.3d 814 (2001).

4

determining her claims. See *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79 (2000); *Baron II.* Garcia does not, in any respect, challenge the adequacy of JAMS. In addition, *Baron II* found that the plaintiff there, in a TILA context, failed to demonstrate an arbitral bias or other disqualification of NAF. In doing so, the Eleventh Circuit took into account the Supreme Court's emphasis of the " 'liberal federal policy favoring arbitration agreements' embodied in the FAA." *Baron II.* The Court considers Garcia's generalized attack on all three arbitral associations to fly in the face of that federal policy favoring arbitration, which of necessity relies on arbitration forum such as the NAF, AAA and JAMS.

Finally, the Court has reviewed the rules and fee schedules of the NAF and AAA, submitted by Garcia, and finds that they do not reflect a bias or expense which would deny Garcia an adequate forum in which to resolve her dispute with Household Bank. For example, the NAF not only sets forth a reasonable fee schedule, but provides that those fees may be awarded to the prevailing party, and permit waiver of fees for indigent litigants.

### Conclusion

The Court finds that Garcia and the putative class members are bound by the Cardmember Agreement, which requires the parties to submit the claims asserted here to binding arbitration, and that the arbitration clause is enforceable. The Court further finds that there is no federal principle which precludes the enforcement of the parties' arbitration agreement. Therefore, it is

ORDERED that Household Bank's Motion to Stay Proceedings and Compel Arbitration [DE # 12-1 & 12-2] is GRANTED. The parties shall submit the claims in this case to arbitration in accordance with their agreement to arbitrate these claims and this case is stayed pending the completion of arbitration.

The Clerk of the Court is directed to mark this case CLOSED and DENY all pending motions as MOOT. This administrative action does not affect the substantive rights of the parties. Should further proceedings become appropriate in this Court, the parties may move to re-open the case.

DONE AND ORDERED in Chambers, Miami, Florida, August _17th_, 2001.

Paul C. Huck
United States District Judge

Copies furnished to:
Tod Aronovitz, Esq.
Lloyd R. Schwed, Esq.
Christopher R. Lipsett, Esq.

6

# Exhibit 4



Priority
Send
Clsd
Enter
JS-5/JS-6
JS-2/JS-3



# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| RICHARD STUART, et al., ) | SA CV 99-987 AHS (EEx) |
| Plaintiffs, ) | |
| ) | ORDER GRANTING DEFENDANTS' |
| v. ) | MOTION TO COMPEL ARBITRATION |
| ) | AND TO STAY ACTION |
| HOUSEHOLD RETAIL SERVS., INC., ) | |
| et al., ) | |
| Defendants. ) | |
| ) | |

**THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d).**

## I.

### SUMMARY

For the reasons set forth below, the Court hereby grants defendants' motion to compel arbitration and stays this action pending arbitration. This disposition is based on the Court's careful consideration of the parties' submissions, the Court's independent research, and recent Supreme Court jurisprudence.

Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 2, 1999, plaintiffs filed their class-action Complaint seeking injunctive relief and damages under seven



1    causes of action: (1) violation of the federal Truth in Lending
2    Act ("TILA"); (2) violation of the California Legal Remedies Act
3    ("CLRA"); (3) commission of unlawful business acts and practices
4    under California Business and Professions Code §§ 17200, et seq.;
5    (4) commission of unfair and fraudulent business acts and
6    practices under California Business and Professions Code §§
7    17200, et seq.; (5) untrue and misleading advertising in
8    violation of California Business and Professions Code §§ 17500,
9    et seq.; (6) fraud and deceit; and (7) money had and received.

10          The gravamen of the Complaint is that defendants
11   utilized misleading sales tactics to conceal the true cost of
12   credit extended to the plaintiffs for the purchase of certain
13   water purification systems.  (Compl. ¶¶ 1-2.)

14          On December 6, 1999, defendants filed a motion to
15   compel arbitration and to stay these proceedings.  On December
16   13, 1999, plaintiffs filed their opposition papers.  On January
17   3, 2000, defendants filed their reply brief.  Upon stipulation of
18   the parties, the Court continued the hearing on defendants'
19   motion to February 14, 2000.  On February 10, 2000, plaintiffs
20   filed a motion for leave to file a notice of recent authority.
21   The Court granted plaintiffs' motion, accepted plaintiffs'
22   supplemental authority, and continued the hearing on defendants'
23   motion to March 27, 2000.  By minute-order issued March 23, 2000,
24   the Court further continued the hearing on the defendants' motion
25   to May 8, 2000.  On April 5, 2000, plaintiffs filed a motion for
26   leave to file a notice of change of status of recent authority,
27   and on May 2, 2000, defendants filed a notice of lodging of
28   recent authorities.

1          Having found defendants' motion to compel arbitration

2   to be suitable for disposition without oral argument, the Court

3   took defendants' motion under submission on May 4, 2000, pursuant

4   to Local Rule 7.11 and Fed. R. Civ. P. 78.  Finding plaintiffs'

5   motion regarding the status of recent authority to be unopposed,

6   the Court granted plaintiffs' motion by the same minute order

7                       III.

8               **THE PARTIES' POSITIONS**

9        **A.**   **Bases of Defendants' Motion to Compel Arbitration**

10         In support of their motion, defendants point, <u>inter</u>

11  <u>alia</u>, to a modification to the plaintiffs' credit card agreement,

12  which modification defendants unilaterally implemented in March

13  1999.[1]  The modification provides that:

14             any claim, dispute or controversy (whether in
               contract, tort, or otherwise) arising from or

15             relating to this Agreement . . . including
               the validity or enforceability of this

16             arbitration clause or any part thereof . . .
               shall be resolved, upon the election of you

17             or us, by binding arbitration pursuant to
               this arbitration provision and the Code of

18             Procedure of the National Arbitration Forum.

19  (Hampton Decl. 12/6/99, Ex. 13 ¶ 18.)

20         Defendants argue that they effected this unilateral

21  modification of the contract pursuant to a "change of terms"

22  provision contained in the original credit card agreement to

23  which the plaintiffs clearly gave actual assent.  That change-of-

24  terms provision states:  "We may, at any time and subject to

25

26        [1]  For purposes of this analysis, the Court assumes

27  that the March 1999 arbitration clause is the only arbitration
    provision relevant to this motion.  In view of the disposition

28  herein, the Court need not address the effect, if any, of earlier
    arbitration clauses.

                       3

1 applicable law: . . . (c) change any other terms and conditions

2 of this Agreement relating to your account by mailing written

3 notice to you in accordance with applicable law." (Hampton Decl.

4 12/6/99, Exs. 5, 8, 11 -- ¶ 13.)

5       The original credit card agreement also provided that

6 the "applicable law" would be the law of Nevada. (See Hampton

7 Decl. 12/6/99, Exs. 5, 8, 11 -- ¶ 28.) Under Nevada law, the

8 issuer of a credit card: "may unilaterally change any term or

9 condition for the use of a credit card without prior notice to

10 the cardholder unless the change will adversely affect or

11 increase the costs to the cardholder for the use of the card."

12 Nev. Rev. Stat. § 97A.140(4) (1998).

13       Defendants argue that because the March 1999

14 arbitration clause represents a binding contract under Nevada

15 law, and because plaintiffs' claims fall squarely within its

16 terms, the arbitration clause must be enforced pursuant to

17 Section 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2,

18 notwithstanding any state law or policy disfavoring arbitration

19 Moreover, although defendants recognize that there are federal

20 exceptions to the rule of enforcement under the FAA (e.g., where

21 the claims asserted are non-arbitrable), defendants argue that

22 none of those exceptions apply in this case.

23       **B.    Plaintiffs' Opposition to Defendants' Motion**

24       Plaintiffs' opposition papers identify what they

25 contend to be four fatal weaknesses in the legal underpinnings of

26 defendants' motion. First, plaintiffs argue that although

27 California law actually governs the question whether the

28 arbitration clause in this case constitutes an enforceable

1 | contract, even under Nevada law, the clause is unenforceable
2 | under general contract principles for at least two reasons: (1)
3 | the clause could not have been implemented pursuant to the
4 | "change of terms" provision of the original credit card agreement
5 | because an agreement to arbitrate is a collateral matter -- not a
6 | term that "relates to the plaintiffs' accounts;" and (2) the
7 | unilaterally-imposed arbitration clause does not fall within the
8 | scope of Nevada Revised Statute § 97A.140(4) since an agreement
9 | to arbitrate is not a "condition for the use of a credit card."

10 | Second, plaintiffs argue that the general rule of
11 | enforcement under the FAA does not apply in this case because the
12 | National Arbitration Forum ("NAF") represents an inadequate forum
13 | for the assertion of the plaintiffs' statutory rights. In this
14 | regard, plaintiffs contend that the procedures utilized by the
15 | NAF would unduly chill the assertion of TILA rights by exposing
16 | the plaintiffs to excessive uncertainty regarding the possibility
17 | of high arbitration fees and the possibility of not recovering
18 | those fees even if plaintiffs were to prevail on the merits.

19 | Third, plaintiffs contend that the arbitration clause
20 | at issue is invalid because it would require each party to bear
21 | its own attorney's fees -- thereby depriving plaintiffs of an
22 | important statutory right under TILA and the CLRA to recover
23 | their legal fees if plaintiffs are found to be the prevailing
24 | parties.

25 | Fourth, plaintiffs argue that the arbitration clause is
26 | unenforceable at least with regard to plaintiffs' demands for
27 | public injunctive relief. According to plaintiffs, claims for
28 | such relief are non-arbitrable, inter alia, because arbitrators

5

1  do not have the proper authority to monitor the on-going
2  necessity of such injunctions in relation to the interests of the
3  public at large.

4                                IV.

5                            DISCUSSION

6      A.   Framework under the FAA

7          Under the FAA, written arbitration contracts relating
8  to activities in interstate commerce are enforceable as a matter
9  of federal law unless one or more of the claims at issue are non-
10 arbitrable pursuant to federal standards.  See Moses H. Cone Mem.
11 Hosp. v. Mercury Constr., 460 U.S. 1, 24-35, 103 S. Ct. 927, 74
12 L. Ed. 2d 765 (1983).  Accordingly, two inquiries are required in
13 order to determine whether enforcement of the arbitration clause
14 at issue here should ensue.  First, the Court must determine
15 whether the clause formed a binding agreement under general
16 principles of the applicable state contract law.  Second, if the
17 clause constitutes such a contract, the Court must determine
18 whether some federal rule of non-arbitrability precludes
19 enforcement of the clause as to one or more of plaintiffs'
20 claims.

21         As discussed below, the Court concludes that the 1999
22 arbitration clause is binding under the relevant contract law and
23 that the claims asserted in the Complaint are fully arbitrable.
24 Accordingly, defendants' motion to compel arbitration and to stay
25 this action should be granted.

26 //
27 //
28 //

1
2
3

4
5
6
7
8
9
10
11
12
13

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    The 1999 arbitration clause is binding under applicable contract law.**

**1.    Applicable Law**

In cases such as this, where pendent state-law claims are asserted in conjunction with a federal claim, the district court should follow the choice-of-law rules of the forum state. See <u>Paracor Fin. v. General Elec. Capital Corp.</u>, 96 F.3d 1151, 1165 n.17 (9th Cir. 1996). On the issue of the enforcement of contractual arbitration clauses, California has adopted the choice-of-law methodology set forth in the Restatement (Second) Conflicts of Laws ("Second Restatement"). See <u>Nedlloyd Lines B.V. v. Superior Court</u>, 3 Cal. 4th 459, 464-65, 11 Cal. Rptr. 2d 330 (1992).

Under Section 187(1) of the Second Restatement, a court should enforce a contractual choice-of-law provision if the relevant rule of law from the chosen jurisdiction is a provision that the parties could expressly have contracted for under the law of the forum state. Here, the relevant rule of Nevada law which the defendants seek to apply in this case is the rule set forth in Nevada Revised Statutes § 97A.140(4), which allows credit card companies to implement certain unilateral changes to terms "relating to" their account agreements with customers Plaintiffs present no authority that California would preclude the parties from expressly agreeing to a unilateral right of modification in either of the parties, and the Court is aware of no such rule. Thus, the Court concludes that the rule set forth at Section 97A.140(4) is one that the parties expressly could have bargained for. Accordingly, the parties' agreement to apply

1  that rule via a general incorporation of Nevada law should not be
2  disturbed.

3             **2.    The 1999 arbitration clause is binding under**
4                       **Nevada law.**

5         Having construed the change-of-terms provision of the
6  parties' original credit card agreement according to its plain
7  (and expansive) terms, the Court concludes that the change-of-
8  terms provision authorizes the unilateral implementation of
9  arbitration clauses like that adopted in March 1999.  Such
10  arbitration clauses clearly represent a term or condition
11  "relating to the plaintiffs' accounts."  Thus, the 1999
12  arbitration clause could, subject to applicable state law, be
13  added to the parties' agreement at the defendants' sole
14  discretion, pursuant to the express contract for which the
15  parties bargained.

16         In addition, under the terms of the 1999 arbitration
17  agreement, the clause is a term "for the use of a credit card"
18  within the scope of the broad language of Nevada Revised Statute
19  § 97A.140(4).  Accordingly, the 1999 arbitration clause could be
20  unilaterally implemented by the defendants, consistent with the
21  applicable Nevada law.

22         In view of the statutory and contract construction
23  stated above, the Court concludes that the 1999 arbitration
24  agreement represents a binding contract under the relevant state
25  law.  Accordingly, the arbitration clause is entitled to
26  enforcement under the FAA unless the plaintiffs' claims in this
27  case are non-arbitrable under federal law.  However, as discussed
28  below, the Court finds no federal-law impediment to the

1  arbitration of any of plaintiffs' causes of action.

2          C.    **The National Arbitration Forum is not inadequate**

3               **for the vindication of plaintiffs' TILA claims.**

4          Plaintiffs argue that the instant case fits within one

5  of the well-recognized exceptions to the FAA's enforcement rule,

6  insofar as the NAF does not provide an adequate forum for the

7  vindication of their statutory rights under TILA.  Relying

8  primarily on the authority of Randolph v. Green Tree Fin. Corp.,

9  178 F.3d 1149 (11th Cir. 1999), cert. granted, 120 S. Ct. 1552

10  (2000) (affirmed in part and reversed in part, 2000 WL 1803919

11  (December 11, 2000)), plaintiffs argue that the procedures

12  utilized by the NAF leave parties such as themselves exposed to

13  excessive uncertainty regarding the fees that might be required

14  for them to assert their TILA claims in the arbitral forum, and

15  that because the NAF procedures would have an undue chilling

16  effect on the assertion of TILA claims, the NAF does not provide

17  an adequate forum.  In addition, plaintiffs contend that the NAF

18  fees could, in fact, be onerous.  In further support of their

19  argument, plaintiffs cite Patterson v. ITT Consumer Fin. Corp.,

20  14 Cal. App. 4th 1659 (1993), in which an NAF arbitration clause

21  was found to be unconscionable under California contract law

22  because it was found to hinder ordinary consumers in the

23  assertion of their rights.

24          For purposes of the present analysis, even assuming

25  that the "chill" theory articulated in the Randolph Circuit

26  opinion remains viable as a cognizable basis upon which an

27  arbitral forum may be found to be inadequate as a matter of

28  federal law, the Court nevertheless concludes that the NAF

1 arbitration provision at issue here is properly distinguishable
2 from that held to be invalid by the Eleventh Circuit in <u>Randolph</u>
3 (and subsequently reversed by the Supreme Court).  Unlike the
4 provision in <u>Randolph</u> (which provided no details regarding which
5 arbitral organization would be used, what set of procedures would
6 be employed, or what sorts of fees would be assessed), the 1999
7 arbitration clause specifies that the rules of the NAF shall
8 apply.  Those rules, in turn, set specific guidelines on the fees
9 that may be charged to the litigants, and they provide that such
10 fees may be awarded to the prevailing party.  (Defs.' Appen. of
11 Auth., Ex. 7 at 35-36, 42-48.)  Furthermore, NAF procedures also
12 permit indigent litigants to request a fee waiver.  (<u>See id.</u> at
13 43.)  Thus the degree of uncertainty[2] that gave rise to the
14 disputed arbitration clause in <u>Randolph</u> is not present here, and
15 there is no showing that the NAF is an inadequate forum for the
16 assertion of TILA claims pursuant to federal standards of
17 arbitrability.

18      The Court recognizes that the plaintiffs may incur
19 substantial arbitration fees to which there would be no analogous
20 charges in a court of law.  Moreover, in some contexts, those
21 potential costs have been found to make NAF arbitration clauses
22 unconscionable under California contract law (which, as discussed
23 earlier, is not applicable here).  <u>See</u> <u>Patterson</u>, 14 Cal. App.
24 4th at 1659.  Nevertheless, it is well-settled that even
25 substantial arbitration costs do not, <u>ex ante</u>, render an arbitral
26

27
28          [2] "The "risk" that Randolph will be saddled with
prohibitive costs is too speculative to justify the invalidation
of an arbitration agreement." 2000 WL 1803919, *7 (U.S.)

1  forum inadequate, given the availability of judicial review of
2  unreasonable conduct in which an arbitrator actually engages.
3  See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170
4  F.3d 1, 16 (1st Cir. 1999).  Moreover, other courts have enforced
5  NAF arbitration clauses without questioning the adequacy of the
6  NAF forum under federal standards.  See, e.g., Sagal v. First USA
7  Bank, N.A., 69 F. Supp. 627 (D. Del. 1999); DiCrisci v. Lyndon
8  Guaranty Bank, 807 F. Supp. 947 (W.D.N.Y. 1992).  In view of the
9  foregoing considerations, and in light of the strong national
10 policy favoring arbitration, the Court concludes that the NAF is
11 not an inadequate forum under federal arbitrability standards.

12         D.    The 1999 arbitration agreement's provision
13               requiring the parties to bear their own attorney
14               fees is severable and therefore does not preclude
15               enforcement.

16         Plaintiffs argue that where, as under TILA and the
17 CLRA, a consumer is given a statutory right to recover his
18 attorney's fees if he succeeds on the merits, that right may not
19 be sacrificed via the enforcement of an arbitration clause such
20 as the one at issue here.  For this proposition, plaintiffs cite
21 Graham Oil Co. v. Arco Prods. Co., 43 F.3d 1244 (9th Cir. 1995),
22 an opinion construing the effect of the attorney's-fees provision
23 of the Petroleum Marketing Practices Act, 15 U.S.C § 2801, et
24 seq.

25         The Court need not decide whether the attorney-fee
26 provision of the 1999 arbitration agreement is invalid under the
27 rule of Graham Oil because the Court concludes that, unlike the
28 analogous provision in Graham Oil, the attorney-fee provision at

11

1  issue here is severable from the rest of the arbitration
2  agreement.  The original credit card agreement between the
3  parties contains an express severabilty clause that provides:
4  "if any provision of this Agreement is finally determined to be
5  void or unenforceable under any law, rule, or regulation, all
6  other provisions will remain valid and enforceable."  (Hampton
7  Decl. 12/6/99, Exs. 5, 8, 11 -- ¶ 30.)  In addition, it does not
8  appear that the attorney-fee provision of the 1999 arbitration
9  agreement is "so interwoven with" all the other terms of that
10 agreement that the arbitration clause "must stand or fall as an
11 entirety."  National Labor Relations Board v. Southern Cal. Pipe
12 Trades, 449 F.2d 668, 673 (9th Cir. 1971).  When considered in
13 conjunction with the strong congressional policy favoring
14 arbitration, the foregoing points suggest that while the
15 attorney-fee provision in the 1999 arbitration clause may prove
16 unenforceable, on the whole, "[a]rbitration is a favored
17 procedure, and we should favor it here."  Graham, 43 F.3d at 1251
18 (Fernandez, J. dissenting).

19      E.    Plaintiffs' prayer for injunctive relief is not
20            inconsistent with arbitration.

21     Plaintiffs argue that, even if some of their claims are
22 subject to arbitration, their claims for injunctive relief are
23 not.  To support this proposition, plaintiffs rely on the
24 respected authority of Broughton v. Cigna Healthplans, 21 Cal.
25 4th 1066, 90 Cal. Rptr. 2d 334 (1999).  In Broughton, the
26 California Supreme Court concluded that, pursuant to federal
27 arbitrability norms, the FAA does not require enforcement of
28 arbitration agreements with respect to claims for injunctive

relief asserted in the public interest. According to the
_Broughton_ court, this is because there is an "inherent conflict"
between arbitration of such claims and the underlying policy of
retaining judicial oversight over such injunctions. _See_ _id._ at
1082-83.

The _Broughton_ court itself recognized, however, that
"the capacity to withdraw statutory rights from the scope of
arbitration agreements is the prerogative solely of Congress, not
state courts or legislatures." _Id._ at 1083 (citing _Southland_
_Corp. v. Keating_, 465 U.S. 1 (1984)). The United States Supreme
Court has found that Congress did not exercise this prerogative
even in the context of, e.g., antitrust claims, where a
plaintiff's pursuit of a treble damages award is recognized as
advancing public purposes that extend beyond the plaintiff's own
need for compensation. _See_ _Mitsubishi Motors Corp. v. Soler_
_Chrysler-Plymouth, Inc._, 473 U.S. 614, 105 S. Ct. 3346, 87 L. Ed.
2d 444 (1985). Under the FAA, "the party opposing arbitration
carries the burden of showing that . . . a waiver of judicial
remedies inherently conflicts with the underlying purposes of
[some] other statute." _Rodriguez de Quijas v. Shearson/American_
_Express, Inc._, 490 U.S. 477, 483, 109 S. Ct. 1917, 104 L. Ed. 2d
526 (1989). Based on the arguments and authorities presented
here, the Court parts company with _Broughton_ and concludes that
plaintiffs have not carried their burden of showing that
injunctive relief in the public interest is inherently
inconsistent with private arbitration.
//
//

1                                    v.

2                                **CONCLUSION**

3          Accordingly, and for the foregoing reasons, the Court

4    concludes that the 1999 arbitration clause at issue in this

5    motion must be enforced under the FAA.  Defendants' motion to

6    compel arbitration is hereby granted.  This action is stayed

7    pending arbitration before the National Arbitration Forum.

8               IT IS SO ORDERED.

9               IT IS FURTHER ORDERED that the Clerk shall serve a copy

10   of this Order on counsel for all parties.

11          Dated:  December _14_, 2000.

12

13                              _____

14                              ALICEMARIE H. STOTLER
                                UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28   G \DOCS\AHSCOMMO\msq\orders\Stuart-HHold-Arbit wpd

# Exhibit 5

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANNE KATHERINE FRERICHS,
on behalf of herself and all others
similarly situated,

          Plaintiffs,

      v.

CREDENTIAL SERVICES INTERNATIONAL,
a Delaware corporation, FIRST USA BANK,
INC., a Delaware corporation and EXPERIAN,
INC., a Delaware corporation,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 98 C 3684

Judge Joan B. Gottschall

DOCKETED

OCT 01 1999

## MEMORANDUM OPINION AND ORDER

Plaintiff Anne Frerichs brought this action against Credential Services International ("CSI"), First USA Bank, Inc. ("First USA"), and Experian, Inc. ("Experian") under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* First USA, relying on an arbitration clause in its credit card agreement with Frerichs, has filed a motion to stay this action and compel arbitration. For the reasons set forth below, the motion is granted as to defendant First USA and denied as to defendants CSI and Experian.

## BACKGROUND

Frerichs has a First USA credit card. Frerich's relationship with First USA is based on a Cardmember Agreement sent to First USA credit card holders. The Agreement gives First USA broad powers to amend the Agreement:

We can amend the terms of this Agreement at any time. We will notify you of what these amendments are. Subject to the requirements of applicable law, any amendment to this Agreement will become effective at the time stated in our notice to you . . . .

Another provision of the Agreement stated that "THIS AGREEMENT AND YOUR ACCOUNT WILL BE GOVERNED BY THE LAW OF THE STATE OF DELAWARE AND, AS APPLICABLE, FEDERAL LAW." Other than this choice of law provision, the Agreement contained no terms relating to the resolution of disputes. In particular, prior to the amendment discussed below, the Agreement did not contain a provision requiring arbitration of disputes.

At some point, First USA mailed to Frerichs a form entitled "Important Notice for First USA Bank Credit Card Customers About Changes to Your First USA Cardmember Agreement." The Notice included a "Summary of Change," which contained the following language: "A provision providing that any disputes between you and First USA are to be resolved by arbitration is being added to your First USA Cardmember Agreement."

In a section entitled "Effective Date/Non-Acceptance Instructions," the Notice provided that

> The change in terms summarized above will become effective January 1, 1998. The new terms will apply to current and future balances in both active accounts and accounts that no longer have charge privileges. If you do not wish to accept the new terms, you must notify us in writing of your decision by December 30, 1997. . . . Giving us this notice will constitute your election to cancel your charge privileges (if not previously canceled), but you may pay off any outstanding unpaid balance of your Account under your prior terms.

The text of the amendment provided, in part:

> ARBITRATION: Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to the Agreement or your Account, including Claims

2

regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration . . . .

The Notice also contained the following language:

IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

The Agreement also contained the following provision regarding "Credit Information":

You agree that we may request consumer credit reports from one or more credit reporting agencies in connection with your application and the administration of your Account. You also authorize us to exchange credit information concerning you or your Account with (and answer questions and requests from) others, such as merchants and credit reporting agencies.

In her complaint, Frerichs charges that, pursuant to a contract between First USA and CSI, First USA provided CSI with lists of First USA's customers and their credit card account numbers for CSI's solicitation and direct marketing programs. Frerichs alleges that CSI uses the information in these lists to obtain a credit report from Experian on each consumer and that CSI obtains the credit reports without the explicit written instructions of each consumer. Frerichs claims that CSI then mails each consumer on its First USA list the consumer's credit report along with a brochure and letter explaining CSI's credit report and credit monitoring membership program, of which the consumer has automatically become a member. Frerichs asserts that without the consent of the consumer, CSI automatically charges each consumer $49.00 to their First USA credit card account for CSI's membership program.

Frerichs charges that CSI and First USA violated the FCRA by using consumer reports for an unauthorized purpose and that Experian violated the FCRA by furnishing consumer

3

reports to CSI for an unauthorized purpose. In a March 30, 1999 order, this court denied motions to dismiss by defendants CSI and Experian. The only motion before this court is First USA's motion to stay and compel arbitration.

## DISCUSSION

First USA seeks an order, pursuant to §§ 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, staying the present action and compelling arbitration of Frerichs' claims. "The Act's centerpiece provision makes a written agreement to arbitrate 'in any maritime transaction or a contract evidencing a transaction involving commerce . . . valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Mitsubishi Motors Corp. V. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting 9 U.S.C. § 2).

> The "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hosp. V. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983), manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Id.*, at 25 n.32.

*Id.*

Frerichs argues that she should not be compelled to submit this dispute to arbitration because her claim does not fall within the scope of the arbitration clause. In addition, Frerichs argues that even if her claim is within the scope of the arbitration clause, the clause should not be enforced because (1) the amendment including the arbitration clause was not a valid modification of the Agreement; (2) the arbitration clause lacks mutuality; (3) the arbitration clause fails to

4

inform cardholders that they are giving up important rights; and/or (4) the arbitration clause violates public policy.

1. **Is Frerichs' claim covered by the arbitration clause?**

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Mitsubishi*, 473 U.S. at 626 (quotations omitted).

The arbitration clause at issue here is broadly worded. It requires arbitration of "[a]ny claim, dispute or controversy . . . arising from or relating in any way to the Agreement or your Account." Indeed, the arbitration clause even requires arbitration of "Claims regarding the applicability of this arbitration clause."

Frerichs argues that her claim does not arise from or relate to the Cardholder Agreement or her account. She asserts that her claim is premised on a violation of the FCRA and is not based on a breach of her agreement with First USA. She contends that "whether [she] has an agreement with First USA is irrelevant," noting that her claim is not based on the provision in the Agreement allowing First USA to obtain her credit report and share information.

In a general sense, Frerichs is correct that her claim does not depend on the existence of the Agreement. The FCRA makes in unlawful for "any person" to use or obtain a credit report for an unauthorized purpose. 15 U.S.C. 1681b(f). There is no requirement that the "person" be a creditor or be part of a creditor/consumer relationship.

However, examination of the allegations in Frerichs' complaint shows that there is at the very least a strong probability that Frerichs' claim arises from or relates to the Agreement or her

5

account. Frerichs alleges that First USA provided CSI with lists of First USA's customers and their credit card account numbers and that CSI uses this information to obtain credit reports on the First USA customers. (Compl. ¶¶ 10-11.) She later alleges that "First USA used the class members' credit reports obtained by CSI to receive commissions from CSI and to solicit First USA customers to become a member of CSI's program." (Compl. ¶ 51.) First USA's alleged provision of Frerichs' name and account number (and the name and account numbers of others) is central to the scheme outlined in Frerichs' complaint and is at least arguably related to Frerichs' account.

In light of the presumption in favor of arbitration and the broadly worded arbitration clause at issue here, this court finds that Frerichs' claim falls within the scope of the arbitration clause, or at the very least, that it is "susceptible of an interpretation that covers the asserted dispute." *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 (7th Cir. 1995) (quotations omitted) (compelling arbitration of ADEA claim under clause requiring arbitration of claims related to breach of employment agreement). Moreover, even if this court were inclined to find that the present dispute is beyond the scope of the arbitration clause, the provision requiring arbitration of disputes concerning the applicability of the arbitration clause would obligate this court to refer to arbitration questions regarding the scope of the arbitration clause. *See Stiles v. Home Cable Concepts, Inc.*, 994 F. Supp. 1410, 1414-15 (M.D. Ala. 1998) (discussing whether arbitration of disputes regarding arbitrability is required).

## 2.    Is the Arbitration Clause Enforceable?

"In determining whether a valid arbitration agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts." *Gibson v.*

6

*Neighborhood Health Clinics*, 121 F.3d 1126, 1130 (7th Cir. 1997). Here, the applicable state law is Delaware law.

Frerichs argues that even if her claim is within the scope of the arbitration clause, the arbitration clause should not be enforced. She supplies several different justifications for not enforcing the arbitration clause.

### A. Was the Modification Valid?

Frerichs first argues that the amendment adding the arbitration clause was not a valid modification of the Agreement. She contends that a valid modification of a contract must meet the formation requirements of a contract — offer, acceptance and consideration. She claims that she had no knowledge of First USA's proposed modification and that she did not knowingly accept the proposed modification.

Frerichs contends that she had no knowledge of the amendment adding the arbitration clause. Although Frerichs does not deny that she received the Notice informing her of the arbitration clause, she argues that the Notice was inadequate. Frerichs complains that the Notice appears to have been "stuffed amongst other solicitations that [are] routinely included with First USA's monthly statements to its customers." She argues that First USA did not put her on notice that she should "read through every piece of literature in her monthly statements to look for possible modifications," noting that the provision granting First USA the power to amend the Agreement does not specify how First USA will notify cardholders of amendments.

The problem with Frerichs' argument is that the original Agreement contained a provision granting First USA broad power to amend the Agreement. The Agreement gave First USA the right to "amend the terms of this Agreement at any time" and informed Frerichs that

7

First USA "will notify you of what these amendments are." Frerichs thus was on notice that First USA had the right to amend the Agreement and that if First USA sought to amend the Agreement she would be notified. *See Grasso v. First USA Bank*, 713 A.2d 304, 311 (Del. Sup. Ct. 1998) (upholding amendment increasing interest rate where credit card agreement authorized bank to amend terms and conditions). While the Agreement did not specify that amendments would be included in cardholders' monthly statements, it did state that First USA "will send statements and any other notices to you at the address shown in our files."

The Agreement and Delaware law required First USA to notify cardholders of amendments to the Agreement. *See Grasso*, 713 A.2d at 309 (citing 5 Del. C. § 952). Implicit in the obligation to provide notice is a requirement that the notice be reasonably effective in informing the cardholder of the amendment. Certainly the notice of the amendment was not optimal. It appears that the notice was included in Frerichs' monthly statement along with various solicitations. Separate written notice would undoubtedly be more effective in informing cardholders of amendments to the Agreement.

While the notice could have been more effective, the court cannot find that it was so inadequate as to render the amendment unenforceable. Delaware expressly permits a bank to amend a credit card agreement, provided the bank supplies the cardholder with notice. In *Grasso*, the court upheld an amendment to a credit card agreement where notice of the amendment was included in the monthly statements of the cardholders, despite the plaintiff's claim that she did not remember receiving notification of the amendment. 713 A.2d at 309-10. Frerichs was on notice from the Agreement that First USA could amend the Agreement, and she could reasonably be expected to examine written materials sent by First USA.

8

Frerichs also contends that she did not knowingly accept the amendment containing the arbitration clause. She claims that, under the circumstances here, her silence should not be deemed acceptance.

In *Fineman v. Citicorp USA, Inc.*, 485 N.E.2d 591 (Ill. App. Ct. 1985), the court rejected plaintiffs' claim that they never accepted a proposed modification in their credit card agreement. The plaintiffs argued that their silence should not be construed as acceptance, but the court disagreed, noting that "the credit agreement included the explicit provision that the agreement could be amended by defendants on 30-days' notice, and silence in response to the notice would constitute acceptance of the amendment." *Id.* at 595.

Here, as in *Fineman*, a provision in the Agreement gives the bank broad power to amend the Agreement. The provision stated that First USA "can amend the terms of this Agreement at any time" and that "any amendment to this Agreement will become effective at the time stated in our notice to you." The provision in *Fineman* explicitly noted that silence would be construed as acceptance, stating that "[i]f you do not agree to the changes, you must notify us in writing and return the card cut in half within 30 days and pay us the balance * * *. Otherwise we will understand that you agree to the changes in the notice." The provision here does not specifically state that silence will be construed as acceptance, but it is sufficient to put Frerichs on notice that First USA could amend her agreement without her explicit acceptance. Moreover the Notice containing the amendment with the arbitration clause explicitly stated that "[i]f you do not wish to accept the new terms, you must notify us in writing of your decision by December 30, 1997."[1]

---

[1]Frerichs requests that if the court finds that her claims are within the scope of the arbitration clause, she be allowed to conduct discovery to determine whether the arbitration clause is valid. For the purposes of this motion, this court has presumed that the Notice was sent

9

After the present motion was fully briefed, a California appellate court decided *Badie v. Bank of America*, 67 Cal. App. 4th 779 (Cal. App. 1998). The court held that a bank could not amend the terms of account agreements by adding an arbitration clause, despite provisions in the account agreements authorizing the bank to change terms of the accounts. The court found that a party with a unilateral right to modify a contract is limited by the implied covenant of good faith and fair dealing to modifications "whose general subject matter was anticipated when the contract was entered into." *Id.* at 791. The court held that "the parties did not intend that the change in terms provision should allow the Bank to add completely new terms" such as the arbitration clause. *Id.* at 803.[2]

This court declines to follow *Badie*, as it is unlikely that Delaware courts would adopt the reasoning of the California court. As noted in *Grasso*, Delaware law specifically authorizes a bank to amend the terms of a credit agreement. *See Grasso*, 713 A.2d at 309-10. At the time the present action was filed, the Delaware statute provided that "(a) Unless the agreement governing a revolving credit plan otherwise provides, (i) a bank may at any time and from time to time amend the terms of such agreement in any respect . . . ." 5 Del. C. § 952. On April 9, 1999, this section was amended (likely in response to the *Badie* decision) to provide that

---

as a "bill-stuffer" and that Frerichs did not read the Notice. Frerichs does not explain how further development of the factual record will benefit her or this court. Her request is denied.

[2] While this court is sympathetic to the result reached in *Badie* as a matter of equity, it makes little sense to construe so narrowly a unilateral modification clause in the context of an agreement terminable at will by either party. In this court's opinion, the real problem in *Badie* and in the case at bar is ensuring adequate notice so the cardholder can terminate the Agreement if dissatisfied with the modification. There is, the court notes, no claim here that plaintiff detrimentally relied on the Agreement as it existed before the modification, such as by having to repay her balance on an expedited basis in order to terminate the agreement.

—

a bank may at any time and from time to time amend such agreement in any respect, whether or not the amendment or the subject of the amendment was originally contemplated by the parties or is integral to the relationship between the parties. Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to . . . arbitration or other alternative dispute resolution mechanisms, or other matters of any kind whatsoever.

\* \* \*

Any notice of an amendment sent by the bank may be included in the same envelope with a periodic statement or as part of the periodic statement or in other materials sent to the borrower.

Although the earlier version of § 952 was in effect at the time this lawsuit was filed, the earlier version was broadly worded, allowing a bank to amend the terms of an agreement "in any respect." This court believes that Delaware courts would construe this expansive language as permitting a bank to amend a credit agreement to include an arbitration clause.[3]

B.    **Does the Arbitration Clause Lack Mutuality?**

Frerichs argues that the arbitration clause is unenforceable because it binds only the cardholder. On its face, the arbitration clause appears to obligate both parties to arbitrate

---

[3]Several other courts that have decided the issue have upheld amendments imposing an arbitration clause. See *Stiles*, 994 F. Supp. at 1418; *Perry v. Beneficial Nat'l Bank*, No. CV97-218, 1998 WL 279174 (Macon Co., Ala. May 18, 1998); *Williams v. Direct Cable TV*, No. CV-97-009, 1997 WL 579156 (Henry Co., Ala. Aug. 13, 1997).

Moreover, there are sensible policy reasons for allowing amendments like the one at issue here. Like the agreement in *Grasso*, the agreement here provided that either party could terminate the agreement at any time. See 713 A.2d at 311. First USA could have terminated the agreements for all cardholders and then offered new agreements containing an arbitration clause. This would be a major inconvenience for First USA and the cardholders. Furthermore, there is no guarantee that cardholders would be more likely to notice the arbitration clause in a new contract as opposed to a supplemental notice. Indeed, it is possible that the notice at issue here is more likely to attract the attention of cardholders because it focuses on the change in terms. Allowing First USA to amend the agreements offers a more efficient solution, though it places the burden on cardholders to cancel the agreement if they do not wish to be bound by the arbitration clause.

11

disputes. However, Frerichs argues that the exceptions for certain types of claims render First USA's obligation illusory. The clause provides that

> Nothing in this agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owned [sic] by either party to the other under this agreement.

Frerichs contends that these exceptions relieve First USA from having to arbitrate the claims it is likely to have against cardholders. She claims that the one-sided nature of the clause makes it void for lack of mutuality. *See Lopez v. Plaza Fin. Co.*, No. 95-C-7567, 1996 WL 210073, at *3-4 (N.D. Ill. Apr. 25, 1996) (refusing to enforce arbitration agreement for lack of mutuality, relying on *Hull v. Norcom, Inc.*, 750 F.2d 1547, 1550 (11th Cir. 1985)).

"The doctrine of mutuality of obligation requires a contract to be based on an exchange of reciprocal promises." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179-80 (3rd Cir. 1999). However, "[m]odern contract law largely has dispensed with the requirement of reciprocal promises . . . provided that a contract is supported by sufficient consideration." *Id.* Delaware follows the modern trend: "A mutuality of obligation defense cannot be interposed where . . . the contract is supported by adequate consideration." *Simm Assoc. v. PNC Nat'l Bank*, No. 98C-02-219-WTQ, 1998 WL 961764, at *5 (Del. Super. Ct. Oct. 8, 1998); *see also Design Benefit Plans, Inc. v. Enright*, 940 F. Supp. 200, 204-06 (N.D. Ill. 1996) (disagreeing with *Lopez*, finding that mutuality of obligation not required if contract as a whole supported by consideration). While most courts have found that it is not necessary that parties to a contract bear reciprocal obligations to arbitrate claims, *see Harris*, 183 F.3d at 180-81, in a number of cases, courts have

pointed to mutual promises to arbitrate claims as consideration for arbitration clauses. *See, e.g.,* *Michalski v. Circuit City Stores, Inc.,* 177 F.3d 634, 636 (7th Cir. 1999).

First USA argues that its promise to arbitrate claims is consideration for Frerichs' promise to arbitrate. This court is skeptical of this argument. The arbitration clause obligates Frerichs to arbitrate her claims, but the exceptions noted above appear to permit First USA to avoid arbitrating the claims it is most likely to bring against cardholders such as Frerichs. *See* *Lopez,* 1996 WL 210073, at *5.

Nevertheless, this court need not decide the issue because the arbitration clause is supported by other consideration. The Agreement here could be terminated by either party at any time. In *Research & Trading Corp. v. Powell,* 468 A.2d 1301, 1304-05 (Del. Ch. 1983), an at-will employee was given the option of signing a restrictive covenant or losing his position. The court found that the employee's continued employment was sufficient consideration for the restrictive covenant. *Id.* at 1305. Similarly, First USA's continuing offer of credit to Frerichs was sufficient consideration for Frerichs' promise to submit claims to arbitration. *See Garber v. Harris Trust & Sav. Bank,* 432 N.E.2d 1309, 1315 (Ill. App. Ct. 1982) (finding that by extending credit on new terms, card issuers gave consideration for amendment to cardholder agreements).

### C.    Did First USA Provide Proper Notice?

Frerichs contends that the arbitration clause failed to inform cardholders that they were giving up important rights, including the right to a jury trial and the right to the protections of the Federal Rules of Civil Procedure. As noted above, the arbitration clause contained the following provision:

13

IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

No more is required. The Supreme Court has indicated that it is improper to impose higher standards on arbitration clauses than are imposed on other contract provisions. *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (finding that Montana statute requiring arbitration notice be typed in underlined capital letters on first page of contract impermissibly singled out arbitration clauses). First USA was not obligated to explain the ramifications of the arbitration provision. *See Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (9th Cir. 1988) (finding that defendant not required to explain "meaning and effect" of arbitration clause).

**D.    Does the Arbitration Clause Violate Public Policy?**

Frerichs argues that the arbitration clause should not be enforced because it is contrary to public policy. She contends that although Delaware favors arbitration agreements because they promote efficiency, arbitration should not be favored here because it is not the most efficient means for resolving the present dispute. As a general matter, Frerichs' argument has been rejected by Congress, when it passed the FAA, and by the Supreme Court, which has interpreted the FAA as establishing a federal policy favoring arbitration. However, because requiring arbitration of the type of consumer complaint that is at issue here may significantly impair plaintiff's rights, her contentions deserve further discussion.

14

Frerichs argues that the most efficient means of resolving the present dispute is through a class action lawsuit. She contends that it would be inefficient to force "thousands, possibly millions," of First USA cardholders to arbitrate their FCRA claims separately.

This court is sympathetic to Frerichs' argument. Consumer protection statutes may depend on class action lawsuits as a means of policing compliance with the law, particularly where the potential recovery for an individual plaintiff is small. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997). However, courts have compelled litigation of claims under consumer protection statutes such as the Truth in Lending Act ("TILA"), even though arbitration prevented the plaintiff from litigating his or her claim on behalf of a class.[4] *See Sagal v. First USA Bank*, Civ. Action No. 98-694-RRM, slip op. at 7-10 (D. Del. Aug. 30, 1999) (rejecting argument that arbitration clause is unenforceable as to TILA claims); *Lopez*, 1996 WL 210073, at *2-3 (finding TILA claims arbitrable in general). In general, statutory claims are subject to arbitration (if they are within the scope of the arbitration clause), unless Congress intended to "preclude a waiver of judicial remedies for the statutory rights at hand." *Shearson/Am. Express v. McMahon*, 482 U.S. 220, 227 (1987). Frerichs has not attempted to show that there is a "congressional command" to preclude arbitration of FCRA claims.

Frerichs also argues that the arbitration fees are much higher than federal court fees, making arbitration an unappealing forum for plaintiffs, especially when the financial stakes for any individual are small and the action could otherwise have been litigated as a class action. In

---

[4] Here, it appears that the applicable arbitration rules could permit other cardholders to join Frerichs' arbitration. *See* National Arbitration Forum, Rule 19 (allowing joinder, intervention and consolidation of claims in certain circumstances). While the NAF rules may allow class arbitration, this court lacks the power to order class arbitration. *Champ v. Segal Trading Co.*, 55 F.3d 269, 276-77 (7th Cir. 1995).

*Randolph v. Green Tree Fin. Corp.*, 178 F.3d 1149, 1157-58 (11th Cir. 1999), the Eleventh

Circuit refused to enforce an arbitration clause to compel arbitration of a plaintiff's TILA claim.

The court noted that "[w]hen an arbitration clause has provisions that defeat the remedial purpose

of [a] statute, . . . the arbitration clause is not enforceable." *Id.* at 1157 (quoting *Paladino v.*

*Avnet Computer Tech., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998); *see also Shankle v. B-G*

*Maintenance Management Co. Of Colo., Inc.*, 163 F.3d 1230, 1235 (10th Cir. 1999); *Cole v.*

*Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1485 (D.C. Cir. 1997). The court found that filing fees,

arbitrators' costs and other arbitration costs may "curtail or bar a plaintiff's access to the arbitral

forum." *Randolph*, 178 F.3d at 1158. If this court were located in the Eleventh Circuit, Frerichs

might have a tenable argument. The arbitration clause here does not provide for apportionment

of arbitration fees, though the arbitration rules do provide for a waiver of fees for indigent

parties. National Arbitration Forum, Rule 45. She has attached to her response brief a schedule

of the arbitration fees, though it is unclear at this stage how much Frerichs would have to pay to

pursue her claim in arbitration. She has not provided any information about her personal

circumstances that would establish that the costs of arbitration would prevent her from pursuing

her claim in arbitration.

Of course, this court is not in the Eleventh Circuit. In *Koveleskie v. SBC Capital*

*Markets, Inc.*, 167 F.3d 361, 366 (7th Cir. 1999), the Seventh Circuit rejected a plaintiff's

challenge to the arbitration procedures in the securities industry. The plaintiff brought a sex

discrimination claim against her former employer. In finding that the claim must be submitted to

arbitration, the court rejected the plaintiff's argument that "securities industry arbitrators

routinely fail to follow Title VII's fee-shifting principle by refusing to award statutory attorneys'

fees to prevailing plaintiffs and by charging plaintiffs expensive forum fees." *Id.* Although the Seventh Circuit indicated that it might be willing to review instances in which unreasonable fees were imposed on a plaintiff, *see id.,* this court does not believe, based upon the Seventh Circuit's forum selection clause jurisprudence, that the Seventh Circuit would follow the lead of the Eleventh Circuit and find arbitration clauses unenforceable unless they "provide the minimum guarantees required to ensure that [a plaintiff's] ability to vindicate her statutory rights will not be undone by steep filing fees, steep arbitrators' fees, or other high costs of litigation." *Randolph,* 178 F.3d at 1158.

Because Frerichs' claim against First USA is covered by the arbitration clause and Frerichs has not shown that the arbitration clause is unenforceable, the arbitration clause is valid and must be enforced as to Frerichs' claims against First USA.[5]

### 3.   Is Frerichs Required to Arbitrate Her Claims Against the Other Defendants?

First USA argues that Frerichs must also arbitrate her claims against CSI and Experian. The arbitration agreement provides that Frerichs must arbitrate claims against "the employees,

---

[5]Despite this result, the court is troubled by what has occurred here. Relying on a clause in the original agreement permitting it to make unilateral modifications in the cardholder agreement, First USA has imposed on Frerichs a broad arbitration clause, apparently through a "bill-stuffer" notice hardly calculated to ensure effective notice. Requiring arbitration of this kind of consumer dispute, where little money is at stake and pursuing the dispute is economically feasible only in a court with its low filing fees and only if the class action mechanism is available, may effectively insulate First USA from a large spectrum of consumer complaints. Nevertheless, while a right to make unilateral modifications invites one party to try to take advantage of the other, while the notice sent by First USA was predictably overlooked by Frerichs, and while it is distressing to observe the ability of a sophisticated party like First USA to protect itself from consumer protection statutes like FCRA, this court can find no basis in the caselaw or in the statute for invalidating this arbitration clause. The remedy for Frerichs and other consumers, if they have one, is with Congress.

17

agents or assigns" of First USA. Neither CSI nor Experian is the employee, agent or assign of First USA.

First USA also notes that a court should order arbitration of claims against a defendant, even if the defendant is not a party to the arbitration agreement, if the claims are intertwined with the facts surrounding the underlying contract which contains the arbitration clause. *See Roberson v. The Money Tree of Ala.*, 954 F. Supp. 1519, 1526-29 (M.D. Ala. 1997). Here, although Frerichs alleges that First USA was part of the scheme to obtain and use Frerichs' credit report for an improper purpose, the claims against CSI and Experian are distinct from the claim against First USA.

## CONCLUSION

First USA's motion to stay this action and compel arbitration [12] is granted as to the defendant First USA. The motion is denied as to defendants CSI and Experian.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED:  September 30 , 1999

18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **STEVEN S. GOLD, And All Others Similarly Situated,** | |
| **Plaintiffs,** | **Civil Action No. 04-CV-12409** |
| **v.** | |
| **DANIELS LAW OFFICES, P.C. and HOUSEHOLD BANK (SB), N.A.,** | |
| **Defendants.** | |

## DEFENDANT HOUSEHOLD BANK (SB), N.A.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY OF PROCEEDINGS IN FAVOR OF ARBITRATION

This is a consumer claim by plaintiff Steven S. Gold against his credit card issuer, Household Bank (SB), N.A. ("Household Bank"), and a law firm that sought to collect Gold's overdue credit card account. Gold's credit card agreement with Household Bank includes an arbitration provision. By this motion, Household Bank seeks an order staying his claim herein against the bank, and requiring Gold to proceed against the bank, if at all, by arbitration instead of litigation.[1]

### STATEMENT OF THE CASE

Plaintiff is delinquent on a credit card account issued by Household Bank. The account is governed by a written agreement, as is customary. By virtue of an amendment made to the

---

[1]     Household Bank is proceeding, on the same date as this motion, to institute an arbitration proceeding against Gold, seeking a declaratory judgment by the arbitrator that the individual claim that Gold seeks to advance against Household Bank in this action has no merit.

agreement in 2000, the agreement contains a broad arbitration provision of a type that is common in the credit card industry. The terms of the agreement are set forth in the accompanying Declaration of Jory V. Berdan ("Berdan Decl."), submitted herewith. The arbitration provision states in relevant part:

> [A]ny claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise; constitution; statute; common law; or equity and whether pre-existing, present or future), including initial claims, counter-claims, cross-claims and third party claims, arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire Agreement ("Claim"), shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the applicable rules or procedures of the arbitration administrator selected at the time the Claim is filed. The party initiating the arbitration proceeding shall have the right to select one of the following three arbitration administrators: the National Arbitration Forum ("NAF"), the American Arbitration Association ("AAA") or JAMS. . . .

> Any participatory arbitration hearing that you attend will take place in the city nearest to your residence where a federal district court is located or at such other location as agreed by the parties. On any Claim you file, you will pay the first $50 of the filing fee. At your request we will pay the remainder of the filing fee and any administrative or hearing fees charged by the arbitration administrator on any Claim submitted by you in arbitration up to a maximum of $1,500. If you are required to pay any additional fees to the arbitration administrator, we will consider a request by you to pay all or part of the additional fees; however, we shall not be obligated to pay any additional fees unless the arbitrator grants you an award. If the arbitrator grants an award in your favor, we will reimburse you for any additional fees paid or owed by you to the arbitration administrator up to the amount of the fees that would have been charged if the original Claim had been for the amount of the actual award in your favor. The parties shall bear the expense of their respective attorney's fees, except as otherwise provided by law. If a statute gives you the right to recover any of these fees, or the fees paid to the arbitration administrator, these statutory rights shall apply in the arbitration notwithstanding anything to the contrary contained herein. If the arbitrator issues an award in our favor you will not be required to reimburse us for any fees we have

2

previously paid to the arbitration administrator or for which we are responsible.

This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1 - 16 (the "FAA"). The arbitrator shall apply applicable substantive law consistent with the FAA and provide written reasoned findings of fact and conclusions of law. The arbitrator's award shall not be subject to appeal except as permitted by the FAA. The parties agree that the award shall be kept confidential. Judgment upon the award may be entered in any court having jurisdiction. . . .

No class actions or joinder or consolidation of any Claim with the claim of any other person are permitted in arbitration without the written consent of you and us.

THE PARTIES ACKNOWLEDGE THAT THEY HAD A RIGHT TO LITIGATE CLAIMS THROUGH A COURT BEFORE A JUDGE OR JURY BUT WILL NOT HAVE THAT RIGHT IF EITHER PARTY ELECTS ARBITRATION. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THEIR RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT BEFORE A JUDGE OR JURY UPON ELECTION OF ARBITRATION BY EITHER PARTY.

(Berdan Decl. Ex. B.)

Plaintiff filed his complaint herein on November 12, 2004. The complaint, filed as a putative class action, alleges that Household Bank violated the Massachusetts Consumer Protection Act by failing to transmit Plaintiff's supplementary account information when it transmitted Plaintiff's delinquent account to a third party debt collector. The complaint seeks statutory and actual damages, and attorneys' fees and costs. The complaint alleges certain other claims, including claims arising under Federal law, against co-defendant Daniels Law Offices, P.C.

There has been no substantive activity to date in the case: Neither Household Bank nor Daniels Law Offices, P.C., has answered.

## ARGUMENT

**I.    Plaintiff's Claim Is Subject to Binding Arbitration and Must Be Pursued On An Individual Basis Pursuant to the Parties' Arbitration Agreement.**

    A.    The FAA Requires Enforcement of the Parties' Arbitration Agreement.

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA embodies a "liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983); Large v. Conseco Fin. Servicing Corp., 292 F.3d 49, 52 (1st Cir. 2002) (quoting Green Tree Fin. Corp. - Ala. v. Randolph, 531 U.S. 79, 91 (2000), and Moses H. Cone, 460 U.S. at 24.)

Following this doctrine, the United States Supreme Court and other courts, including the First Circuit, routinely enforce arbitration provisions contained in standard form contracts in consumer credit agreements.[2] This Court has enforced a similar arbitration agreement in a consumer lending agreement of a Household Bank affiliate in the consumer credit context. See Mattox v. Decision One Mortgage Co., No. CIV.A. 01-10657-GAO, 2002 WL 31121087, at *1

---

[2]    See, e.g., Green Tree Fin. Corp. - Ala. v. Randolph, 531 U.S. 79, 89-90 (2000); Large v. Conseco Fin. Servicing Corp., 292 F.3d 49, 52 (1st Cir. 2002) (affirming district court's granting motion to compel arbitration in mortgage context); Thompson v. Irwin Home Equity Corp., 300 F.3d 88 (1st Cir. 2002) (affirming district court's granting motion to compel arbitration in mortgage context); Mattox v. Decision One Mortgage Co., No. CIV.A. 01-10657-GAO, 2002 WL 31121087, at *1 (D. Mass. Sept. 26, 2002) (granting motion to compel arbitration in mortgage context); Fluehmann v. Assocs. Fin. Servs., No. CIV.A. 01-40076-NMG, 2002 WL 500564, at *10 (D. Mass. Mar. 29, 2002) (granting motion to stay in favor of arbitration in mortgage context).

US1DOCS 4948585v1

(D. Mass. Sept. 26, 2002). Other federal district courts have likewise repeatedly enforced arbitration provisions in Household Bank credit card agreements in similar circumstances.[3]

This motion presents two questions: (1) whether the parties agreed to arbitrate and (2) whether the scope of that agreement encompasses Plaintiff's claims. See, e.g., Fluehmann v. Assocs. Fin. Servs., No. CIV.A. 01-40076-NMG, 2002 WL 500564, at *5-6 (D. Mass. Mar. 29, 2002). The answer to each question is "yes." The arbitration agreement is valid, and the arbitration agreement covers the claims alleged in the complaint.

B.     Plaintiff Entered Into A Valid and Enforceable Arbitration Agreement.

Plaintiff's account agreement includes an explicit and detailed arbitration provision, which was added pursuant to an amendment in 2000. The amendment was implemented in accordance with the change-in-terms provision of the agreement and Nevada law, which governs the agreement.[4] See Nev. Rev. Stat. 97A.140.4 (1995) ("An issuer may unilaterally change any term or condition for the use of a credit card."). See Berdan Decl. Ex. A.

Amendments to credit card accounts made in this way have been repeatedly enforced.[5] Other federal district courts have enforced arbitration agreements added to Household Bank

---

[3]     See Santos v. Household Int'l, Inc., No. C03-1243 (N.D. Cal. Oct. 24, 2003) (order denying plaintiff's motion for remand and granting defendants' motion to compel arbitration)); McIntyre v. Household Bank, 216 F. Supp. 2d 719 (N.D. Ill. 2002); Buffington v. Household Bank (Nevada), No. 00-4469-CIV (S.D. Fla. Aug. 17, 2001) (order granting motion to stay proceedings and compel arbitration); Garcia v. Household Bank (SB), No. 00-4470-CIV (S.D. Fla. Aug. 17, 2001) (same); Stuart v. Household Retail Servs., Inc., No. SA CV 99-987 (C.D. Cal. Dec. 14, 2000) (same). Copies of the unpublished orders in Santos, Buffington, Garcia and Stuart are attached as Exhibits 1 through 4.

[4]     Plaintiff's Agreement with Household provides that it shall be governed by federal law "and the laws of the state of Nevada." (Berdan Decl. Ex. A.)

[5]     See, e.g., Taylor v. First North American Nat'l Bank, 325 F. Supp. 2d. 1304 (M.D. Ala. 2004); Taylor v. Citibank USA, N.A., 292 F. Supp. 2d 1333 (M.D. 2003); Billups v. Bankfirst, 294 F. Supp. 2d 1265 (M.D. Ala. 2003); Bellavia v. First USA Bank, No. 02 C 3971, 2003 WL

credit card agreements pursuant to change-in-terms provisions. <u>Lawrence v. Household Bank (SB), N.A.</u>, 343 F. Supp. 2d 1101, 1110, 1115 (M.D. Ala. 2004); <u>Buffington v. Household Bank</u>, No. 00-4469-CIV, slip op. at 3 (S.D. Fla. Aug. 17, 2001) (Ex. 2); <u>Stuart v. Household Retail Servs., Inc.</u>, No. SA CV 99-987 (C.D. Cal. Dec. 14, 2000) (Ex. 4).

     C.    <u>Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement.</u>

In determining whether a particular arbitration provision encompasses a plaintiff's claims, a court must resolve any ambiguities concerning the scope of the arbitration agreement in favor of arbitration. <u>See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 626 (1985) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); <u>Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union, Local 791, AFL-CIO</u>, 321 F.3d 251, 254 (1st Cir. 2003) (quoting <u>Mitsubishi Motors</u>).

Plaintiff's claim against Household Bank falls squarely within the broad scope of the arbitration agreement, which expressly includes "any claim, dispute, or controversy . . . arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause." (Berdan Decl. Ex. B.) Federal

---

22425008 (N.D. Ill. Oct. 22, 2003); <u>Walton v. Experian</u>, No. 02 C 5067, 2003 WL 22110788 (N.D. Ill. Sept. 9, 2003); <u>Bank One v. Williams</u>, No. 301CV24DD, 2002 WL 1013161 (N.D. Miss. Apr. 29, 2002), <u>aff'd</u>, 61 Fed. Appx. 120 (5th Cir. 2003); <u>Vigil v. Sears Nat'l Bank</u>, 205 F. Supp. 2d 566 (E.D. La. 2002); <u>Beneficial Nat'l Bank v. Payton</u>, 214 F. Supp. 2d 679 (S.D. Miss. 2001); <u>Lloyd v. MBNA Am. Bank</u>, No. Civ.A. 00-109, 2001 WL 194300, at *4-5 (D. Del. Feb. 22, 2001), <u>aff'd</u>, No. 01-1752, 2002 WL 21932 (3d Cir. Jan. 7, 2002); <u>Bank One v. Coates</u>, 125 F. Supp. 2d 819, 831 (S.D. Miss. 2001), <u>aff'd</u>, 34 Fed. Appx. 964 (5th Cir. 2002); <u>Goetsch v. Shell Oil Co.</u>, 197 F.R.D. 574, 577 (W.D.N.C. 2000); <u>Herrington v. Union Planters Bank</u>, 113 F. Supp. 2d 1026, 1030 (S.D. Miss. 2000), <u>aff'd</u>, 265 F.3d 1059 (5th Cir. 2001); <u>Marsh v. First USA Bank</u>, 103 F. Supp. 2d 909, 915 (N.D. Tex. 2000); <u>Frerichs v. Credential Servs. Int'l</u>, No. 98C3684 (N.D. Ill. Sept. 30, 1999); <u>Sagal v. First USA Bank</u>, 69 F. Supp. 2d 627, 629-32 (D. Del. 1999), <u>aff'd</u>, 254 F.3d 1078 (3d Cir. 2001); <u>Stiles v. Home Cable Concepts, Inc.</u>, 994 F. Supp. 1410, 1414-15 (M.D. Ala. 1998). A copy of the unpublished order in <u>Frerichs</u> is attached as Exhibit 5.

courts, including district courts in this circuit, have held claims arbitrable under similarly broad language. See, e.g., Winterwood Farm, LLC v. JER, Inc., 327 F. Supp. 2d 34, 39 (D. Me. 2004).[6]

> D.    The Parties' Arbitration Agreement Requires Arbitration of Plaintiff's Claims On An Individual Basis.

The arbitration agreement expressly precludes either party from bringing claims in arbitration on a class-action basis, absent consent. See Berdan Decl., Ex. B ("No class actions or joinder or consolidation of any Claim with the claim of any other person are permitted in arbitration without the written consent of you and us."). Accordingly, although the complaint is styled as a putative class action, Plaintiff's claim against Household Bank will necessarily be arbitrated on an individual basis. This Court has held that courts must enforce arbitration agreements even if enforcement would preclude plaintiff from pursuing a class action. Mattox v. Decision One Mortgage Co., No. CIV.A. 01-10657-GAO, 2002 WL 31121087, at *2 (D. Mass. Sept. 26, 2002) ("[T]he unavailability in arbitration of procedural devices such as class action suits does not relieve a party of an obligation to arbitrate under a valid arbitration agreement.").[7]

---

[6]    See also, Keifer Specialty Flooring Inc, v. Tarkett, Inc., 174 F.3d 907, 909 (7th Cir. 1999) (arbitration provisions that apply to all claims "arising out of or relating to" the underlying agreement are "extremely broad and capable of an expansive reach"); Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 93 (4th Cir. 1996) (The "sweeping language" of such a broad arbitration provision "d[oes] not limit arbitration to the literal interpretation or performance of the contract, but embrace[s] every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute.") (emphasis in original) (internal brackets and quotation marks and citation omitted).

[7]    See also, Hogan v. Conseco Fin. Servicing Corp., No. Civ.A. 00-483-T, 2002 WL 32157517, at *3 (D.R.I. Mar. 18, 2002) (holding that plaintiff must arbitrate TILA claims notwithstanding plaintiff's argument that doing so would thwart the purpose of TILA by precluding class actions"); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 32 (1991) (holding that plaintiff must arbitrate ADEA claim on individual basis notwithstanding plaintiff's argument that "arbitration procedures cannot adequately further the purposes of the ADEA because they do not provide for . . . class actions"); EEOC v. Waffle House, Inc., 534 U.S. 279,

## II.    This Action Should Be Stayed Pending Arbitration.

Section 3 of the FAA provides that a court, upon determining that an action before it is subject to an enforceable arbitration provision, "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Accordingly, this Court should stay Plaintiff's claim against Household Bank pending such arbitration.

### CONCLUSION

Plaintiff's claims against Household Bank should be stayed in favor of arbitration.

Respectfully submitted,


Dated: January 31, 2005

        /s/Gabrielle R. Wolohojian
Gabrielle Wolohojian, BBO # 555704
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
(617) 526-5000

Christopher R. Lipsett
Shoshana L. Gillers
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800
(212) 230-8888

Attorneys for Defendant Household Bank (SB), N.A.

---

294 n.9 (2002) (holding that the FAA "confers . . . the right to obtain an order directing that arbitration proceed *in the manner provided for in [the parties'] agreement*") (internal quotations and citation omitted) (emphasis in original); Volt Info. Scis., Inc. v. Bd. of Trs. of Stanford Univ., 489 U.S. 468, 478 (1989) (holding that the FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms").

8

**Certificate of Service**

I, Gabrielle R. Wolohojian, hereby certify that I caused a true and accurate copy of the foregoing document to be served via the electronic docketing service on counsel for each other party this 31st day of January 2005.

__/s/Gabrielle R. Wolohojian_____
Gabrielle R. Wolohojian

9

# Exhibit 1

E-filing

# FILED

### OCT 2 4 2003

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

Evelyn Santos,

        Plaintiff,

  v.

Household International, Inc. *et al.*,

        Defendants.

No. C03-1243 MJJ

**ORDER DENYING PLAINTIFF'S MOTION FOR REMAND AND GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

### INTRODUCTION

Before the Court are two motions. The first, brought by Plaintiff Evelyn Santos ("Santos") seeks to remand this action to state court. Defendants Household Bank *et al.* (collectively, "Household") oppose Santos' motion on the grounds that her claims "arise under" federal law by virtue of the National Bank Act, 12 U.S.C. §§ 85-86, and the doctrine of complete preemption.

The second motion, brought by Household, seeks to compel arbitration of the parties' dispute and an order staying the proceedings in this action pending such arbitration. Santos opposes Household's motion on the grounds that the contract between Household and Santos, which contains the arbitration clause at issue, is unconscionable. For the reasons that follow, the Court DENIES Santos' motion for remand and GRANTS Household's motion to compel arbitration.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## FACTUAL BACKGROUND

In June 2000, Santos agreed to accept a MasterCard credit card from Household Bank with a $500 credit limit. While Santos does not remember having been presented with a statement containing an arbitration provision or signing an agreement, Household records show that Santos accepted the Cardmember Agreement and Disclosure Statement by using the card for purchases and/or advances. Declaration of Stephanie Jimenez in Support of Motion to Compel Arbitration and for Stay ("Jimenez Decl."), at 1.

The Cardmember Agreement and Disclosure Statement contains a choice of law provision stating that federal law and the laws of the state of Nevada will govern any contractual disagreements that arise between the parties. The agreement also states that if a party elects arbitration to resolve a dispute arising out of the contract then the right to litigate such a dispute before a judge will be waived. In addition, the agreement contains provisions prohibiting class actions and requiring that arbitration disputes be kept confidential.

On February 11, 2003, Santos filed a class action lawsuit in Contra Costa Superior Court challenging the allegedly "unfair, unlawful, and deceptive business practices of defendants Household Bank and Household Credit Services, Inc . . . in California involving the issuance and servicing of Household Bank MasterCard credit cards." Complaint ¶ 1.

On March 24, 2003, Household removed the case to federal court "because [the complaint] advances a claim that Household Bank, which is a national bank, charged excessive interest. Any such claim, even if a plaintiff seeks to characterize it as a claim under State law, is by virtue of the National Bank Act, 12 U.S.C. sections 85-86, and the doctrine of 'complete preemption,' deemed to arise under Federal law - and it is therefore removable under 28 U.S.C. § 1441." Defendant's Opposition to Motion to Remand ("Remand Opp.") at 1-2. In construing the Complaint as advancing a claim for usury, Household focuses on paragraphs 12 and 26 of Santos' complaint.

In paragraph 12 of the complaint, Santos alleges that:

> defendants imposed an over limit fee on plaintiff on July 20, 2000. At that time, plaintiff was below her credit limit and, pursuant to the terms of the agreement (which provides that an over limit charge will only be assessed when a 'New Balance' exceeds the credit limit), no charge should have accrued. Further, the

2

United States District Court
For the Northern District of California

1    over limit charges, in reality, are a form of interest[1] and, as such, are unconscionably high.

2

3    In paragraph 26 of the complaint, Santos alleges that Household routinely "imposed

4    unconscionable and/or unwarranted over limit fees."

5    On May 2, 2003, Santos moved to remand.  Household opposed the motion and filed their

6    own, requesting that the Court enforce the arbitration provision in the contract.

7    **A.    MOTION TO REMAND**

8        **1.    Legal Standard**

9        A plaintiff may challenge removal by a motion to remand.  *See* 28 U.S.C. § 1447.  The party

10   invoking the federal court's removal jurisdiction bears the burden of establishing federal jurisdiction.

11   *See Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1195 (9th Cir. 1988) ("The burden of establishing

12   federal jurisdiction is upon the party seeking removal . . . .").  Courts strictly construe the removal

13   statute against removal jurisdiction.  *See Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir. 1992).  Any

14   doubt about the propriety of removal is resolved in favor of remand.  *Id.*

15       Here, removal is premised upon federal question jurisdiction, 28 U.S.C. § 1441(b): "Any

16   civil action of which the district courts have original jurisdiction founded on a claim or right arising

17   under the Constitution, treaties or laws of the United States shall be removable without regard to the

18   citizenship or residence of the parties."

19       **2.    Analysis**

20           **a.    Complete Preemption**

21       The Supreme Court recently clarified when removal is proper under the complete preemption

22   doctrine: "When the federal statute completely pre-empts the state-law cause of action, *a claim*

23   *which comes within the scope of that [federal] cause of action,* even if pleaded in terms of state law,

24   is in reality based on federal law.  This claim is then removable under 28 U.S.C. § 1441(b), which

25   _____

26   [1] 12 C.F.R. § 7.4001(a), which is promulgated under 12 U.S.C. § 85, defines what the term "interest" may mean under § 85.  Section 7.4001(a) reads as follows:

27   The term "interest" as used in 12 U.S.C. 85 includes any payment compensating a creditor or

28   prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by borrower of a condition upon which credit was extended.  It includes, among other things, the following fees connected with credit extension or availability: . . . overlimit fees.

3

United States District Court
For the Northern District of California

1 | authorizes any claim that 'arises under' federal law to be removed to federal court." *Beneficial*

2 | *National Bank v. Anderson*, 123 S. Ct. 2058, 2063 (2003) (emphasis added).

3 |      In *Beneficial*, the Supreme Court held that an action filed in a state court to recover damages

4 | from a national bank for allegedly charging excessive interest in violation of both "the common law

5 | usury doctrine" and an Alabama usury statute should be removed to a federal court because it

6 | actually arises under federal law—the National Bank Act. 123 S. Ct. at 2060. The *Beneficial* Court

7 | found that the National Bank Act, specifically sections 85-86,[2] provided the exclusive cause of action

8 | for usury claims against national banks. *Id.* at 2064. Thus, there was "no such thing as a state law

9 | claim of usury against a national bank." 123 S. Ct. at 2064.

10 |      In this case, the dispositive question is whether 12 U.S.C. §§ 85-86 provide "the exclusive

11 | cause of action" against national banks for any of Santos' claims. *See Lippitt*, 340 F.3d 1033 at *21.

12 | If so, the cause of action necessarily arises under federal law and the case is removable. If not, her

13 | complaint does not arise under federal law and is not removable. *Id.*

14 |        **b.**     **Plaintiff's Complaint**

15 |      On its face, Santos's complaint raises six state causes of action seeking to enforce California

16 | consumer protection statutes. In Santos' reply memorandum in support of her motion to remand

17 | ("Remand Mot. Reply") Santos states that she "is not seeking to enforce liabilities or duties created

18 | by the National Bank Act [in its regulation of usury]. Rather, she is seeking to enforce California

19 | consumer statutes. In doing so, plaintiff's Complaint focuses on defendants' behavior relative to

20 | advertising, over limit charges and contractual relations. Not one of the causes of action is

21 | dependent upon a finding of usury." Remand Mot. Reply at 3.

22 |      However, Santos stated at oral argument that one of her contentions was that the $29 over

23 | limit fee was unconscionable because it was a flat rate fee that was too high and bore no proportional

24 | relationship to the costs encountered by the credit card company in dealing with over limit situations.

25 |

26 |

27 |      [2] Section 85 regulates the rates of interest national banks can "take, receive, reserve, and charge
     on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt." Section

28 | 86 creates a cause of action for "usurious" transactions, defined as "the receiving, reserving, or charging
     a rate of interest greater than is allowed by the preceding section [12 USC § 85]."

United States District Court
For the Northern District of California

1    Santos' statements at oral argument helped to clarify the complaint. Paragraph 12 alleges
2  that the over limit charges are "a form of interest" and "unconscionably high." Remand Opp. at 2.
3  At oral argument Santos reiterated her argument that the over limit fees are too high. Santos also
4  cleared up ambiguity regarding Paragraph 26, which states that "defendants routinely imposed
5  unconscionable and/or unwarranted over limit fees." By "unconscionable and/or unwarranted,"
6  Santos means both 1) that the *amount* of the over limit fee is unconscionable and 2) that charging an
7  over limit fee when the account is not over limit is unconscionable.

8    The above demonstrates that Santos is directly asserting a usury cause of action. The
9  National Banking Act provides "the exclusive cause of action" against national banks for this type of
10  claim. *Beneficial*, 123 S. Ct. at 2064. Thus, the cause of action necessarily arises under federal law
11  and the case is removable. *See Lippitt*, 340 F.3d 1033 at *21.

12  **B.    MOTION COMPEL ARBITRATION**

13    **1.    Legal Standard**

14    Section 4 of the Federal Arbitration Act ("FAA") permits "a party aggrieved by the alleged
15  failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to]
16  petition any United States District Court . . . for an order directing that . . . arbitration proceed in the
17  manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has
18  failed to comply with a valid arbitration agreement, the court must issue an order compelling
19  arbitration. *Cohen v. Wedbush, Noble Cooke, Inc.*, 841 F.2d 282, 285 (9th Cir. 1988).

20    In determining whether to issue an order compelling arbitration, the court may not review the
21  merits of the dispute, but must limit its inquiry into (1) whether the contract containing the
22  arbitration agreement evidences a transaction involving interstate commerce, (2) whether there exists
23  a valid agreement to arbitrate, and (3) whether the dispute(s) fall within the scope of the agreement to
24  arbitrate. *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 477-78 (9th Cir. 1991). If the
25  answer to each of these queries is affirmative, then the court must order the parties to arbitration in
26  accordance with the terms of their agreement. 9 U.S.C. § 4.

27    **2.    Analysis**

28  Santos' sole contention is that the contract itself is unconscionable and therefore raises the

5

United States District Court
For the Northern District of California

1    issue, under prong two of the *Standard Fruit* test, of whether there exists a valid agreement to

2    arbitrate. She advances two-part argument. First, she claims that the contract is procedurally

3    unconscionable because the agreement is an adhesion contract. Second, she contends that the

4    contract is substantively unconscionable because (1) the agreement attempts to ban class actions and

5    (2) the agreement requires that any award be kept confidential. Plaintiffs' Opposition to Defendant's

6    Motion to Compel Arbitration ("Opp. to Mot. to Compel") at 3.

7        While the FAA establishes a strong public policy favoring arbitration for the purposes of

8    avoiding unnecessary expense and delay of litigation, the United States Supreme Court has

9    interpreted Section 2 of the FAA to mean that "states may regulate contracts, including arbitration

10   clauses" if a contract is found to be unconscionable. *Allied-Bruce Terminix Cos. v. Dobson*, 513

11   U.S. 265, 281 (1995). Nevada law[3] will not enforce contracts, including arbitration clauses, that are

12   unconscionable, *see Burch v. Second Judicial District Court*, 49 P.3d 647, 649 (Nev. 2002), and

13   requires that both procedural and substantive unconscionability be present in order for a court to

14   exercise its discretion to refuse to enforce a contract on unconscionability grounds. *Id.* at 650.

15       **a.    Procedural Unconscionability**

16       Under Nevada law, adhesion contracts[4] are not procedurally unenforceable per se. *Mallin v.*

17   *Farmers Insurance Exchange*, 108 Nev. 788, 808 (Nev. 1992).[5] Rather, to determine whether an

18   agreement is procedurally unconscionable, a court must evaluate how the parties negotiated the

19   contract and the circumstances of the parties at that time. *Circuit City Stores, Inc. v. Mantor*, 335

20   F.3d 1101, 1106 (9th Cir. 2003) (interpreting Nevada law). Courts must consider the following to

21

22   _____

23   [3] The contract at issue here has a choice of law provision stating that the agreement will be governed by federal law and the laws of the state of Nevada. Santos "accepts the choice of law provision . . . ." Opp. to Mot. to Compel at 2.

24

25   [4] An adhesion contract is a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it. *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003).

26

27   [5] In *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003), the Ninth Circuit held that adhesion contracts are by definition procedurally unconscionable. However, the *Ting* court was referring to California legislative intent when it held that an adhesion contract is procedurally unconscionable. *See*

28   *Ting*, 319 F.3d at 1148. As noted earlier, Santos has accepted that Nevada law governs for the purposes of this motion. Opp. to Mot. to Compel at 2.

1   determine whether a contract is procedurally unconscionable: (1) whether the contract is oppressive

2   and (2) whether the contract contains surprise. *Id.*

3       A court can find that the contract is oppressive when there is an inequality of bargaining

4   power that results in no real negotiation and an absence of meaningful choice. *Circuit City Stores,*

5   *Inc. v. Mantor*, 335 F.3d 1101, 1106 (9th Cir. 2003). For example, in *Burch v. Second Judicial*

6   *District Court*, 49 P.3d 647, 650 (Nev. 2002), the court found that the contract was oppressive

7   because the Burches were not sophisticated consumers and the disclaimers in the contract were not

8   conspicuous. The court reasoned that the Burches did not understand the terms of the contract

9   because they did not have the opportunity to read the entire contract and thus did not have a

10  meaningful choice to decide if they wanted to agree to the terms in the contract, including the

11  arbitration clause. *Id.*

12      Unlike in *Burch*, here Santos offers no evidence to demonstrate that the arbitration clause in

13  the contract is oppressive. Household mailed Santos a Cardmember Agreement and Disclosure

14  Statement establishing the terms of the contract now in dispute. Santos accepted the terms of the

15  agreement by using the card for purchases and/or advances. (Jimenez Decl. at 1). Thus, unlike in

16  *Burch*, Santos appears to have had ample time to look over the contract and decide whether she

17  should enter into it. Therefore, this was not an oppressive contract.

18      Another factor courts look to in determining whether a contract is procedurally

19  unconscionable is surprise, defined as the extent to which the supposedly agreed-upon terms of the

20  bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed

21  terms. *Circuit City Stores, Inc.*, 335 F.3d at 1106.[6] Here, unlike in *Burch*, the language regarding

22  arbitration was conspicuous as the text was in capital letters, making this provision stand out.[7]

23  Therefore, because this contract is not oppressive and does not contain surprise, the Court finds that

24

25  ———————————

26  [6] Santos does not discuss the issue of surprise in her Opposition.

27  [7] The following portion of the arbitration provision is highlighted in capital letters: "The parties
    acknowledge that they had a right to litigate claims through a court before a judge or jury, but will not
    have that right if either party elects arbitration. The parties hereby knowingly and voluntarily waive their

28  rights to litigate such claims in a court before a judge or jury upon election of arbitration by either party."
    (*See*, Cardmember Agreement and Disclosure Statement).

7

United States District Court
For the Northern District of California

1  the contract is not procedurally unconscionable.

2           b.  **Substantive Unconscionability**

3       Nevada law requires that both procedural and substantive unconscionability must be present

4  in order for a court to exercise its discretion to refuse to enforce a contract as unconscionable.

5  *Burch*, 49 P.3d at 650. As noted above, Santos has not demonstrated procedural unconscionability.

6  However, even assuming that she could make this showing, she would still need to demonstrate

7  substantive unconscionability. As explained below, this she cannot do.

8       Santos claims that two provisions in the agreement render the contract substantively

9  unconscionable—the confidentiality provision and the provision prohibiting class actions.

10           1.  **Confidentiality Provision**

11

12       Santos contends that the agreement is substantively unconscionable because it requires that

13  the results of any arbitration must be kept confidential. In *Ting*, the court held that confidentiality

14  provisions usually favor companies over individuals because plaintiffs are unable to mitigate the

15  advantages inherent in being a repeat player. *Ting v. AT&T*, 319 F.3d 1126, 1152 (9th Cir. 2003).

16  Thus the court in *Ting* was concerned with the fact that the unavailability of arbitral decisions would

17  have the effect of preventing potential plaintiffs from obtaining the information needed to build a

18  case of intentional misconduct or unlawful discrimination against AT&T, and therefore held that

19  confidentiality provisions compel a finding of substantive unconscionability. *Id.*

20       Unlike in *Ting*, however, here Household has agreed to waive the confidentiality provision in

21  light of Santos' objection to it. Household's Reply in Support of Motion to Compel Arbitration

22  ("Reply to Motion to Compel") at 5. This eliminates the *Ting* court's concern that potential

23  plaintiffs would not be able to obtain confidential information to build a case against the stronger

24  party—here, Household. Thus, because the waiver addresses the concerns of the *Ting* court, Santos

25  has not established substantive unconscionability.

26           2.  **Provision Prohibiting Class Actions**

27

28       Santos also contends that an agreement attempting to ban class actions is substantively

8

1   unconscionable since a credit card company is not going to bring a class action against its customers

2   and thus such an agreement is manifestly one-sided. Opp. to Mot. to Compel at 4. Santos relies on

3   *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094 (2002), a California case, and *Ting v. AT&T*, 319

4   F.3d 1126 (9th Cir. 2003), in which the Ninth Circuit construed California law, for this proposition.

5   However, cases construing Nevada law (which governs this case) have never made such a finding,

6   and the weight of authority is to the contrary.[8]  *See, e.g., Edelist v. MBNA America Bank*, 790 A.2d

7   1249, 1260-61 (Del. 2001); *Gras v. Associates First Capital Corp.*, 786 A.2d 886, 893 (N.J. 2001);

8   *Hutcherson v. Sears Roebuck & Co.*, 793 N.E.2d 886, 896 (Ill. 2003); *Pyburn v. Bill Heard

9   Chevrolet*, 63 S.W.3d 351, 365 (Tenn. 2001). *See also Snowden v. Checkpoint Check Cashing*, 290

10  F.3d 631, 638-39 (4th Cir. 2002); *Metro East Center for Conditioning and Health v. Quest

11  Communications, Inc.*, 294 F.3d 924, 927 (7th Cir. 2002); *Randolph v. Green Tree Financial Corp.*,

12  244 F.3d 814, 817 (11th Cir. 2001); *Johnson v. West Suburban Bank*, 225 F.3d 366, 369 (3rd Cir.

13  2000).

14          Santos therefore fails to establish that the contract is substantively unconscionable. Because

15  Santos has not shown that the contract at issue is procedurally or substantively unconscionable, the

16  arbitration clause therein is enforceable.

17                                    **CONCLUSION**

18          For the reasons stated above, the Court **DENIES** Santos' motion to remand and **GRANTS**

19  Household's motion to compel arbitration. The proceedings in this Court are hereby stayed pending

20  such arbitration.

21

22          **IT IS SO ORDERED.**

23  Dated: October 2ȼ 2003                         _____
                                                    MARTIN J. JENKINS
24                                                  UNITED STATES DISTRICT JUDGE

25

26

27   _____

28          [*] The Court notes that even in California the subject is unresolved. The issue is currently
    pending before the California Supreme Court.

*United States District Court*
*For the Northern District of California*

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-4469-CIV-HUCK/BROWN



VIVIAN BUFFINGTON, individually and
on behalf of all other similarly situated,

     Plaintiff,

vs.

HOUSEHOLD BANK (Nevada), N.A.,
a Nevada corporation,

     Defendant.

_____/



### ORDER GRANTING MOTION TO STAY
### PROCEEDINGS AND TO COMPEL ARBITRATION

This case is before the Court on Defendant, Household Bank (Nevada), N.A.'s ("Household

Bank") Motion To Stay Proceedings and Compel Arbitration ("Motion"). Household Bank seeks

*to require the Plaintiff, Vivian Buffington, to arbitrate her claims against it pursuant to an*

amendment in the parties' Cardmember Agreement adopting an arbitration clause. Buffington

counters that the arbitration agreement is unenforceable as a matter of federal law, that Buffington

has not knowingly waived her right to a jury trial, that Household Bank has not established that the

amendment to the Cardholder Agreement containing the arbitration clause was sent to Buffington

and others, that there is no mutuality of assent to the amendment, that the amendment may not be

applied retroactively, that the arbitration agreement is procedurally and substantively

unconciounable, and that the three available arbitral bodies are structurally biased and economically

unfeasible. For the reasons discussed below, Household Bank's Motion is GRANTED.

1



**Background**

Buffington, individually and on behalf of a putative class, has sued Household Bank for damages resulting from its alleged excessive finance charges, late fees and other penalties charged. Buffington claims that these fees are in violation of their Cardmember Agreements, and in violation of certain regulatory requirements, including the Federal Truth In Lending Act ("TILA"). In summary, Buffington claims that Household Bank improperly concealed the actual costs of the credit charged under the Cardholder Agreement. The members of the putative class are Household cardholders subject to the terms of the standard Cardholder Agreement, which the cardholders sign upon opening their accounts. The Cardmember Agreement provides that it is governed by federal law and Nevada state law. The agreement includes a "Change of Terms" provision allowing amendments to its terms and conditions. Nevada law allows such provisions.

Household Bank amended its standard Cardmember Agreement to include an arbitration clause in its newly issued cards. In addition, on or about February, 2000, Household Bank sent to its existing cardholders a written notice entitled "NOTICE OF CHANGE IN TERMS - IMPORTANT INFORMATION" which amended the existing agreements by adopting, effective April 1, 2000, an arbitration of claims agreement. The arbitration agreement provides:

> **ARBITRATION**
> You agree any claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise, constitution; statute; common law; or equity and whether pre-existing, present or future), including initial claims, counter-claims, cross-claims and third party claims, arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire agreement ("Claim"), shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the applicable rules of procedures of the arbitration administrator selected at the time the Claim is filed.

2

\* \* \*

THE PARTIES ACKNOWLEDGE THAT THEY HAD A RIGHT
TO LITIGATE CLAIMS THROUGH A COURT BEFORE A
JUDGE OR JURY, BUT WILL NOT HAVE THAT RIGHT IF
EITHER PARTY ELECTS ARBITRATION. THE PARTIES
HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THEIR
RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT BEFORE
A JUDGE OR JURY UPON ELECTION OF ARBITRATION BY
EITHER PARTY.

Upon receipt of this notice, Buffington and the putative class members had the option of continuing or terminating their Cardmember Agreements. They opted to continue using their cards pursuant to the terms of the amended Cardmember Agreements.

## Discussion

Under the Federal Arbitration Act ("FAA"), arbitration agreements are enforceable in federal courts if two prerequisites are present: 1) the arbitration agreement conforms to general principles of contract law and 2) an absence of a federal principle which precludes the enforcement of the arbitration agreement. The Court finds that the Cardmember Agreement was properly amended to incorporate the arbitration clause, and it is enforceable under applicable Nevada principles of contract law. The Court also finds that there is no federal principle which precludes the enforcement of Household Bank's properly implemented arbitration agreement.

In opposing Household Bank's Motion on the basis that the arbitration agreement was unenforceable under federal law principles, Buffington relied primarily on *Baron v. Best Buy Co., Inc.*, Case No. 99-1297-CIV-KING, United States District Court, Southern District of Florida ("*Baron I*"). In fact, in her opposition memorandum Buffington observed that *Baron I* held unenforceable an "arbitration clause virtually identical to Household's in a TILA class action" (Opposition p. 1). In that observation, Buffington was correct. Her reliance on *Baron I* was, at that time, justifiable. However, soon after Buffington filed her memorandum, the Eleventh Circuit Court

3

of Appeals reversed *Baron I. Baron v. Best Buy Co.*, No. 99-14028 (11th Cir. June 1, 2001) ("*Baron II*"). The Eleventh Circuit held that an arbitration clause contained in a credit card agreement, which submitted TILA claims to arbitration before the National Arbitration Forum, was enforceable. In so holding, the Eleventh Circuit rejected the very arguments asserted by Buffington here. This Court is bound to follow *Baron II* and rejects Buffington's various arguments claiming that the subject arbitration agreement is unenforceable by virtue of federal law principles. The Court also notes that recently, in a well reasoned decision, the District Court for the Central District of California rejected most of the same arguments raised by Buffington here and compelled arbitration pursuant to this identical Cardmember Agreement arbitration clause. *Stuart v. Household Retail Serv., Inc., S.A. CV,* 99-987AHS (Dec. 14, 2000).

*Baron II* and *Stuart* are consistent with the pro-arbitration policy enunciated by the FAA and federal decisions. In the context of another TILA case, the Supreme Court recently reaffirmed the "liberal federal policy favoring arbitration agreements" as reflected in the FAA and again "rejected generalized attacks on arbitration that rest on 'suspicion of arbitration' as a method of weakening the protections afforded in the substantive law to would-be complainants," including TILA protection. *Green Tree Financial Corp. - Alabama v. Randolph,* 531 U.S. 79, 89-90 (2000).

Buffington also maintains that she and the putative class did not knowingly waive their right to a jury trial, and that they are not bound by what she describes as a unilateral modification of the agreement, which lacks mutuality of assent. Buffington further contends that, even if the arbitration claim were properly incorporated into the agreement, that clause is unenforceable.[1] However, the

---

[1] As previously noted, *Baron II* rejected most of Buffington's enforceablity arguments raised here. In another recent decision, the Eleventh Circuit held that an agreement to arbitrate claims, including TILA claims, is enforceable even if enforcement may preclude plaintiff from maintaining a class action. *Randolph v. Green Tree Financial Corp. - Alabama,* 244 F.3d 814 (2001).

4

record before the Court establishes to the Court's satisfaction that Household Bank sent the NOTICE OF CHANGE IN TERMS to Buffington and the putative class members, which notice adequately informed them of the arbitration clause amendment and that they consented to the amendment by continuing to use their credit cards pursuant to the amended terms of the Cardmember Agreement.

Finally, the Court rejects Buffington's contention that the proposed arbitral bodies are structurally biased and economically unfeasible. The Cardholder Agreement gives the party initiating arbitration the right to select one of three arbitral organizations, the National Arbitration Forum ("NAF"), the American Arbitration Association ("AAA") and JAMS. Buffington has the burden of establishing that each of these organizations are biased and so uneconomical as to deny her a fair forum for determining her claims. See *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79 (2000); *Baron II*. Buffington does not, in any respect, challenge the adequacy of JAMS. In addition, *Baron II* found that the plaintiff there, in a TILA context, failed to demonstrate an arbitral bias or other disqualification of NAF. In doing so, the Eleventh Circuit took into account the Supreme Court's emphasis of the " 'liberal federal policy favoring arbitration agreements' embodied in the FAA." *Baron II*. The Court considers Buffington's generalized attack on all three arbitral associations to fly in the face of that federal policy favoring arbitration, which of necessity relies on arbitration forum such as the NAF, AAA and JAMS.

Finally, the Court has reviewed the rules and fee schedules of the NAF and AAA, submitted by Buffington, and finds that they do not reflect a bias or expense which would deny Buffington an adequate forum in which to resolve her dispute with Household Bank. For example, the NAF not only sets forth a reasonable fee schedule, but provides that those fees may be awarded to the prevailing party, and permit waiver of fees for indigent litigants.

5

## Conclusion

The Court finds that Buffington and the putative class's Cardmember Agreement were properly amended, under applicable Nevada law, to include an arbitration clause which, if invoked, requires the parties to submit the claims asserted here to binding arbitration. The arbitration clause is enforceable under Nevada law. The Court further finds that there is no federal principle which precludes the enforcement of the parties' arbitration agreement. Therefore, it is

ORDERED that Household Bank's Motion to Stay Proceedings and Compel Arbitration [DE # 13-1 & 13-2] is GRANTED. The parties shall submit the claims in this case to arbitration in accordance with their agreement to arbitrate these claims and this case is stayed pending the completion of arbitration.

The Clerk of the Court is directed to mark this case CLOSED and DENY all pending motions as MOOT. This administrative action does not affect the substantive rights of the parties. Should further proceedings become appropriate in this Court, the parties may move to re-open the case.

DONE AND ORDERED in Chambers, Miami, Florida, August _17_, 2001.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Tod Aronovitz, Esq.
Lloyd R. Schwed, Esq.
Christopher R. Lipsett, Esq.

6

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-4470-CIV-HUCK/BROWN



.L..D by _CR_ D.C.

AUG 17 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

DOMINICA GARCIA, individually and
on behalf of all other similarly situated,

    Plaintiff,

vs.

HOUSEHOLD BANK (SB), N.A.,
a Nevada corporation,

    Defendant.

_____/



CLOSED CIVIL CASE

## ORDER GRANTING MOTION TO STAY
## PROCEEDINGS AND TO COMPEL ARBITRATION

    This case is before the Court on Defendant, Household Bank (SB), N.A.'s ("Household Bank") Motion To Stay Proceedings and Compel Arbitration ("Motion"). Household Bank seeks to require the Plaintiff, Dominica Garcia, to arbitrate her claims against it pursuant to an amendment in the parties' Cardmember Agreement adopting an arbitration clause. Garcia counters that the arbitration agreement is unenforceable as a matter of federal law, that Garcia has not knowingly waived her right to a jury trial, that there is no mutuality of assent to the amendment, that the arbitration agreement is unconscionable and thus unenforceable, and that the three available arbitral bodies are structurally biased and economically unfeasible. For the reasons discussed below, Household Bank's Motion is GRANTED.

1



## Background

Garcia, individually and on behalf of a putative class, has sued Household Bank for damages resulting from its alleged excessive finance charges, late fees and other penalties charged. Garcia claims that these fees are in violation of their Cardmember Agreements, and in violation of certain regulatory requirements, including the Federal Truth In Lending Act ("TILA"). In summary, Garcia claims that Household Bank improperly concealed the actual costs of the credit charged under the Cardholder Agreement. The members of the putative class are Household Bank cardholders subject to the terms of the standard Cardholder Agreement, which the cardholders sign upon opening their accounts. Garcia opened an account with Household Bank by signing a credit card application in April of 2000, in which she agreed to be bound by the terms of the Cardholder Agreement. The Cardholder Agreement contains an arbitration provision, which provides:

> **ARBITRATION**
> Any claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise) arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire agreement ("Claim"), shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the Code of Procedure of the National Arbitration Forum in effect at the time the Claim is filed.
>
> * * *
>
> THE PARTIES ACKNOWLEDGE THAT THEY HAD A RIGHT TO LITIGATE CLAIMS THROUGH A COURT, BUT THAT THEY AGREE TO HAVE AN ELECTION TO RESOLVE ANY CLAIMS THROUGH ARBITRATION, AND THAT THEY HEREBY WAIVE THEIR RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT BEFORE A JUDGE OR JURY UPON ELECTION OF ARBITRATION BY EITHER PARTY.

Garcia received another copy of the Cardholder Agreement a short time later with her permanent credit card, which she opted to use pursuant to the terms of the Cardmember Agreement.

2

## Discussion

Under the Federal Arbitration Act ("FAA"), arbitration agreements are enforceable in federal courts if two prerequisites are present: 1) the arbitration agreement conforms to general principles of contract law and 2) an absence of a federal principle which precludes the enforcement of the arbitration agreement. The Court finds that Garcia knowingly and voluntarily waived her right to a jury trail when she entered into the Cardmember Agreement, and it is enforceable under applicable principles of contract law. The Court also finds that there is no federal principle which precludes the enforcement of the arbitration agreement.

In opposing Household Bank's Motion on the basis that the arbitration agreement was unenforceable under federal law principles, Garcia relied primarily on *Baron v. Best Buy Co., Inc.,* Case No. 99-1297-CIV-KING, United States District Court, Southern District of Florida ("*Baron I*"). In fact, in her opposition memorandum Garcia observed that *Baron I* held unenforceable an "arbitration clause virtually identical to Household's in a TILA class action" (Opposition p. 1). In that observation, Garcia was correct. Her reliance on *Baron I* was, at that time, justifiable. However, soon after Garcia filed her memorandum, the Eleventh Circuit Court of Appeals reversed *Baron I. Baron v. Best Buy Co.,* No. 99-14028 (11th Cir. June 1, 2001) ("*Baron II*"). The Eleventh Circuit held that an arbitration clause contained in a credit card agreement, which submitted TILA claims to arbitration before the National Arbitration Forum, was enforceable. In so holding, the Eleventh Circuit rejected the very arguments asserted by Garica here. This Court is bound to follow *Baron II* and rejects Garcia's various arguments claiming that the subject arbitration agreement is unenforceable by virtue of federal law principles. The Court also notes that recently, in a well reasoned decision, the District Court for the Central District of California rejected most of the same arguments raised by Garcia here and compelled arbitration pursuant to this identical Cardmember

3

Agreement arbitration clause. *Stuart v. Household Retail Serv., Inc., S.A. CV,* 99-987AHS (Dec. 14, 2000).

*Baron II* and *Stuart* are consistent with the pro-arbitration policy enunciated by the FAA and federal decisions. In the context of another TILA case, the Supreme Court recently reaffirmed the "liberal federal policy favoring arbitration agreements" as reflected in the FAA and again "rejected generalized attacks on arbitration that rest on 'suspicion of arbitration' as a method of weakening the protections afforded in the substantive law to would-be complainants," including TILA protection. *Green Tree Financial Corp. - Alabama v. Randolph,* 531 U.S. 79, 89-90 (2000).

Garcia maintains that she and the putative class did not knowingly waive their right to a jury trial, and that they are not bound by what she describes as a unilateral modification of the agreement, which lacks mutuality of assent. Garcia further contends that, even if the arbitration claim were properly incorporated into the agreement, that clause is unenforceable.[1] However, the record before the Court establishes to the Court's satisfaction that Cardmember Agreement adequately informed Garcia and the putative class members of the arbitration clause, and that they consented to the this term by signing the agreement and using their credit cards pursuant its terms.

Finally, the Court rejects Garcia's contention that the proposed arbitral bodies are structurally biased and economically unfeasible. The Cardholder Agreement gives the party initiating arbitration the right to select one of three arbitral organizations, the National Arbitration Forum ("NAF"), the American Arbitration Association ("AAA") and JAMS. Garcia has the burden of establishing that each of these organizations are biased and so uneconomical as to deny her a fair forum for

---

[1] As previously noted, *Baron II* rejected most of Garcia's enforceablity arguments raised here. In another recent decision, the Eleventh Circuit held that an agreement to arbitrate claims, including TILA claims, is enforceable even if enforcement may preclude plaintiff from maintaining a class action. *Randolph v. Green Tree Financial Corp. - Alabama,* 244 F.3d 814 (2001).

determining her claims. See *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79 (2000); *Baron II*. Garcia does not, in any respect, challenge the adequacy of JAMS. In addition, *Baron II* found that the plaintiff there, in a TILA context, failed to demonstrate an arbitral bias or other disqualification of NAF. In doing so, the Eleventh Circuit took into account the Supreme Court's emphasis of the " 'liberal federal policy favoring arbitration agreements' embodied in the FAA." *Baron II*. The Court considers Garcia's generalized attack on all three arbitral associations to fly in the face of that federal policy favoring arbitration, which of necessity relies on arbitration forum such as the NAF, AAA and JAMS.

Finally, the Court has reviewed the rules and fee schedules of the NAF and AAA, submitted by Garcia, and finds that they do not reflect a bias or expense which would deny Garcia an adequate forum in which to resolve her dispute with Household Bank. For example, the NAF not only sets forth a reasonable fee schedule, but provides that those fees may be awarded to the prevailing party, and permit waiver of fees for indigent litigants.

### Conclusion

The Court finds that Garcia and the putative class members are bound by the Cardmember Agreement, which requires the parties to submit the claims asserted here to binding arbitration, and that the arbitration clause is enforceable. The Court further finds that there is no federal principle which precludes the enforcement of the parties' arbitration agreement. Therefore, it is

ORDERED that Household Bank's Motion to Stay Proceedings and Compel Arbitration [DE # 12-1 & 12-2] is GRANTED. The parties shall submit the claims in this case to arbitration in accordance with their agreement to arbitrate these claims and this case is stayed pending the completion of arbitration.

5

The Clerk of the Court is directed to mark this case CLOSED and DENY all pending motions as MOOT. This administrative action does not affect the substantive rights of the parties. Should further proceedings become appropriate in this Court, the parties may move to re-open the case.

DONE AND ORDERED in Chambers, Miami, Florida, August $\underline{17}$, 2001.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Tod Aronovitz, Esq.
Lloyd R. Schwed, Esq.
Christopher R. Lipsett, Esq.

6

# Exhibit 4





X Priority
X Send
__ Clsd
__ Enter
X JS-5/JS-6
__ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

RICHARD STUART, et al.,        )    SA CV 99-987 AHS (EEx)
                               )
          Plaintiffs,          )
                               )    ORDER GRANTING DEFENDANTS'
     v.                        )    MOTION TO COMPEL ARBITRATION
                               )    AND TO STAY ACTION
HOUSEHOLD RETAIL SERVS., INC., )
et al.,                        )
          Defendants.          )
                               )
_____)

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

I.

### SUMMARY

     For the reasons set forth below, the Court hereby

grants defendants' motion to compel arbitration and stays this

action pending arbitration.  This disposition is based on the

Court's careful consideration of the parties' submissions, the

Court's independent research, and recent Supreme Court

jurisprudence.

Docketed

Copies / NTC Sent

JS-5/JS-6

JS-2/JS-3

CLSD

II.

### FACTUAL AND PROCEDURAL BACKGROUND

     On August 2, 1999, plaintiffs filed their class-action

Complaint seeking injunctive relief and damages under seven

45

1  causes of action: (1) violation of the federal Truth in Lending
2  Act ("TILA"); (2) violation of the California Legal Remedies Act
3  ("CLRA"); (3) commission of unlawful business acts and practices
4  under California Business and Professions Code §§ 17200, et seq.;
5  (4) commission of unfair and fraudulent business acts and
6  practices under California Business and Professions Code §§
7  17200, et seq.; (5) untrue and misleading advertising in
8  violation of California Business and Professions Code §§ 17500,
9  et seq.; (6) fraud and deceit; and (7) money had and received.

10       The gravamen of the Complaint is that defendants
11  utilized misleading sales tactics to conceal the true cost of
12  credit extended to the plaintiffs for the purchase of certain
13  water purification systems.  (Compl. ¶¶ 1-2.)

14       On December 6, 1999, defendants filed a motion to
15  compel arbitration and to stay these proceedings.  On December
16  13, 1999, plaintiffs filed their opposition papers.  On January
17  3, 2000, defendants filed their reply brief.  Upon stipulation of
18  the parties, the Court continued the hearing on defendants'
19  motion to February 14, 2000.  On February 10, 2000, plaintiffs
20  filed a motion for leave to file a notice of recent authority.
21  The Court granted plaintiffs' motion, accepted plaintiffs'
22  supplemental authority, and continued the hearing on defendants'
23  motion to March 27, 2000.  By minute order issued March 23, 2000,
24  the Court further continued the hearing on the defendants' motion
25  to May 8, 2000.  On April 5, 2000, plaintiffs filed a motion for
26  leave to file a notice of change of status of recent authority,
27  and on May 2, 2000, defendants filed a notice of lodging of
28  recent authorities.

1    Having found defendants' motion to compel arbitration

2 to be suitable for disposition without oral argument, the Court

3 took defendants' motion under submission on May 4, 2000, pursuant

4 to Local Rule 7.11 and Fed. R. Civ. P. 78.  Finding plaintiffs'

5 motion regarding the status of recent authority to be unopposed,

6 the Court granted plaintiffs' motion by the same minute order

7            III.

8        **THE PARTIES' POSITIONS**

9    **A. Bases of Defendants' Motion to Compel Arbitration**

10    In support of their motion, defendants point, _inter_

11 _alia_, to a modification to the plaintiffs' credit card agreement,

12 which modification defendants unilaterally implemented in March

13 1999.[1]  The modification provides that:

14     any claim, dispute or controversy (whether in
        contract, tort, or otherwise) arising from or
15     relating to this Agreement . . . including
        the validity or enforceability of this
16     arbitration clause or any part thereof . . .
        shall be resolved, upon the election of you
17     or us, by binding arbitration pursuant to
        this arbitration provision and the Code of
18     Procedure of the National Arbitration Forum.

19 (Hampton Decl. 12/6/99, Ex. 13 ¶ 18.)

20    Defendants argue that they effected this unilateral

21 modification of the contract pursuant to a "change of terms"

22 provision contained in the original credit card agreement to

23 which the plaintiffs clearly gave actual assent.  That change-of-

24 terms provision states: "We may, at any time and subject to

25

26    [1]  For purposes of this analysis, the Court assumes

27 that the March 1999 arbitration clause is the only arbitration
  provision relevant to this motion.  In view of the disposition
28 herein, the Court need not address the effect, if any, of earlier
  arbitration clauses.

1   applicable law: . . . (c) change any other terms and conditions

2   of this Agreement relating to your account by mailing written

3   notice to you in accordance with applicable law."  (Hampton Decl.

4   12/6/99, Exs. 5, 8, 11 -- ¶ 13.)

5         The original credit card agreement also provided that

6   the "applicable law" would be the law of Nevada.  (See Hampton

7   Decl. 12/6/99, Exs. 5, 8, 11 -- ¶ 28.)  Under Nevada law, the

8   issuer of a credit card:  "may unilaterally change any term or

9   condition for the use of a credit card without prior notice to

10   the cardholder unless the change will adversely affect or

11   increase the costs to the cardholder for the use of the card."

12   Nev. Rev. Stat. § 97A.140(4) (1998).

13         Defendants argue that because the March 1999

14   arbitration clause represents a binding contract under Nevada

15   law, and because plaintiffs' claims fall squarely within its

16   terms, the arbitration clause must be enforced pursuant to

17   Section 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2,

18   notwithstanding any state law or policy disfavoring arbitration

19   Moreover, although defendants recognize that there are federal

20   exceptions to the rule of enforcement under the FAA (e.g., where

21   the claims asserted are non-arbitrable), defendants argue that

22   none of those exceptions apply in this case.

23         **B.   Plaintiffs' Opposition to Defendants' Motion**

24         Plaintiffs' opposition papers identify what they

25   contend to be four fatal weaknesses in the legal underpinnings of

26   defendants' motion.  First, plaintiffs argue that although

27   California law actually governs the question whether the

28   arbitration clause in this case constitutes an enforceable

1   contract, even under Nevada law, the clause is unenforceable

2   under general contract principles for at least two reasons: (1)

3   the clause could not have been implemented pursuant to the

4   "change of terms" provision of the original credit card agreement

5   because an agreement to <u>arbitrate</u> is a collateral matter -- not a

6   term that "relates to the plaintiffs' accounts;" and (2) the

7   unilaterally-imposed arbitration clause does not fall within the

8   scope of Nevada Revised Statute § 97A.140(4) since an agreement

9   to <u>arbitrate</u> is not a "condition for the use of a credit card."

10         Second, plaintiffs argue that the general rule of

11   enforcement under the FAA does not apply in this case because the

12   National Arbitration Forum ("NAF") represents an inadequate forum

13   for the assertion of the plaintiffs' statutory rights.  In this

14   regard, plaintiffs contend that the procedures utilized by the

15   NAF would unduly chill the assertion of TILA rights by exposing

16   the plaintiffs to excessive uncertainty regarding the possibility

17   of high arbitration fees and the possibility of not recovering.

18   those fees even if plaintiffs were to prevail on the merits.

19         Third, plaintiffs contend that the arbitration clause

20   at issue is invalid because it would require each party to bear

21   its own attorney's fees -- thereby depriving plaintiffs of an

22   important statutory right under TILA and the CLRA to recover

23   their legal fees if plaintiffs are found to be the prevailing

24   parties.

25         Fourth, plaintiffs argue that the arbitration clause is

26   unenforceable at least with regard to plaintiffs' demands for

27   public injunctive relief.  According to plaintiffs, claims for

28   such relief are non-arbitrable, <u>inter alia</u>, because arbitrators

1  do not have the proper authority to monitor the on-going
2  necessity of such injunctions in relation to the interests of the
3  public at large.

## IV.

### DISCUSSION

#### A.   Framework under the FAA

7  Under the FAA, written arbitration contracts relating
8  to activities in interstate commerce are enforceable as a matter
9  of federal law unless one or more of the claims at issue are non-
10 arbitrable pursuant to federal standards.  See Moses H. Cone Mem.
11 Hosp. v. Mercury Constr., 460 U.S. 1, 24-35, 103 S. Ct. 927, 74
12 L. Ed. 2d 765 (1983).  Accordingly, two inquiries are required in
13 order to determine whether enforcement of the arbitration clause
14 at issue here should ensue.  First, the Court must determine
15 whether the clause formed a binding agreement under general
16 principles of the applicable state contract law.  Second, if the
17 clause constitutes such a contract, the Court must determine
18 whether some federal rule of non-arbitrability precludes
19 enforcement of the clause as to one or more of plaintiffs'
20 claims.

21 As discussed below, the Court concludes that the 1999
22 arbitration clause is binding under the relevant contract law and
23 that the claims asserted in the Complaint are fully arbitrable.
24 Accordingly, defendants' motion to compel arbitration and to stay
25 this action should be granted.
26 //
27 //
28 //

6

1          **B.    The 1999 arbitration clause is binding under**
2              **applicable contract law.**

3              1.   Applicable Law

4          In cases such as this, where pendent state-law claims
5    are asserted in conjunction with a federal claim, the district
6    court should follow the choice-of-law rules of the forum state.
7    See Paracor Fin. v. General Elec. Capital Corp., 96 F.3d 1151,
8    1165 n.17 (9th Cir. 1996). On the issue of the enforcement of
9    contractual arbitration clauses, California has adopted the
10   choice-of-law methodology set forth in the Restatement (Second)
11   Conflicts of Laws ("Second Restatement").  See Nedlloyd Lines
12   B.V. v. Superior Court, 3 Cal. 4th 459, 464-65, 11 Cal. Rptr. 2d
13   330 (1992).

14         Under Section 187(1) of the Second Restatement, a court
15   should enforce a contractual choice-of-law provision if the
16   relevant rule of law from the chosen jurisdiction is a provision
17   that the parties could expressly have contracted for under the
18   law of the forum state.  Here, the relevant rule of Nevada law
19   which the defendants seek to apply in this case is the rule set
20   forth in Nevada Revised Statutes § 97A.140(4), which allows
21   credit card companies to implement certain unilateral changes to
22   terms "relating to" their account agreements with customers
23   Plaintiffs present no authority that California would preclude
24   the parties from expressly agreeing to a unilateral right of
25   modification in either of the parties, and the Court is aware of
26   no such rule.  Thus, the Court concludes that the rule set forth
27   at Section 97A.140(4) is one that the parties expressly could
28   have bargained for. Accordingly, the parties' agreement to apply

7

1  that rule via a general incorporation of Nevada law should not be
2  disturbed.

3          2.      **The 1999 arbitration clause is binding under**
4                  **Nevada law.**

5          Having construed the change-of-terms provision of the
6  parties' original credit card agreement according to its plain
7  (and expansive) terms, the Court concludes that the change-of-
8  terms provision authorizes the unilateral implementation of
9  arbitration clauses like that adopted in March 1999.  Such
10 arbitration clauses clearly represent a term or condition
11 "relating to the plaintiffs' accounts."  Thus, the 1999
12 arbitration clause could, subject to applicable state law, be
13 added to the parties' agreement at the defendants' sole
14 discretion, pursuant to the express contract for which the
15 parties bargained.

16         In addition, under the terms of the 1999 arbitration
17 agreement, the clause is a term "for the use of a credit card"
18 within the scope of the broad language of Nevada Revised Statute
19 § 97A.140(4).  Accordingly, the 1999 arbitration clause could be
20 unilaterally implemented by the defendants, consistent with the
21 applicable Nevada law.

22         In view of the statutory and contract construction
23 stated above, the Court concludes that the 1999 arbitration
24 agreement represents a binding contract under the relevant state
25 law.  Accordingly, the arbitration clause is entitled to
26 enforcement under the FAA unless the plaintiffs' claims in this
27 case are non-arbitrable under federal law.  However, as discussed
28 below, the Court finds no federal-law impediment to the

8

1   arbitration of any of plaintiffs' causes of action.

2             C.    The National Arbitration Forum is not inadequate
3                   for the vindication of plaintiffs' TILA claims.

4           Plaintiffs argue that the instant case fits within one
5   of the well-recognized exceptions to the FAA's enforcement rule,
6   insofar as the NAF does not provide an adequate forum for the
7   vindication of their statutory rights under TILA.  Relying
8   primarily on the authority of <u>Randolph v. Green Tree Fin. Corp.</u>,
9   178 F.3d 1149 (11th Cir. 1999), <u>cert. granted</u>, 120 S. Ct. 1552
10  (2000) (affirmed in part and reversed in part, 2000 WL 1803919
11  (December 11, 2000)), plaintiffs argue that the procedures
12  utilized by the NAF leave parties such as themselves exposed to
13  excessive uncertainty regarding the fees that might be required
14  for them to assert their TILA claims in the arbitral forum, and
15  that because the NAF procedures would have an undue chilling
16  effect on the assertion of TILA claims, the NAF does not provide
17  an adequate forum.  In addition, plaintiffs contend that the NAF
18  fees could, in fact, be onerous.  In further support of their
19  argument, plaintiffs cite <u>Patterson v. ITT Consumer Fin. Corp.</u>,
20  14 Cal. App. 4th 1659 (1993), in which an NAF arbitration clause
21  was found to be unconscionable under California contract law
22  because it was found to hinder ordinary consumers in the
23  assertion of their rights.

24          For purposes of the present analysis, even assuming
25  that the "chill" theory articulated in the <u>Randolph</u> Circuit
26  opinion remains viable as a cognizable basis upon which an
27  arbitral forum may be found to be inadequate as a matter of
28  federal law, the Court nevertheless concludes that the NAF

1  arbitration provision at issue here is properly distinguishable
2  from that held to be invalid by the Eleventh Circuit in <u>Randolph</u>
3  (and subsequently reversed by the Supreme Court). Unlike the
4  provision in <u>Randolph</u> (which provided no details regarding which
5  arbitral organization would be used, what set of procedures would
6  be employed, or what sorts of fees would be assessed), the 1999
7  arbitration clause specifies that the rules of the NAF shall
8  apply. Those rules, in turn, set specific guidelines on the fees
9  that may be charged to the litigants, and they provide that such
10 fees may be awarded to the prevailing party. (Defs.' Appen. of
11 Auth., Ex. 7 at 35-36, 42-48.) Furthermore, NAF procedures also
12 permit indigent litigants to request a fee waiver. (<u>See id.</u> at
13 43.) Thus the degree of uncertainty[2] that gave rise to the
14 disputed arbitration clause in <u>Randolph</u> is not present here, and
15 there is no showing that the NAF is an inadequate forum for the
16 assertion of TILA claims pursuant to federal standards of
17 arbitrability.

18      The Court recognizes that the plaintiffs may incur
19 substantial arbitration fees to which there would be no analogous
20 charges in a court of law. Moreover, in some contexts, those
21 potential costs have been found to make NAF arbitration clauses
22 unconscionable under California contract law (which, as discussed
23 earlier, is not applicable here). <u>See Patterson</u>, 14 Cal. App.
24 4th at 1659. Nevertheless, it is well-settled that even
25 substantial arbitration costs do not, <u>ex ante</u>, render an arbitral
26
27
        [2] "The "risk" that Randolph will be saddled with
28 prohibitive costs is too speculative to justify the invalidation
   of an arbitration agreement." 2000 WL 1803919, *7 (U.S.)

1 forum inadequate, given the availability of judicial review of
2 unreasonable conduct in which an arbitrator actually engages.
3 See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170
4 F.3d 1, 16 (1st Cir. 1999). Moreover, other courts have enforced
5 NAF arbitration clauses without questioning the adequacy of the
6 NAF forum under federal standards. See, e.g., Sagal v. First USA
7 Bank, N.A., 69 F. Supp. 627 (D. Del. 1999); DiCrisci v. Lyndon
8 Guaranty Bank, 807 F. Supp. 947 (W.D.N.Y. 1992). In view of the
9 foregoing considerations, and in light of the strong national
10 policy favoring arbitration, the Court concludes that the NAF is
11 not an inadequate forum under federal arbitrability standards.

12       **D.    The 1999 arbitration agreement's provision**
13              **requiring the parties to bear their own attorney**
14              **fees is severable and therefore does not preclude**
15              **enforcement.**

16       Plaintiffs argue that where, as under TILA and the
17 CLRA, a consumer is given a statutory right to recover his
18 attorney's fees if he succeeds on the merits, that right may not
19 be sacrificed via the enforcement of an arbitration clause such
20 as the one at issue here. For this proposition, plaintiffs cite
21 Graham Oil Co. v. Arco Prods. Co., 43 F.3d 1244 (9th Cir. 1995),
22 an opinion construing the effect of the attorney's-fees provision
23 of the Petroleum Marketing Practices Act, 15 U.S.C § 2801, et
24 seq.

25       The Court need not decide whether the attorney-fee
26 provision of the 1999 arbitration agreement is invalid under the
27 rule of Graham Oil because the Court concludes that, unlike the
28 analogous provision in Graham Oil, the attorney-fee provision at

11

1    issue here is severable from the rest of the arbitration
2    agreement.  The original credit card agreement between the
3    parties contains an express severability clause that provides:
4    "if any provision of this Agreement is finally determined to be
5    void or unenforceable under any law, rule, or regulation, all
6    other provisions will remain valid and enforceable."  (Hampton
7    Decl. 12/6/99, Exs. 5, 8, 11 -- ¶ 30.)  In addition, it does not
8    appear that the attorney-fee provision of the 1999 arbitration
9    agreement is "so interwoven with" all the other terms of that
10   agreement that the arbitration clause "must stand or fall as an
11   entirety."  National Labor Relations Board v. Southern Cal. Pipe
12   Trades, 449 F.2d 668, 673 (9th Cir. 1971).  When considered in
13   conjunction with the strong congressional policy favoring
14   arbitration, the foregoing points suggest that while the
15   attorney-fee provision in the 1999 arbitration clause may prove
16   unenforceable, on the whole, "[a]rbitration is a favored
17   procedure, and we should favor it here."  Graham, 43 F.3d at 1251
18   (Fernandez, J. dissenting).

19            E.    Plaintiffs' prayer for injunctive relief is not
20                  inconsistent with arbitration.

21            Plaintiffs argue that, even if some of their claims are
22   subject to arbitration, their claims for injunctive relief are
23   not.  To support this proposition, plaintiffs rely on the
24   respected authority of Broughton v. Cigna Healthplans, 21 Cal.
25   4th 1066, 90 Cal. Rptr. 2d 334 (1999).  In Broughton, the
26   California Supreme Court concluded that, pursuant to federal
27   arbitrability norms, the FAA does not require enforcement of
28   arbitration agreements with respect to claims for injunctive

                                12

1  relief asserted in the public interest. According to the
2  Broughton court, this is because there is an "inherent conflict"
3  between arbitration of such claims and the underlying policy of
4  retaining judicial oversight over such injunctions. See id. at
5  1082-83.

6          The Broughton court itself recognized, however, that
7  "the capacity to withdraw statutory rights from the scope of
8  arbitration agreements is the prerogative solely of Congress, not
9  state courts or legislatures." Id. at 1083 (citing Southland
10 Corp. v. Keating, 465 U.S. 1 (1984)). The United States Supreme
11 Court has found that Congress did not exercise this prerogative
12 even in the context of, e.g., antitrust claims, where a
13 plaintiff's pursuit of a treble damages award is recognized as
14 advancing public purposes that extend beyond the plaintiff's own
15 need for compensation. See Mitsubishi Motors Corp. v. Soler
16 Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S. Ct. 3346, 87 L. Ed.
17 2d 444 (1985). Under the FAA, "the party opposing arbitration
18 carries the burden of showing that . . . a waiver of judicial
19 remedies inherently conflicts with the underlying purposes of
20 [some] other statute." Rodriguez de Quijas v. Shearson/American
21 Express, Inc., 490 U.S. 477, 483, 109 S. Ct. 1917, 104 L. Ed. 2d
22 526 (1989). Based on the arguments and authorities presented
23 here, the Court parts company with Broughton and concludes that
24 plaintiffs have not carried their burden of showing that
25 injunctive relief in the public interest is inherently
26 inconsistent with private arbitration.

27 //

28 //

13

**V.**

**CONCLUSION**

Accordingly, and for the foregoing reasons, the Court concludes that the 1999 arbitration clause at issue in this motion must be enforced under the FAA.  Defendants' motion to compel arbitration is hereby granted.  This action is stayed pending arbitration before the National Arbitration Forum.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order on counsel for all parties.

Dated:  December _14_, 2000.

_____
ALICEMARIE H. STOTLER
UNITED STATES DISTRICT JUDGE

G \DOCS\AHSCOMMO\msq\orders\Stuart-HHold-Arbit wpd

14

# Exhibit 5

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANNE KATHERINE FRERICHS,
on behalf of herself and all others
similarly situated,

                Plaintiffs,

                v.

CREDENTIAL SERVICES INTERNATIONAL,
a Delaware corporation, FIRST USA BANK,
INC., a Delaware corporation and EXPERIAN,
INC., a Delaware corporation,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 98 C 3684

Judge Joan B. Gottschall

DOCKETED

OCT 01 1999

## MEMORANDUM OPINION AND ORDER

Plaintiff Anne Frerichs brought this action against Credential Services International ("CSI"), First USA Bank, Inc. ("First USA"), and Experian, Inc. ("Experian") under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* First USA, relying on an arbitration clause in its credit card agreement with Frerichs, has filed a motion to stay this action and compel arbitration. For the reasons set forth below, the motion is granted as to defendant First USA and denied as to defendants CSI and Experian.

## BACKGROUND

Frerichs has a First USA credit card. Frerich's relationship with First USA is based on a Cardmember Agreement sent to First USA credit card holders. The Agreement gives First USA broad powers to amend the Agreement:



> We can amend the terms of this Agreement at any time. We will notify you of
> what these amendments are. Subject to the requirements of applicable law, any
> amendment to this Agreement will become effective at the time stated in our
> notice to you . . . .

Another provision of the Agreement stated that "THIS AGREEMENT AND YOUR ACCOUNT

WILL BE GOVERNED BY THE LAW OF THE STATE OF DELAWARE AND, AS

APPLICABLE, FEDERAL LAW." Other than this choice of law provision, the Agreement

contained no terms relating to the resolution of disputes. In particular, prior to the amendment

discussed below, the Agreement did not contain a provision requiring arbitration of disputes.

At some point, First USA mailed to Frerichs a form entitled "Important Notice for First

USA Bank Credit Card Customers About Changes to Your First USA Cardmember Agreement."

The Notice included a "Summary of Change," which contained the following language: "A

provision providing that any disputes between you and First USA are to be resolved by

arbitration is being added to your First USA Cardmember Agreement."

In a section entitled "Effective Date/Non-Acceptance Instructions," the Notice provided

that

> The change in terms summarized above will become effective January 1, 1998.
> The new terms will apply to current and future balances in both active accounts
> and accounts that no longer have charge privileges. If you do not wish to accept
> the new terms, you must notify us in writing of your decision by December 30,
> 1997. . . . Giving us this notice will constitute your election to cancel your charge
> privileges (if not previously canceled), but you may pay off any outstanding
> unpaid balance of your Account under your prior terms.

The text of the amendment provided, in part:

> ARBITRATION: Any claim, dispute or controversy ("Claim") by either you or us
> against the other, or against the employees, agents or assigns of the other, arising
> from or relating in any way to the Agreement or your Account, including Claims

regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration . . . .

The Notice also contained the following language:

IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

The Agreement also contained the following provision regarding "Credit Information":

You agree that we may request consumer credit reports from one or more credit reporting agencies in connection with your application and the administration of your Account. You also authorize us to exchange credit information concerning you or your Account with (and answer questions and requests from) others, such as merchants and credit reporting agencies.

In her complaint, Frerichs charges that, pursuant to a contract between First USA and CSI, First USA provided CSI with lists of First USA's customers and their credit card account numbers for CSI's solicitation and direct marketing programs. Frerichs alleges that CSI uses the information in these lists to obtain a credit report from Experian on each consumer and that CSI obtains the credit reports without the explicit written instructions of each consumer. Frerichs claims that CSI then mails each consumer on its First USA list the consumer's credit report along with a brochure and letter explaining CSI's credit report and credit monitoring membership program, of which the consumer has automatically become a member. Frerichs asserts that without the consent of the consumer, CSI automatically charges each consumer $49.00 to their First USA credit card account for CSI's membership program.

Frerichs charges that CSI and First USA violated the FCRA by using consumer reports for an unauthorized purpose and that Experian violated the FCRA by furnishing consumer

3

reports to CSI for an unauthorized purpose. In a March 30, 1999 order, this court denied motions to dismiss by defendants CSI and Experian. The only motion before this court is First USA's motion to stay and compel arbitration.

## DISCUSSION

First USA seeks an order, pursuant to §§ 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, staying the present action and compelling arbitration of Frerichs' claims. "The Act's centerpiece provision makes a written agreement to arbitrate 'in any maritime transaction or a contract evidencing a transaction involving commerce . . . valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Mitsubishi Motors Corp. V. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting 9 U.S.C. § 2).

> The "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hosp. V. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983), manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Id.*, at 25 n.32.

*Id.*

Frerichs argues that she should not be compelled to submit this dispute to arbitration because her claim does not fall within the scope of the arbitration clause. In addition, Frerichs argues that even if her claim is within the scope of the arbitration clause, the clause should not be enforced because (1) the amendment including the arbitration clause was not a valid modification of the Agreement; (2) the arbitration clause lacks mutuality; (3) the arbitration clause fails to

4

inform cardholders that they are giving up important rights; and/or (4) the arbitration clause violates public policy.

### 1.    Is Frerichs' claim covered by the arbitration clause?

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Mitsubishi*, 473 U.S. at 626 (quotations omitted).

The arbitration clause at issue here is broadly worded. It requires arbitration of "[a]ny claim, dispute or controversy . . . arising from or relating in any way to the Agreement or your Account." Indeed, the arbitration clause even requires arbitration of "Claims regarding the applicability of this arbitration clause."

Frerichs argues that her claim does not arise from or relate to the Cardholder Agreement or her account. She asserts that her claim is premised on a violation of the FCRA and is not based on a breach of her agreement with First USA. She contends that "whether [she] has an agreement with First USA is irrelevant," noting that her claim is not based on the provision in the Agreement allowing First USA to obtain her credit report and share information.

In a general sense, Frerichs is correct that her claim does not depend on the existence of the Agreement. The FCRA makes in unlawful for "any person" to use or obtain a credit report for an unauthorized purpose. 15 U.S.C. 1681b(f). There is no requirement that the "person" be a creditor or be part of a creditor/consumer relationship.

However, examination of the allegations in Frerichs' complaint shows that there is at the very least a strong probability that Frerichs' claim arises from or relates to the Agreement or her

5

account. Frerichs alleges that First USA provided CSI with lists of First USA's customers and their credit card account numbers and that CSI uses this information to obtain credit reports on the First USA customers. (Compl. ¶¶ 10-11.) She later alleges that "First USA used the class members' credit reports obtained by CSI to receive commissions from CSI and to solicit First USA customers to become a member of CSI's program." (Compl. ¶ 51.) First USA's alleged provision of Frerichs' name and account number (and the name and account numbers of others) is central to the scheme outlined in Frerichs' complaint and is at least arguably related to Frerichs' account.

In light of the presumption in favor of arbitration and the broadly worded arbitration clause at issue here, this court finds that Frerichs' claim falls within the scope of the arbitration clause, or at the very least, that it is "susceptible of an interpretation that covers the asserted dispute." *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 (7th Cir. 1995) (quotations omitted) (compelling arbitration of ADEA claim under clause requiring arbitration of claims related to breach of employment agreement). Moreover, even if this court were inclined to find that the present dispute is beyond the scope of the arbitration clause, the provision requiring arbitration of disputes concerning the applicability of the arbitration clause would obligate this court to refer to arbitration questions regarding the scope of the arbitration clause. *See Stiles v. Home Cable Concepts, Inc.*, 994 F. Supp. 1410, 1414-15 (M.D. Ala. 1998) (discussing whether arbitration of disputes regarding arbitrability is required).

2.      Is the Arbitration Clause Enforceable?

"In determining whether a valid arbitration agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts." *Gibson v.*

6

*Neighborhood Health Clinics*, 121 F.3d 1126, 1130 (7th Cir. 1997). Here, the applicable state law is Delaware law.

Frerichs argues that even if her claim is within the scope of the arbitration clause, the arbitration clause should not be enforced. She supplies several different justifications for not enforcing the arbitration clause.

### A.    Was the Modification Valid?

Frerichs first argues that the amendment adding the arbitration clause was not a valid modification of the Agreement. She contends that a valid modification of a contract must meet the formation requirements of a contract — offer, acceptance and consideration. She claims that she had no knowledge of First USA's proposed modification and that she did not knowingly accept the proposed modification.

Frerichs contends that she had no knowledge of the amendment adding the arbitration clause. Although Frerichs does not deny that she received the Notice informing her of the arbitration clause, she argues that the Notice was inadequate. Frerichs complains that the Notice appears to have been "stuffed amongst other solicitations that [are] routinely included with First USA's monthly statements to its customers." She argues that First USA did not put her on notice that she should "read through every piece of literature in her monthly statements to look for possible modifications," noting that the provision granting First USA the power to amend the Agreement does not specify how First USA will notify cardholders of amendments.

The problem with Frerichs' argument is that the original Agreement contained a provision granting First USA broad power to amend the Agreement. The Agreement gave First USA the right to "amend the terms of this Agreement at any time" and informed Frerichs that

7

First USA "will notify you of what these amendments are." Frerichs thus was on notice that First USA had the right to amend the Agreement and that if First USA sought to amend the Agreement she would be notified. *See Grasso v. First USA Bank*, 713 A.2d 304, 311 (Del. Sup. Ct. 1998) (upholding amendment increasing interest rate where credit card agreement authorized bank to amend terms and conditions). While the Agreement did not specify that amendments would be included in cardholders' monthly statements, it did state that First USA "will send statements and any other notices to you at the address shown in our files."

The Agreement and Delaware law required First USA to notify cardholders of amendments to the Agreement. *See Grasso*, 713 A.2d at 309 (citing 5 Del. C. § 952). Implicit in the obligation to provide notice is a requirement that the notice be reasonably effective in informing the cardholder of the amendment. Certainly the notice of the amendment was not optimal. It appears that the notice was included in Frerichs' monthly statement along with various solicitations. Separate written notice would undoubtedly be more effective in informing cardholders of amendments to the Agreement.

While the notice could have been more effective, the court cannot find that it was so inadequate as to render the amendment unenforceable. Delaware expressly permits a bank to amend a credit card agreement, provided the bank supplies the cardholder with notice. In *Grasso*, the court upheld an amendment to a credit card agreement where notice of the amendment was included in the monthly statements of the cardholders, despite the plaintiff's claim that she did not remember receiving notification of the amendment. 713 A.2d at 309-10. Frerichs was on notice from the Agreement that First USA could amend the Agreement, and she could reasonably be expected to examine written materials sent by First USA.

8

Frerichs also contends that she did not knowingly accept the amendment containing the arbitration clause. She claims that, under the circumstances here, her silence should not be deemed acceptance.

In *Fineman v. Citicorp USA, Inc.*, 485 N.E.2d 591 (Ill. App. Ct. 1985), the court rejected plaintiffs' claim that they never accepted a proposed modification in their credit card agreement. The plaintiffs argued that their silence should not be construed as acceptance, but the court disagreed, noting that "the credit agreement included the explicit provision that the agreement could be amended by defendants on 30-days' notice, and silence in response to the notice would constitute acceptance of the amendment." *Id.* at 595.

Here, as in *Fineman*, a provision in the Agreement gives the bank broad power to amend the Agreement. The provision stated that First USA "can amend the terms of this Agreement at any time" and that "any amendment to this Agreement will become effective at the time stated in our notice to you." The provision in *Fineman* explicitly noted that silence would be construed as acceptance, stating that "[i]f you do not agree to the changes, you must notify us in writing and return the card cut in half within 30 days and pay us the balance * * *. Otherwise we will understand that you agree to the changes in the notice." The provision here does not specifically state that silence will be construed as acceptance, but it is sufficient to put Frerichs on notice that First USA could amend her agreement without her explicit acceptance. Moreover the Notice containing the amendment with the arbitration clause explicitly stated that "[i]f you do not wish to accept the new terms, you must notify us in writing of your decision by December 30, 1997."[1]

---

[1]Frerichs requests that if the court finds that her claims are within the scope of the arbitration clause, she be allowed to conduct discovery to determine whether the arbitration clause is valid. For the purposes of this motion, this court has presumed that the Notice was sent

After the present motion was fully briefed, a California appellate court decided *Badie v. Bank of America*, 67 Cal. App. 4th 779 (Cal. App. 1998). The court held that a bank could not amend the terms of account agreements by adding an arbitration clause, despite provisions in the account agreements authorizing the bank to change terms of the accounts. The court found that a party with a unilateral right to modify a contract is limited by the implied covenant of good faith and fair dealing to modifications "whose general subject matter was anticipated when the contract was entered into." *Id.* at 791. The court held that "the parties did not intend that the change in terms provision should allow the Bank to add completely new terms" such as the arbitration clause. *Id.* at 803.[2]

This court declines to follow *Badie*, as it is unlikely that Delaware courts would adopt the reasoning of the California court. As noted in *Grasso*, Delaware law specifically authorizes a bank to amend the terms of a credit agreement. *See Grasso*, 713 A.2d at 309-10. At the time the present action was filed, the Delaware statute provided that "(a) Unless the agreement governing a revolving credit plan otherwise provides, (i) a bank may at any time and from time to time amend the terms of such agreement in any respect . . . ." 5 Del. C. § 952. On April 9, 1999, this section was amended (likely in response to the *Badie* decision) to provide that

---

as a "bill-stuffer" and that Frerichs did not read the Notice. Frerichs does not explain how further development of the factual record will benefit her or this court. Her request is denied.

    [2]While this court is sympathetic to the result reached in *Badie* as a matter of equity, it makes little sense to construe so narrowly a unilateral modification clause in the context of an agreement terminable at will by either party. In this court's opinion, the real problem in *Badie* and in the case at bar is ensuring adequate notice so the cardholder can terminate the Agreement if dissatisfied with the modification. There is, the court notes, no claim here that plaintiff detrimentally relied on the Agreement as it existed before the modification, such as by having to repay her balance on an expedited basis in order to terminate the agreement.

> a bank may at any time and from time to time amend such agreement in any respect, whether or not the amendment or the subject of the amendment was originally contemplated by the parties or is integral to the relationship between the parties. Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to . . . arbitration or other alternative dispute resolution mechanisms, or other matters of any kind whatsoever.
>
> * * *
>
> Any notice of an amendment sent by the bank may be included in the same envelope with a periodic statement or as part of the periodic statement or in other materials sent to the borrower.

Although the earlier version of § 952 was in effect at the time this lawsuit was filed, the earlier version was broadly worded, allowing a bank to amend the terms of an agreement "in any respect." This court believes that Delaware courts would construe this expansive language as permitting a bank to amend a credit agreement to include an arbitration clause.[3]

### B.  Does the Arbitration Clause Lack Mutuality?

Frerichs argues that the arbitration clause is unenforceable because it binds only the cardholder. On its face, the arbitration clause appears to obligate both parties to arbitrate

---

[3]Several other courts that have decided the issue have upheld amendments imposing an arbitration clause. *See Stiles*, 994 F. Supp. at 1418; *Perry v. Beneficial Nat'l Bank*, No. CV97-218, 1998 WL 279174 (Macon Co., Ala. May 18, 1998); *Williams v. Direct Cable TV*, No. CV-97-009, 1997 WL 579156 (Henry Co., Ala. Aug. 13, 1997).

   Moreover, there are sensible policy reasons for allowing amendments like the one at issue here. Like the agreement in *Grasso*, the agreement here provided that either party could terminate the agreement at any time. *See* 713 A.2d at 311. First USA could have terminated the agreements for all cardholders and then offered new agreements containing an arbitration clause. This would be a major inconvenience for First USA and the cardholders. Furthermore, there is no guarantee that cardholders would be more likely to notice the arbitration clause in a new contract as opposed to a supplemental notice. Indeed, it is possible that the notice at issue here is more likely to attract the attention of cardholders because it focuses on the change in terms. Allowing First USA to amend the agreements offers a more efficient solution, though it places the burden on cardholders to cancel the agreement if they do not wish to be bound by the arbitration clause.

11

disputes. However, Frerichs argues that the exceptions for certain types of claims render First USA's obligation illusory. The clause provides that

> Nothing in this agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owned [sic] by either party to the other under this agreement.

Frerichs contends that these exceptions relieve First USA from having to arbitrate the claims it is likely to have against cardholders. She claims that the one-sided nature of the clause makes it void for lack of mutuality. *See Lopez v. Plaza Fin. Co.*, No. 95-C-7567, 1996 WL 210073, at *3-4 (N.D. Ill. Apr. 25, 1996) (refusing to enforce arbitration agreement for lack of mutuality, relying on *Hull v. Norcom, Inc.*, 750 F.2d 1547, 1550 (11th Cir. 1985)).

"The doctrine of mutuality of obligation requires a contract to be based on an exchange of reciprocal promises." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179-80 (3rd Cir. 1999). However, "[m]odern contract law largely has dispensed with the requirement of reciprocal promises . . . provided that a contract is supported by sufficient consideration." *Id.* Delaware follows the modern trend: "A mutuality of obligation defense cannot be interposed where . . . the contract is supported by adequate consideration." *Simm Assoc. v. PNC Nat'l Bank*, No. 98C-02-219-WTQ, 1998 WL 961764, at *5 (Del. Super. Ct. Oct. 8, 1998); *see also Design Benefit Plans, Inc. v. Enright*, 940 F. Supp. 200, 204-06 (N.D. Ill. 1996) (disagreeing with *Lopez*, finding that mutuality of obligation not required if contract as a whole supported by consideration). While most courts have found that it is not necessary that parties to a contract bear reciprocal obligations to arbitrate claims, *see Harris*, 183 F.3d at 180-81, in a number of cases, courts have

pointed to mutual promises to arbitrate claims as consideration for arbitration clauses. *See, e.g., Michalski v. Circuit City Stores, Inc.,* 177 F.3d 634, 636 (7th Cir. 1999).

First USA argues that its promise to arbitrate claims is consideration for Frerichs' promise to arbitrate. This court is skeptical of this argument. The arbitration clause obligates Frerichs to arbitrate her claims, but the exceptions noted above appear to permit First USA to avoid arbitrating the claims it is most likely to bring against cardholders such as Frerichs. *See Lopez,* 1996 WL 210073, at *5.

Nevertheless, this court need not decide the issue because the arbitration clause is supported by other consideration. The Agreement here could be terminated by either party at any time. In *Research & Trading Corp. v. Powell,* 468 A.2d 1301, 1304-05 (Del. Ch. 1983), an at-will employee was given the option of signing a restrictive covenant or losing his position. The court found that the employee's continued employment was sufficient consideration for the restrictive covenant. *Id.* at 1305. Similarly, First USA's continuing offer of credit to Frerichs was sufficient consideration for Frerichs' promise to submit claims to arbitration. *See Garber v. Harris Trust & Sav. Bank,* 432 N.E.2d 1309, 1315 (Ill. App. Ct. 1982) (finding that by extending credit on new terms, card issuers gave consideration for amendment to cardholder agreements).

### C.   Did First USA Provide Proper Notice?

Frerichs contends that the arbitration clause failed to inform cardholders that they were giving up important rights, including the right to a jury trial and the right to the protections of the Federal Rules of Civil Procedure. As noted above, the arbitration clause contained the following provision:

13

IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.

No more is required. The Supreme Court has indicated that it is improper to impose higher standards on arbitration clauses than are imposed on other contract provisions. *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (finding that Montana statute requiring arbitration notice be typed in underlined capital letters on first page of contract impermissibly singled out arbitration clauses). First USA was not obligated to explain the ramifications of the arbitration provision. *See Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (9th Cir. 1988) (finding that defendant not required to explain "meaning and effect" of arbitration clause).

### D.    Does the Arbitration Clause Violate Public Policy?

Frerichs argues that the arbitration clause should not be enforced because it is contrary to public policy. She contends that although Delaware favors arbitration agreements because they promote efficiency, arbitration should not be favored here because it is not the most efficient means for resolving the present dispute. As a general matter, Frerichs' argument has been rejected by Congress, when it passed the FAA, and by the Supreme Court, which has interpreted the FAA as establishing a federal policy favoring arbitration. However, because requiring arbitration of the type of consumer complaint that is at issue here may significantly impair plaintiff's rights, her contentions deserve further discussion.

14

Frerichs argues that the most efficient means of resolving the present dispute is through a class action lawsuit. She contends that it would be inefficient to force "thousands, possibly millions," of First USA cardholders to arbitrate their FCRA claims separately.

This court is sympathetic to Frerichs' argument. Consumer protection statutes may depend on class action lawsuits as a means of policing compliance with the law, particularly where the potential recovery for an individual plaintiff is small. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997). However, courts have compelled litigation of claims under consumer protection statutes such as the Truth in Lending Act ("TILA"), even though arbitration prevented the plaintiff from litigating his or her claim on behalf of a class.[4] *See Sagal v. First USA Bank*, Civ. Action No. 98-694-RRM, slip op. at 7-10 (D. Del. Aug. 30, 1999) (rejecting argument that arbitration clause is unenforceable as to TILA claims); *Lopez*, 1996 WL 210073, at *2-3 (finding TILA claims arbitrable in general). In general, statutory claims are subject to arbitration (if they are within the scope of the arbitration clause), unless Congress intended to "preclude a waiver of judicial remedies for the statutory rights at hand." *Shearson/Am. Express v. McMahon*, 482 U.S. 220, 227 (1987). Frerichs has not attempted to show that there is a "congressional command" to preclude arbitration of FCRA claims.

Frerichs also argues that the arbitration fees are much higher than federal court fees, making arbitration an unappealing forum for plaintiffs, especially when the financial stakes for any individual are small and the action could otherwise have been litigated as a class action. In

---

[4] Here, it appears that the applicable arbitration rules could permit other cardholders to join Frerichs' arbitration. *See* National Arbitration Forum, Rule 19 (allowing joinder, intervention and consolidation of claims in certain circumstances). While the NAF rules may allow class arbitration, this court lacks the power to order class arbitration. *Champ v. Segal Trading Co.*, 55 F.3d 269, 276-77 (7th Cir. 1995).

*Randolph v. Green Tree Fin. Corp.*, 178 F.3d 1149, 1157-58 (11th Cir. 1999), the Eleventh Circuit refused to enforce an arbitration clause to compel arbitration of a plaintiff's TILA claim. The court noted that "[w]hen an arbitration clause has provisions that defeat the remedial purpose of [a] statute, . . . the arbitration clause is not enforceable." *Id.* at 1157 (quoting *Paladino v. Avnet Computer Tech., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998); *see also Shankle v. B-G Maintenance Management Co. Of Colo., Inc.*, 163 F.3d 1230, 1235 (10th Cir. 1999); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1485 (D.C. Cir. 1997). The court found that filing fees, arbitrators' costs and other arbitration costs may "curtail or bar a plaintiff's access to the arbitral forum." *Randolph*, 178 F.3d at 1158. If this court were located in the Eleventh Circuit, Frerichs might have a tenable argument. The arbitration clause here does not provide for apportionment of arbitration fees, though the arbitration rules do provide for a waiver of fees for indigent parties. National Arbitration Forum, Rule 45. She has attached to her response brief a schedule of the arbitration fees, though it is unclear at this stage how much Frerichs would have to pay to pursue her claim in arbitration. She has not provided any information about her personal circumstances that would establish that the costs of arbitration would prevent her from pursuing her claim in arbitration.

Of course, this court is not in the Eleventh Circuit. In *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 366 (7th Cir. 1999), the Seventh Circuit rejected a plaintiff's challenge to the arbitration procedures in the securities industry. The plaintiff brought a sex discrimination claim against her former employer. In finding that the claim must be submitted to arbitration, the court rejected the plaintiff's argument that "securities industry arbitrators routinely fail to follow Title VII's fee-shifting principle by refusing to award statutory attorneys'

fees to prevailing plaintiffs and by charging plaintiffs expensive forum fees." *Id.* Although the

Seventh Circuit indicated that it might be willing to review instances in which unreasonable fees

were imposed on a plaintiff, *see id.,* this court does not believe, based upon the Seventh Circuit's

forum selection clause jurisprudence, that the Seventh Circuit would follow the lead of the

Eleventh Circuit and find arbitration clauses unenforceable unless they "provide the minimum

guarantees required to ensure that [a plaintiff's] ability to vindicate her statutory rights will not

be undone by steep filing fees, steep arbitrators' fees, or other high costs of litigation."

*Randolph,* 178 F.3d at 1158.

Because Frerichs' claim against First USA is covered by the arbitration clause and

Frerichs has not shown that the arbitration clause is unenforceable, the arbitration clause is valid

and must be enforced as to Frerichs' claims against First USA.[5]

### 3. Is Frerichs Required to Arbitrate Her Claims Against the Other Defendants?

First USA argues that Frerichs must also arbitrate her claims against CSI and Experian.

The arbitration agreement provides that Frerichs must arbitrate claims against "the employees,

_____

[5]Despite this result, the court is troubled by what has occurred here. Relying on a clause in the original agreement permitting it to make unilateral modifications in the cardholder agreement, First USA has imposed on Frerichs a broad arbitration clause, apparently through a "bill-stuffer" notice hardly calculated to ensure effective notice. Requiring arbitration of this kind of consumer dispute, where little money is at stake and pursuing the dispute is economically feasible only in a court with its low filing fees and only if the class action mechanism is available, may effectively insulate First USA from a large spectrum of consumer complaints. Nevertheless, while a right to make unilateral modifications invites one party to try to take advantage of the other, while the notice sent by First USA was predictably overlooked by Frerichs, and while it is distressing to observe the ability of a sophisticated party like First USA to protect itself from consumer protection statutes like FCRA, this court can find no basis in the caselaw or in the statute for invalidating this arbitration clause. The remedy for Frerichs and other consumers, if they have one, is with Congress.

agents or assigns" of First USA. Neither CSI nor Experian is the employee, agent or assign of First USA.

First USA also notes that a court should order arbitration of claims against a defendant, even if the defendant is not a party to the arbitration agreement, if the claims are intertwined with the facts surrounding the underlying contract which contains the arbitration clause. *See Roberson v. The Money Tree of Ala.*, 954 F. Supp. 1519, 1526-29 (M.D. Ala. 1997). Here, although Frerichs alleges that First USA was part of the scheme to obtain and use Frerichs' credit report for an improper purpose, the claims against CSI and Experian are distinct from the claim against First USA.

## CONCLUSION

First USA's motion to stay this action and compel arbitration [12] is granted as to the defendant First USA. The motion is denied as to defendants CSI and Experian.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: September 30, 1999

18