# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN S. GOLD, And All Others Similarly Situated,<br><br>                    **Plaintiffs,**<br><br>v.<br><br>DANIELS LAW OFFICES, P.C. and HOUSEHOLD BANK (SB), N.A.,<br><br>                    **Defendants.** | Civil Action No. 04-CV-12409 |

## DEFENDANT HOUSEHOLD BANK (SB), N.A.'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR STAY OF PROCEEDINGS IN FAVOR OF ARBITRATION

Plaintiff Gold seeks to avoid arbitration on the grounds that the amendment adding arbitration terms to his credit card agreement (a) was "unilateral" by Household Bank (SB), N.A. ("Household Bank"),[1] and (b) means he will not have a jury trial of this dispute.  Neither argument has merit, for the reasons set forth below.  The arbitration provision was added by written notification to Plaintiff, following wholly conventional procedure that was explicitly authorized by the governing State law, specifically in accord with the pre-existing change-in-terms provision of his agreement, and common everyday practice in connection with open-end consumer lending agreements.  The enforceability of such arbitration provisions has repeatedly been sustained by courts, including this Court in a case not involving Household Bank, and

---

[1]    As of March 1, 2005, Household Bank (SB), N.A. changed its name to HSBC Bank Nevada, N.A.  For simplicity, we continue to refer to the bank herein as Household Bank.

including multiple other courts involving the same Household Bank terms. That the amendment in this case adopted an arbitration provision -- rather than affecting some other aspect of the credit card agreement -- did not require different change-in-terms procedures. The Federal Arbitration Act is clear that no special contract formation or amendment procedure can be imposed with respect to arbitration, as compared with other contractual terms; and this is so even though selection of arbitration rather than court proceedings necessarily means that there will be no jury trial.

Plaintiff's remaining arguments are directed at Defendant Daniels Law Offices, P.C. and not at Defendant Household Bank. They are therefore not addressed here.

I.     **Household Bank's Change-In-Terms Notice Was Proper And Effective, As A Matter Of Contract Law, To Amend The Cardholder Agreement To Add Arbitration Terms**

Federal law, through the Federal Arbitration Act ("FAA"), dictates that contracts to arbitrate are "valid" and "enforceable." 9 U.S.C. § 2. But in evaluating the requisites of contract formation to determine whether a contract to arbitrate has been made, state law governs. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) ("When deciding whether parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996) (holding that, under the FAA, general state law rules governing the formation of contracts apply with equal force to arbitration provisions); Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 19 (1st Cir. 1999) (quoting First Options).

In this case, the applicable State contract law is Nevada law. Nevada is where the bank, and Plaintiff's account, are located, and Nevada standards govern the financial terms of the

contract.  See generally, Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299

(1978); Smiley v. Citibank (S. D.), N.A., 517 U.S. 735 (1996).  The parties' agreement plainly

states that it shall be governed by federal law "and the laws of the State of Nevada."[2]  Plaintiff

does not dispute that Nevada law is the State law that governs.

      Nevada statutory law prescribes that a credit card contract, such as this one, may be

unilaterally changed by the bank, by mailing notice to the cardholder.[3]   Other federal cases have

considered Household Bank's  adoption of arbitration terms pursuant to this Nevada change-in-

terms procedure, and upheld it.[4]   Plaintiff argues that the process of unilateral amendment

through the change-in-terms notification process should not be accepted as a permissible way to

amend a credit card contract, at least with respect to arbitration, but that position is simply not

tenable in light of the Nevada statute specifically providing for it.  Indeed, Plaintiff

acknowledges in a footnote that the law is against him.  See Pl.'s Br. at 4 n.3 ("The Plaintiff

acknowledges those cases that uphold, as a general matter, a unilateral change in terms or

---

[2]     The parties' agreement is attached as Exhibit A to the Berdan Declaration ("Berdan Decl. Ex. A"), which is attached to Household Bank's Motion for Stay of Proceedings in Favor of Arbitration ("Def.'s Br.").

[3]     The statute reads as follows:

     An issuer may unilaterally change any term or condition for the use of a credit card without prior written notice to the cardholder unless the change will adversely affect or increase the costs to the cardholder for the use of the credit card. If the change will increase such costs, the issuer shall provide notice to the cardholder of the change at least 30 days before the change becomes effective.

Nev. Rev. Stat. 97A.140.4.

[4]     Lawrence v. Household Bank (SB), N.A., 343 F. Supp. 2d 1101, 1110, 1115 (M.D. Ala. 2004); Buffington v. Household Bank, No. 00-4469-CIV, slip op. at 3 (S.D. Fla. Aug. 17, 2001); Stuart v. Household Retail Servs., Inc., No. SA CV 99-987, slip op. at 8 (C.D. Cal. Dec. 14, 2000).  Copies of the unpublished orders in Buffington and Stuart are attached as Exhibits 2 and 4 to Def.'s Br.

conditions, specifically in conjunction with a specific State law, such as the one in place in Nevada.").

The Nevada statute accords with ordinary principles and expectations. A credit card account is not a term loan. It is customary that at-will banking agreements may be subject to change. There is nothing impermissible in a bank taking the position that it is not willing to extend credit card credit forever based on present terms, and that a person who wants to use the bank's money and credit in the future must accept new terms: A customer who is unhappy with the new terms (whether the interest rate, the late fees, or the arbitration terms) is free to pay off the open-end line, or move his account to a different institution.[5] The Truth-in-Lending Act's implementing regulation, Regulation Z, specifically envisions that price changes on credit card (and other "open-end credit") accounts will be effectuated by such mailed notice. 12 C.F.R. § 226.9(c)(1).[6]   See, e.g., Eovaldi v. First Nat'l Bank, 596 F.2d 188, 194-95 (7th Cir. 1979)

---

[5]   Plaintiff suggests that the bank was precluded from unilaterally amending credit card terms because the average consumer would find it difficult to terminate his or her account and pay the remaining balance. (Pl.'s Br. at 8.) That rule would turn the Nevada statute, and the parties' explicit change-in-terms agreement on its head: The bank would be precluded ever from changing its terms even though the parties' agreement was only to lend money and credit on an at-will basis. As the First Circuit has said in response to a similar argument, "inequality in bargaining power . . . 'is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.'"   Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 17 (1st Cir. 1999) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991)).

[6]   Regulation Z provides, in pertinent part:

(c) Change in terms--

(1) Written notice required.  Whenever any term required to be disclosed under § 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected.  The notice shall be mailed or delivered at least 15 days prior to the effective date of the change.

(holding that credit card issuer complied with Regulation Z by inserting notice of modified

billing procedure into billing statement envelope).[7] Moreover, pre-existing contractual terms

between Household Bank and Plaintiff specifically authorized Household Bank to "add new

terms at any time." (Berdan Decl. Ex. A.) Plaintiff advances no evidence disputing that the

change-in-terms notice was sent to him, and that he continued to use his account for new

purchases after receiving it. (Berdan Decl. ¶¶ 7, 9.)[8] This Court,[9] and other courts, [10] have

---

12 C.F.R. § 226.9(c)(1). Regulation Z was not applicable to the arbitration terms involved in this case because arbitration terms are not a required disclosure under the Truth-in-Lending Act.

[7]    Cf. Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 172 (1st Cir. 2004) (change-in-terms procedure followed in connection with deposit agreement (citing Eovaldi)).

[8]    There is nothing to the suggestion that a cardholder might reasonably have failed to understand that Household Bank's change-in-terms notice was an important piece of information, or that it concerned arbitration. The notice is emblazoned on the outside, in capital letters: "IMPORTANT INFORMATION FOR OUR CUSTOMERS;" the notice clearly states that it sets forth amendments to the card agreement; and the arbitration amendment is suitably captioned and set forth at length. (Berdan Decl. Ex. B.) Compare Eovaldi, 596 F.2d at 195.

[9]    Diamond v. M.B.N.A. Am. Bank, N.A., No. 03-30185, slip op. at 1 (D. Mass. Oct. 27, 2003) (holding that "the underlying [credit card] agreement between the defendant and the plaintiff is valid, and the amendment adding mandatory arbitration is equally valid.") (attached as Exhibit A).

[10]    See, e.g., Taylor v. First North American Nat'l Bank, 325 F. Supp. 2d 1304, 1307, 1314 (M.D. Ala. 2004); In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 399 (S.D.N.Y. 2003); Taylor v. Citibank USA, N.A., 292 F. Supp. 2d 1333, 1336-38 (M.D. 2003); Bellavia v. First USA Bank, No. 02 C 3971, 2003 WL 22425008, at *1, *4 (N.D. Ill. Oct. 22, 2003); Walton v. Experian, No. 02 C 5067, 2003 WL 22110788, at *1-*2 (N.D. Ill. Sept. 9, 2003); Bank One v. Williams, No. 301CV24DD, 2002 WL 1013161, at *1, *4 (N.D. Miss. Apr. 29, 2002), aff'd, 61 Fed. Appx. 120 (5th Cir. 2003); Vigil v. Sears Nat'l Bank, 205 F. Supp. 2d 566, 568, 572-73 (E.D. La. 2002); Beneficial Nat'l Bank v. Payton, 214 F. Supp. 2d 679, 687 (S.D. Miss. 2001); Lloyd v. MBNA Am. Bank, No. Civ.A. 00-109, 2001 WL 194300, at *4-5 (D. Del. Feb. 22, 2001), aff'd, No. 01-1752, 2002 WL 21932 (3d Cir. Jan. 7, 2002); Bank One v. Coates, 125 F. Supp. 2d 819, 831 (S.D. Miss. 2001), aff'd, 34 Fed. Appx. 964 (5th Cir. 2002); Goetsch v. Shell Oil Co., 197 F.R.D. 574, 577 (W.D.N.C. 2000); Herrington v. Union Planters Bank, 113 F. Supp. 2d 1026, 1030 (S.D. Miss. 2000), aff'd, 265 F.3d 1059 (5th Cir. 2001); Marsh v. First USA Bank, 103 F. Supp. 2d 909, 915 (N.D. Tex. 2000); Sagal v. First USA Bank,

previously enforced arbitration provisions in consumer lending agreements adopted pursuant to such procedures.[11]

These principles are not rendered inapplicable, as Plaintiff suggests, (Pl.'s Br. at 5) on the ground that the amended terms provide for arbitration. No "arbitration exception" is set forth in the Nevada change-in-terms statute; none is recognized by the cases; there is no such exception in the pre-existing contract terms authorizing the bank to make amendments; and no general principle would suggest such an exception. Moreover, arbitration terms should not be deemed judicially suspect. On the contrary, the FAA embodies a "liberal federal policy favoring arbitration agreements," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), specifically meant to "reverse centuries of judicial hostility to such agreements." Chase Commercial Corp. v. Owen, 32 Mass. App. Ct. 248, 252 (Mass. Ct. App. 1992). The FAA

---

69 F. Supp. 2d 627, 629-32 (D. Del. 1999), aff'd, 254 F.3d 1078 (3d Cir. 2001); Stiles v. Home Cable Concepts, Inc., 994 F. Supp. 1410, 1414-15 (M.D. Ala. 1998).

[11]     Plaintiff's reliance on Stone v. Golden Wexler & Sarnese, P.C., 341 F. Supp. 2d 189 (E.D.N.Y. 2004), appeal pending, is misplaced. That case declined to enforce an arbitration provision added by a change-in-terms procedure, specifically noting that the law of Virginia applicable to the account did *not* have a statute authorizing unilateral amendments, and it distinguished cases like those cited in footnote 10 specifically on that ground. See Pl.'s Br. at 4 n.3 (acknowledging that "the cases uphold, as a general mater, a unilateral change in terms . . . specifically in conjunction with a specific state law, such as the one in place in Nevada" allowing such changes). Stone was, in any event, wrongly decided: It is against the weight of authority even among cases that do not involve an explicit change-in-terms statute like the Nevada statute that controls here; contrary to general principles applicable to open-end contracts; and mistaken in its analysis. The decision was grounded in large part on the notion that the arbitration amendment was unrelated to other aspects of the parties' contractual relationship, but in reality it applied only to disputes arising from to the credit card relationship established by their contract.

Plaintiff also relies on Badie v. Bank of Am., 67 Cal. App. 4th 779 (Cal. Ct. App. 1998), which is similar to Stone and distinguishable on the same grounds. Moreover, in Badie, the California court's analysis was largely based on its determination that, not only was there no statutory authorization for amendment of the credit card agreement, but the parties had amended the agreement previously to preclude the addition of new terms on non-financial terms.

provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save

upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2

(emphasis added). Thus, the Supreme Court has held that the FAA precludes the imposition of

standards or requirements for adoption or enforcement of arbitration terms that are different from

those generally applicable to other contractual terms. Doctor's Assocs., Inc. v. Casarotto, 517

U.S. 681, 687 (1996).[12]


**II.     That No Jury Is Available In Arbitration Does Not Invalidate An Arbitration
          Agreement Adopted In Accordance With Ordinary Contractual Amendment
          Procedures**

The Seventh Amendment right to a jury trial is not a free-floating entitlement, but rather

is contingent on the existence of a proceeding in an Article III forum. "The Seventh Amendment

confers not the right to a jury trial per se, but rather only the right to have a jury hear the case

once it is determined that the litigation should proceed before a court." Cooper v. MRM Inv.

Co., 367 F.3d 493, 506 (6th Cir. 2004) (citation omitted); see also Hawkins v. AID Ass'n for

Lutherans, 338 F.3d 801, 808 (7th Cir. 2003) ("[T]here is no constitutional right to a civil jury

---

[12]       This is not to say, of course, that different standards may be applicable to the formation
or amendment of important contract terms (whether those terms relate to arbitration or some
other matter) in banking agreements, as contrasted with other types of agreements such as
employment agreements. For example, in Campbell v. Gen. Dynamics Gov't Sys. Corp., 321 F.
Supp. 2d 142 (D. Mass. 2004), an employer emailed its employees a new policy requiring
employees to submit all disputes to arbitration. Id. at 144. Invoking applicable civil rights
statutes, this Court held that notice by email was insufficient. Significantly, the Court limited its
holding to the employment context, noting that "Congress and the courts have looked more
critically at whether an employee has been given notice of mandatory arbitration in a civil rights
setting than in a commercial setting." Id. at 147. See also Rosenberg v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 170 F.3d 1, 17 (1st Cir. 1999) ("Our resolution of this case has no bearing
whatsoever on the enforceability of agreements to arbitrate consumer disputes."). Unlike
employers, who have many opportunities to communicate with their employees, credit card
issuers generally communicate with their customers *only* by mail. Household Bank did so here
in keeping with the procedures prescribed by federal law and the applicable Nevada statute.

trial outside of an Article III forum.").  Therefore, "[i]f the claims are properly before an arbitral

forum pursuant to an arbitration agreement, the jury trial right vanishes."  Cooper, 367 F.3d at

506 (citation omitted).  Given the dependence of the right to a jury trial on the right to proceed

in a federal forum, "the loss of the right to a jury trial is a necessary and fairly obvious

consequence of [the] agreement to arbitrate."  Sydnor v. Conseco Fin. Serv. Corp., 252 F.3d 302,

307 (4th Cir. 2001) (quoting Pierson v. Dean, Witter, Reynolds, Inc., 742 F.2d 334, 339 (7th Cir.

1984)); cf. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)

("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded

by the statute; it only submits to their resolution in an arbitral, rather than judicial, forum."); Volt

Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Jr. Univ., 489 U.S. 468, 476 (1989) ("There

is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy

is simply to ensure the enforceability, according to their terms, of private agreements to

arbitrate.").

Plaintiff's own cases make the point.  In Chase Commercial Corp. v. Owen, 32 Mass.

App. Ct. 248, 252 (Mass. Ct. App. 1992), cited at Pl.'s Br. at 4 n.4, for example, the Appeals

Court of Massachusetts upheld a jury waiver in a non-arbitration context, noting that

> "courts have been receptive to contractual waivers of broader procedural rights than the
> one involved here.  Private parties, for example, may be bound by a contract requiring
> arbitration of future disputes. . . .  Agreements in advance to arbitrate . . . eliminate not
> only the right to a jury trial on the merits of the dispute, but the right to *any* judicial trial."

Id. at 252.  Plaintiff does not  cite any case that requires an explicit jury trial waiver in the

context of arbitration.

Accordingly, the authorities concerning the standards applicable to jury waiver in the

context of a judicial proceeding are inapplicable to evaluating the validity of an arbitration

agreement; and Federal courts routinely uphold arbitration agreements against the challenge that

the agreement is an unenforceable waiver of Seventh Amendment rights.  See, e.g., Cooper, 367

F.3d at 506; Hawkins, 338 F.3d at 808; American Heritage Life Ins. Co. v. Orr, 294 F.3d 702,

711 (5th Cir. 2002); Snydor, 252 F.3d at 307; Burden v. Check Into Cash Of Kentucky, LLC,

267 F.3d 483, 492 (6th Cir. 2001).  This Court, as well as other federal district courts within this

Circuit, has followed this precedent.  See, e.g., Gonzalez v. GE Group Adm'rs, Inc., 321 F. Supp.

2d 165, 169 (D. Mass. 2004); Sleeper Farms v. Agway, Inc., 211 F. Supp. 2d 197, 203 (D. Me.

2002); Hurlbut v. Gantshar, 674 F. Supp. 385, 389 (D. Mass. 1987); cf. Rosenberg v. Merrill

Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 13 (1st Cir. 1999) (the ADEA's right to a jury

trial can be waived by an arbitration agreement because a "party who agrees to arbitrate . . .

'submits to . . .  an arbitral, rather than a judicial, forum.'") (quoting Gilmer v. Interstate/Johnson

Lane Corp., 500 U.S. 20, 26 (1991)).

    These principles apply with equal force where the arbitration agreement was added

pursuant to a change-in-terms provision.  Federal courts have rejected the argument that such

arbitration agreements inappropriately deprived them of the Seventh Amendment right to a jury

trial.  See, e.g., Bank One, N.A. v. Coates, 125 F. Supp. 2d 819, 834 (S.D. Miss. 2001), aff'd,

2002 WL 663804 (5th Cir. Apr. 5, 2002) (unpublished table decision); Marsh v. First USA Bank,

N.A., 103 F. Supp. 2d 909, 921-22 (N.D. Tex. 2000); Buffington v. Household Bank (Nevada),

N.A., No. 00-4469, slip op. at 4-5 (S.D. Fla. Aug. 17, 2001).  "A valid arbitration provision,

which waives the right to resolve a dispute through litigation in a judicial forum, implicitly

waives the attendant right to a jury trial."  Marsh, 103 F. Supp. 2d at 921.

**III.    Plaintiff's Remaining Arguments Are Not Applicable To Defendant Household Bank**

Part I.B of Plaintiff's brief argues that the arbitration agreement does not apply to Daniels Law Offices, P.C.  Part I.C of his brief argues that Count III of the Complaint cannot be arbitrated because it requests a Court order directed at Daniels Law Offices, P.C.  Count III is explicitly limited to Daniels Law Offices, P.C. and not Household Bank.  (Compl. at 17.) Because these arguments do not relate to Household Bank, we do not address them.

<u>CONCLUSION</u>

Plaintiff's claims against Household Bank should be stayed in favor of arbitration.

Respectfully submitted,

Defendant Household Bank (SB), N.A.

By its attorneys,

_____/s/ Gabrielle R. Wolohojian_____
Gabrielle R. Wolohojian, BBO # 555704
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
(617) 526-5000

Christopher R. Lipsett
Shoshana L. Gillers
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800
(212) 230-8888

**Certificate of Service**

I, Gabrielle R. Wolohojian, hereby certify that I caused a true and accurate copy of the foregoing document to be served via the electronic docketing service on counsel for each other party this 8th day of March, 2005.

___/s/Gabrielle R. Wolohojian_____
Gabrielle R. Wolohojian

US1DOCS 5005790v1

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT C. DIAMOND,<br>            Plaintiff | )<br>)<br>) |
| v. | ) CIVIL ACTION NO. 03-30185-MAP<br>) |
| M.B.N.A. AMERICA BANK, N.A.,<br>            Defendant | )<br>) |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION TO DISMISS
AND COMPEL ARBITRATION
(Docket No. 5)

October 27, 2003

PONSOR, U.S.D.J.

For the reasons set forth by the court in more detail following oral argument on October 17, 2003, the defendant's motion is hereby ALLOWED.  The clerk will enter judgment for the defendant.

In sum, the court finds that Delaware law applies and requires arbitration in this case.  The underlying agreement between the defendant and the plaintiff is valid, and the amendment adding mandatory arbitration is equally valid.  Under these circumstances, the parties' contractual arbitration clause is fully enforceable.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

1                    UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2                       WESTERN SECTION

3

4

5    ROBERT DIAMOND            .   Docket No. CA 03-30185-MAP
                         .
6          v.           .   Springfield, MA
                         .
7    MBNA                 .   October 17, 2003
    . . . . . . . . . . . . . . . . . . . . . .   3:01 p.m.
8

9

10

11                    TRANSCRIPT OF HEARING HELD

12             BEFORE THE HONORABLE MICHAEL A. PONSOR,

13            UNITED STATES DISTRICT COURT JUDGE.

14

15

16    <u>APPEARANCES</u>:

17

18    For the plaintiff:  Mark Bluver and Taruna Garg, 1441
                         Main Street, Suite 1100, Springfield,
19                         MA 01075.

20

21    For the defendant:  Beth Bookwalter, 60 State Street,
                         Boston, MA 02109.
22

23                 Alice Moran, CSR, RPR, RMR
               Official Federal Court Reporter
24               1550 Main Street, Room 536
                 Springfield, MA 01103
25          Tel: 413-731-0086  Fax: 413-737-7333

```
 1                    (Hearing commenced at 3:01.)

 2

 3              THE CLERK:   This is the case of Robert Diamond

 4    versus MBNA, Civil Action, 03-30185.

 5              THE COURT:   We are here this afternoon for

 6    argument on the defendant's motion to dismiss and compel

 7    arbitration, or in the alternative to stay these court

 8    proceedings pending completion of arbitration.

 9         What I'd like to do is in a brief and crude way

10    summarize what I understand to be the background facts

11    and also the little flashpoints of disagreement between

12    the parties and then hear your argument.

13         Before I get started, I think I'd like to have

14    counsel introduce themselves so I know who I've got here.

15    I will start here on my left.

16              MS. GARG:   Good afternoon, Judge.   Taruna Garg

17    of Shatz, Schwartz & Fentin.

18              THE COURT:   Very good.  Mr. Bluver.

19              MR. BLUVER:   Good afternoon, Your Honor.   Mark

20    Bluver.

21              THE COURT:   Very Good.

22              MS. BOOKWALTER:   Good afternoon, Your Honor.

23    Beth Bookwalter from Hale & Dorr representing MBNA.

24              THE COURT:   Okay.   One thing I should put on

25    the record is that Mr. Bluver and I know each other in a
```

1    non-judicial capacity.  We both enjoy bike riding and

2    several times we have been in the same group of riders

3    taking weekend rides.  It's been a while since we've done

4    that, but we do have occasional contacts doing that and

5    also occasionally meeting over at the gym.

6        We don't have an association that's close enough

7    that I feel my objectivity is in any way compromised or

8    even touched, but that is a fact and I just want to make

9    sure defense knew about it.  If you begin to sense

10   there's a problem, bring it to my attention.  You can

11   file an appropriate motion but I wanted to let you know

12   that.

13              MS. BOOKWALTER:  Thank you, Your Honor.

14              THE COURT:  This is in some ways a simple case.

15   It involves the plaintiff who has had a series of

16   problems with charges on his MBNA credit card arising

17   from, as I understand it, online gambling.

18       He has been a credit card holder since 1987 I

19   believe, and -- yes, a credit card holder since November

20   of 1987 with MBNA.

21       In 1999, after Mr. Diamond had been holding the

22   credit card for more than ten years, MBNA amended its

23   agreement with its card holders to include a mandatory

24   arbitration clause which I'll refer to as the amendment.

25       One point of disagreement which I'll look forward to

1   hearing from you about during oral argument is the

2   question of how relevant it is that the plaintiff denies

3   receiving a copy of that amendment, being put on notice

4   of that amendment.

5       The defendant takes the position that there is a

6   presumption when notification occurs in the ordinary

7   course of business that the notification was received.

8       The defendant points out that the plaintiff indeed

9   received his bills on a regular basis at his ordinary

10   place of residence and paid those bills, and that there

11   is a presumption that the amendment was sent out to the

12   same location and that he received it.

13       Mr. Diamond has submitted an affidavit saying that

14   he did not to the best of his knowledge receive the

15   amendment.  And so I'm in somewhat of a quandary, a mild

16   quandary, about that issue.  Because on the one hand it

17   is conceivable that an entity like MBNA, which I assume

18   has tens of thousands, if not hundreds of thousands of

19   card holders, conceivably could forget to send or for

20   some reason omit to send a copy of the agreement to the

21   card holder.

22       It would be hard for them to say absolutely when a

23   card holder says he doesn't think that they ever got a

24   copy of the amendment to point to a registered letter or

25   anything of that sort which would positively confirm that

1    the copy of the amendment was sent.

2        On the other hand, I'm also aware of the fact that

3    most of us when we get this junk from our credit card

4    companies look at it.  We're mystified.  We confirm that

5    it's not a bill and we chuck it in the garbage and forget

6    about whether we ever got it or not.  So I don't know

7    really what that situation is or how relevant that is to

8    the issues in this case.

9        But in any event the defendant says we did it.  It

10   was part of our ordinary practice.  We never had any

11   problem staying in touch with Mr. Diamond.  He must have

12   gotten it.  Mr. Diamond says as far as I know, I never

13   did get it and I don't know the significance of that or

14   how that point should be handled.

15       But, in any event, I think it is undisputed that at

16   least from MBNA's point of view that they did amend their

17   agreement with the card holders and include a mandatory

18   arbitration clause.

19       Two years later, or a year plus later, Mr. Diamond

20   got into some problems with his credit card related to

21   gambling online.

22       Now why anybody would ever do that, heaven only

23   knows.  But, in any event, he did it and he got into

24   problems where he owed over $30,000 on his credit card as

25   a result of online gambling.

1           Now, Mr. Diamond took the position that at least

2      some of that $30,000 plus debt was not legitimate.  That

3      he had winnings which weren't credited.  That there were

4      charges that shouldn't have been on there.  It seems

5      undisputed that at least a significant portion however of

6      that $30,000 plus was -- he took his chance and he lost.

7           Okay.  He contacted MBNA and there was some

8      negotiations which went on and at the conclusion of which

9      it emerged that the credit card company was willing to

10     take $2,500 in complete satisfaction of the $30,000 plus

11     debt that Mr. Diamond was looking at.

12          Around this time, or during the course of these

13     discussions as I understand it, Mr. Diamond was told by

14     somebody at MBNA that we don't enforce gambling debts.

15     Why they wouldn't, I don't know.  But, in any event,

16     somebody said something about we don't enforce gambling

17     charges on our credit cards.

18          I guess what happened at that point was that Mr.

19     Diamond then decided that he probably was being wreckless

20     in suggesting that he even paid $2500 when he really

21     could perhaps not pay anything so he wrote a letter

22     purporting to withdraw his offer apparently to pay the

23     $2500.

24          Then things get a little bit more mystifying because

25     only about three months later Mr. Diamond racks up

1    another $30,000, or at least his credit card reflects a

2    claim of $30,000, an additional $30,000 plus charges

3    related to online gambling and he again disputed the

4    charge.

5        Again, there seems to be -- again, I'm kind of

6    drawing inferences here, but there seems to be a claim on

7    the one hand that the charges were inflated unfairly.

8    That it contains at least some charges that he shouldn't

9    have to pay, and also that maybe he did lose some portion

10   of this $30,000.

11       So there's two defenses to the $30,000 as I

12   understand it.  One is I shouldn't have to pay any of it

13   because I shouldn't have to pay gambling losses that I

14   incurred online.

15       That strikes me as kind of strange because it gives

16   somebody, I suppose -- I don't think he'd give the money

17   back if he won.  So you go online and you use your credit

18   card and bet and then if you lose, you don't have to pay

19   it.  So there's an aspect of this whole gambling online

20   thing that kind of goes over my head.

21       But he makes a claim that he doesn't have to pay any

22   of that because it's a gambling debt I think, but he

23   makes a claim that even if I have to pay what we might

24   call legitimate gambling debts -- that is money that I

25   actually bet and lost -- there's some portion of this

1    $30,000 which is over and above that and which is not

2    legitimate even if you assume that some of the gambling

3    charges are partly his responsibility.  So he has, for

4    lack of a better word, a beef about this second $30,000

5    debt that he racked up online.

6         At this point, apparently if I understand it

7    correctly, MBNA is saying, well, no.  You owe the $30,000

8    and you also owe the $2500 that we agreed you would pay

9    the first time you got into this problem, and I think

10   that in crude terms is what their position is right now.

11   You owe us $30,000 plus and the plaintiff's position is

12   no, I don't.  It's disputed.

13        When the dispute occurred, MBNA invoked its

14   arbitration clause in its current agreement with its card

15   holders, and apparently the claim by MBNA now is for a

16   little over $30,000, $30,300 and change.

17        MBNA invoked the arbitration clause before the

18   National Arbitration Forum.  The plaintiff filed a

19   response to the arbitration claim.  There was a so-called

20   document hearing which was scheduled in June.  Plaintiff

21   filed an objection to that, and then in June of this year

22   filed this lawsuit in superior court several counts

23   including some federal statutes.  It was removed here by

24   MBNA and here we are.

25        MBNA's argument is pretty simple.  The agreement

1  calls for arbitration; you're not supposed to be here.

2  You're supposed to be in arbitration.

3       Everybody concedes that federal courts love

4  arbitration.  Supreme Courts love arbitration.  Federal

5  courts love arbitration.  That's one headache we don't

6  have to deal with.   It goes into arbitration and there

7  it is.  So there is quite a strong presumption in favor

8  of arbitration which is a boulder that the plaintiff is

9  going to have to deal with here that is not an easy

10  boulder to overcome.

11       The plaintiff takes the position that the

12  arbitration agreement is not enforceable.  First of all,

13  it was a contract of adhesion.  The defendant says that

14  doesn't matter.  It was a take-it-or-leave-it kind of

15  contract.

16       The defendant's position is he was given an

17  opportunity to opt out.  He could have decided that he

18  was going to get his credit card from some other company

19  if he wanted to, and there is nothing that in any way

20  undermines an arbitration agreement simply because it's a

21  one-way contract.

22       The defendant also takes the position that

23  consideration for that agreement was the defendant's

24  continued supplying of credit.

25       The plaintiff takes the position that the

1    arbitration agreement was never properly disclosed to the

2    plaintiff and there was never any meeting of the minds

3    about it.  And, again, I'll be interested in hearing the

4    defendant's position on that.

5        The plaintiff also takes the position that there was

6    a unilateral amendment to the terms of the contract.  And

7    it's certainly true that in some cases the court will not

8    recognize unilateral amendments of the terms of a

9    contract but the defendant responds that in the credit

10   card context, this kind of unilateral amendment is

11   recognized and permitted.

12       I myself have written on a couple of occasions in

13   other context that a unilateral agreement or unilateral

14   amendments to an agreement would not be enforceable.  The

15   question is does that case law really apply to this type

16   of a situation?

17       I guess one of the things that I'm concerned about,

18   and this is a question for the plaintiff, is the kind of

19   slippery slope argument.

20        If there's an arbitration agreement in a contract, a

21   credit card contract, does the plaintiff just have to

22   come in and say I never got it?  It's unilateral.  It's a

23   contract of adhesion and I don't have to go to

24   arbitration.  Because if that's the case, you might as

25   well chuck all the arbitration agreements out.  Everybody

1   is going to be able to say with credibility I don't

2   remember ever getting this agreement and in that case

3   there won't be any arbitrations.

4        People will always be able to come in here and get

5   before a jury.  Although, well, in this case I'm not sure

6   how sympathetic a jury would be to an individual who got

7   himself in over his head in this particular way, but that

8   would be a question for later on.

9        So we're arguing really about the nature of the

10  contract and whether the arbitration agreement applies.

11  The defendant's responses to the plaintiffs are pretty

12  simple.  That this is an enforceable arbitration

13  agreement.  It's governed by Delaware law, not

14  Massachusetts law, and the plaintiff should go ahead and

15  get whatever remedies he's going to get in the

16  arbitration proceeding which is already started.

17       That's a very clumsy summary of some fairly nuanced

18  issues but at least it will put the thing in context, and

19  what I think I'd like to hear now is from you, Ms.

20  Bookwalter.  Correct anything that I've misstated; fill

21  in anything significant that I've left out, and we will

22  just get right to the crux of it.

23            MS. BOOKWALTER:  Thank you, Your Honor.  I

24  think your summary of the allegations in the complaint is

25  fair.  Obviously many of them are contested by MBNA, and

1    should the case go forward, MBNA will take issue with

2    some of the arguments that have been raised.

3         The motion to compel arbitration to dismiss this

4    matter should be granted because, as Your Honor has

5    identified, there is an arbitration clause here that

6    governs the relationship between MBNA and Mr. Diamond,

7    and that is the arbitration clause in the 1999 amendment

8    which was added to the initial 1987 credit card

9    agreement.

10        The language in that arbitration clause is broad and

11   it covers any claim or dispute arising under the

12   agreement or the account, and it includes claims whether

13   they arise in statute, in contract, in tort, or

14   otherwise.

15        THE COURT:  Right.  I don't think there's too

16   much a dispute that if the arbitration agreement is

17   valid, it embraces the dispute that we have here.

18        MS. BOOKWALTER:  And, Your Honor, I think that

19   Mr. Diamond has not contested that that would be the

20   case.  Should the arbitration clause be found to be

21   valid, he has not contested to this point that all of

22   these claims would fall underneath the language in that

23   clause.

24        There is an issue as to what law should be applied.

25   The 1987 credit card agreement contains a Delaware choice

1  of law provision, and that is the appropriate law for

2  this Court to apply pursuant to the terms of that

3  contract.  However, the outcome would be the same whether

4  Delaware or Massachusetts law were applied.

5       Mr. Diamond's chief argument against applying that

6  choice of law provision is that there are some public

7  policy reasons that Massachusetts law recognizes that

8  would prevent the application of Delaware law.  But given

9  that the outcome would be the same, whether Delaware or

10  Massachusetts law were applied, it cannot be said that

11  there is any public policy reason to disregard the

12  party's agreement in the contract that Delaware law

13  should govern.

14       This Court is not the first court to review MBNA's

15  credit card agreements which have been amended by

16  additions of arbitration clauses.  There are three courts

17  in particular who have recently reviewed virtually

18  identical MBNA credit card agreements and arbitration

19  clauses.  Those are the cases of Lloyd, Edelist and

20  Joseph v. MBNA, which I'll discuss a little bit more

21  later in detail.

22       In all of those cases the courts have found that the

23  arbitration clause added into the initial credit card

24  agreement by amendment was valid and was enforceable.

25       And in all of those cases the credit card holders,

1    some of them were class action, but at least some of the

2    credit card holders in each case disputed whether they

3    had actually received the notice or whether they had read

4    the notice had it been received.  And again in each of

5    those cases the court found that due to the mailing

6    procedures utilized by MBNA, that this provided

7    sufficient notice to the credit card holders and that

8    that was the end of the inquiry.  The denial by the

9    credit card holder themselves did not trump the valid

10   notice pursuant to the mailing procedures used.

11        In this particular case because the arbitration

12   clause is valid as Your Honor recognized, the policies

13   under the Federal Arbitration Act require that the

14   parties be compelled to arbitrate their dispute.

15        And, in addition, dismissal would be appropriate in

16   this case because, as we just recognized, the arbitration

17   clause is broad and would cover all of the claims that

18   Mr. Diamond has brought before this Court.  So rather

19   than stay the action, MBNA would ask the Court in fact to

20   dismiss the action in its entirety.

21        THE COURT:  Now the other three courts that

22   have concluded that a simple denial of having received

23   the amendment is insufficient to defeat an effort to

24   enforce the arbitration clause contained in the

25   amendment, with regard to those courts, what rationale

1  did they rely on?  Did they find that there was a

2  presumption, or did they find that it was an inadequate

3  denial?  How did they handle that?

4          MS. BOOKWALTER:  That is right, Your Honor.

5  There was found that there was a presumption of receipt

6  if proper mailing procedures were established, and let me

7  just talk a little about the cases that address that

8  issue in particular.

9      As I mentioned, there are three cases that were

10 addressing MBNA's agreement in particular and then

11 there's some additional cases that address other credit

12 card company agreements where the same issue arises.

13     In the case of <u>Edelist</u>, the Delaware Superior Court

14 was facing a very similar issue.  MBNA amended an initial

15 credit card agreement by adding an arbitration clause.

16 The credit holder denied that he ever received the

17 amendment and claimed, as Mr. Diamond did here, that it

18 should not be applied to him.

19     MBNA in that case submitted an affidavit, such as

20 the affidavit of Ms. Fisher that MBNA has submitted in

21 this case, and in that affidavit MBNA described its

22 mailing procedures by which it noticed the card holders

23 of the amendment to the agreement including the

24 arbitration clause.

25     In Ms. Fisher's affidavit, which has been submitted

1    in this case, she details the procedures MBNA used in

2    1999 to notice Mr. Diamond of the amendment to his

3    agreement.

4        And she explains that MBNA has a regular practice of

5    using a vendor to accomplish all mailing; that MBNA keeps

6    a list of customers who are receiving amendments, and

7    that the vendor also keeps track not only of that

8    customer list but whether any of the mailings that it

9    sends out are returned by the United States Postal

10   Office, and all that information is retained regularly in

11   MBNA records.

12       THE COURT:  The cases that have specifically

13   addressed the MBNA's amendment to its agreement which

14   includes the arbitration clause, were they all state

15   court cases?  I notice two of them are.  I think _Edelist_

16   and _Joseph_.  _Joseph_ is an Ohio case.  _Edelist_ is a

17   Delaware case.

18       MS. BOOKWALTER:  That's right.  The _Lloyd_ case

19   was from the Delaware District Court.  It was a federal

20   case, and it came out the same way as _Edelist_ did.  The

21   court found that the arbitration clause was enforceable,

22   and although that opinion does not make as much of the

23   issue of denial of receipt, there is language in the

24   opinion that's consistent with what the _Edelist_ state

25   court says, which is that proper mailing of the amendment

1     is all that the credit card company needs to demonstrate.
2     That there is no requirement that the credit card company
3     demonstrate that the person actually received the
4     amendment because of the presumption that a letter
5     properly mailed is received.
6          And Your Honor mentioned the <u>Joseph v. MBNA</u> case.
7     In that particular case the court took note of MBNA's
8     mailing procedures which were described in the opinion to
9     be the same as Ms. Fisher describes in her affidavit.
10          And in <u>Joseph</u> the court noted that there were
11     several other courts who previously found that MBNA's
12     mailing procedures were sufficient to give notice to card
13     holders.  In <u>Joseph</u> the court also adopted that sentiment
14     and found that the mailing procedures MBNA used were
15     sufficient.
16          And, again, in the opinion of <u>Joseph</u> the mailing
17     procedures described are the same as those described in
18     Ms. Fisher's affidavit.  It's the same procedures that
19     MBNA has been using at least since 1994.
20          There are two other cases that I think are helpful
21     on this issue.  They don't deal specifically with MBNA's
22     credit card agreements but they did address this issue of
23     whether the denial of receipt by a credit card holder is
24     enough to overcome this presumption that a notice
25     properly mailed has been received.

1     In particular, in Delaware -- there's a District of

2  Delaware case called <u>Pick v. Discover</u> in which the issue

3  was raised, and there the court found that the credit

4  card company had established that it used proper mailing

5  procedures and that that overcame the credit card

6  holder's denial that he had ever received the amendment.

7     The <u>Pick</u> case also dealt with an amendment to a

8  credit card agreement that added in an arbitration clause

9  to the pre-existing credit card agreement.

10    The other case that bears reference is a case from

11 the Northern District of Texas called <u>Marsh</u>, and in that

12 case this issue was discussed in several paragraphs of

13 the opinion.

14    In the <u>Marsh</u> case the credit card holder had

15 submitted affidavits, much like Mr. Diamond has submitted

16 in this case, in which they deny that they had ever

17 received an amendment that contained an arbitration

18 provision to their credit card agreement.

19    And in the <u>Marsh</u> case again the court came out the

20 same way as the Delaware courts and the Ohio Court of

21 Appeals came out finding that the credit card company had

22 established proper mailing procedures and that that

23 presumption -- the presumption that that notice properly

24 mailed was received would overcome any denial in the

25 affidavits of the credit card holders claiming that they

1    had in fact not received the amendment.

2              THE COURT:  All right.  Very good.

3              MS. BOOKWALTER:   I think one other thing in

4    Mr. Diamond's affidavit is of interest, and Your Honor

5    mentioned this in the summary that you gave at the

6    beginning.  Mr. Diamond acknowledges in his affidavit

7    that he did from time to time receive materials from MBNA

8    but that his practice was generally to disregard any

9    information that was not a bill.

10             THE COURT:  That's what everybody does probably

11   in this room.

12             MS. BOOKWALTER:  And, Your Honor, in some of

13   the opinions in which the court finds that the credit

14   card holder's mere denial is not enough, there is a

15   suggestion that that is one of the underlying reasons for

16   finding that the credit holder similar saying I did not

17   receive it cannot overcome the presumption that one's

18   notice is properly mailed that it will in fact be

19   received.

20             THE COURT:  All right.  Let me hear from the

21   plaintiff unless there's something you think is very

22   important you want to add.

23             MS. BOOKWALTER:  I would just address a little

24   bit the unilateral modification issue.  The -- whether or

25   not Delaware law is applied, the outcome of the validity

1   of the arbitration clause is the same.  It remains

2   enforceable under Massachusetts law as well as Delaware.

3       In Delaware, as Your Honor may know, there is an

4   explicit statutory scheme that allows banks to amend

5   credit card agreements unilaterally.  And that statutory

6   provision, which is Title 5 in Delaware code at Section

7   952, specifically references arbitration agreements and

8   permits bank to amend credit card agreements unilaterally

9   to include such arbitration provisions.

10      In Massachusetts unilateral modifications are

11  permitted where the contract is a terminable at-will

12  contract.  This issue was recently addressed in the case

13  of Cochran v. Quest by the First Circuit.  That was an

14  opinion that came out as recently as April of this year.

15  And in that case the First Circuit found that an employer

16  was entitled to unilaterally amend a terminable at-will

17  employment contract to change the terms of compensation.

18      The reasoning that the First Circuit expressed in

19  that case was that at any time either the employer or the

20  employee could have ended the agreement.  So the

21  unilateral modification was simply a renegotiation of the

22  terminable at-will contract.  This same situation is

23  present here.

24      At any point Mr. Diamond could have cancelled his

25  account with MBNA.  He could have sought credit from any

1    number of other credit card issuers.  By the same token,

2    MBNA had the right to terminate at any point its

3    relationship with Mr. Diamond.

4         So the situation here is the same as that which was

5    just addressed by the First Circuit in <u>Cochran</u> finding

6    that the unilateral modification of terminal at-will

7    contract is permitted.

8         And in <u>Cochran</u> the court also addressed the issue of

9    consideration for the unilateral modification.  The court

10   in <u>Cochran</u> found that the employer's promise to continue

11   the employment, again where the agreement is terminable

12   at will, constitutes valid consideration for the modified

13   terms.

14        The situation is the same here again.  MBNA has

15   promised to continue offering Mr. Diamond credit was the

16   consideration for his agreement to the modified terms as

17   they appeared in the 1999 amendment, and as we have

18   discussed that included the arbitration provision.

19             THE COURT:  Let me stop you.  I'm interested

20   in hearing the plaintiff's response to some of these

21   arguments.  I may give you an opportunity to reply when I

22   heard the plaintiff's response.

23             MS. BOOKWALTER:  Thank you, Your Honor.

24             THE COURT:  All right.  You have hard cases.

25   I'm hoping one of these days you'll come in with somebody

1    named Rockefeller who's rear-ended one of your clients.

2    This is a tough one given the presumption and all of the

3    case law about arbitration.

4              MR. BLUVER:   That's what makes my job

5    interesting, Your Honor.

6              THE COURT:   Yeah.

7              MR. BLUVER:   Good afternoon, Your Honor.  Your

8    Honor, formally Taruna Garg is a new associate in our

9    office and the first time she's in this court.

10             THE COURT:   Nice to meet you.

11             MR. BLUVER:   While she did a lot of the work,

12   any errors in the research or anything like that or

13   misspellings --

14             THE COURT:   Both sides are extremely good.

15             MR. BLUVER:   -- is my fault.

16        Let me just jump to the two points I think I hear

17   you asking.  One is the relevant issue about notice of

18   the unilateral amendment position counsel has been

19   talking about and the reliance on the cases in the

20   employer/employee context.

21        There's no case in Massachusetts, other than in the

22   context of an at-will employment case, where there's

23   anything where a court has allowed a unilateral after the

24   fact amendment that has dramatically or even

25   insignificantly changed the relationship, the bargain to

1   the relationship between the parties.

2       These employer/employee contract cases are very

3   interesting because starting with the O'Brien case and

4   AT&T out of the Supreme Judicial Court, you got to be

5   careful what you ask for.  That was -- it was an employee

6   manual and the plaintiff's position was that the employee

7   manual had created a contract, and it was the defendant

8   employer's position that that wasn't the case.  There was

9   no contract.  When you're at will, you're at will and

10  there is no contract.

11      And for the first time, I forget the years, I know

12  it's recent, a year couple years, three years ago, the

13  Supreme Judicial Court said in that case on that manual

14  we're going to call it a contract because there was

15  enough detail and it looked like the employer had

16  actually followed it.  So it wasn't exactly at will

17  anymore.  There was a contract.

18      What happened in the case was the plaintiff didn't

19  follow the terms of the contract and ended up being

20  kicked out of court.

21      In the First Circuit case -- I mean, to the extent

22  that these relationships between employees and employers

23  are truly at will, it seems to make sense that the

24  employer, if it changes a condition of employment and the

25  employee elects not to stay on or can't stay on, he has

1    no grounds to stand on because he never had a contract.

2    And in all of those cases the employer never argued that

3    there was a contract.

4         So using the term contract in that -- while perhaps

5    from an argument point of view is easy to use, it's not

6    the same situation as what you normally think of when two

7    parties actually have an agreement between themselves for

8    one party to do one thing and another party to do another

9    thing and they continue on their merry way based on that

10   relationship.  And then as this Court, and other courts

11   have said, when one party after the fact changes

12   significant terms of the relationship, unless there's

13   independent consideration, unless there's a meeting of

14   the minds, unless there's some notice, it's not going to

15   be enforceable.

16        THE COURT:  Let me try and separate out the

17   notice issue from the issue of unilateral amendment

18   because I found Ms. Bookwalter's argument on this point

19   pretty compelling.

20        Let's suppose there's no question but let's call him

21   instead of Diamond we'll call him Gold.  He gets the

22   notice.  He clearly gets a notice.  Here it is.  Here's

23   the notice I got, and the notice from the credit card

24   company says we don't want to do business with you

25   anymore under the terms of the old contract.

1      We are only willing to do business with you unless

2    -- we're only willing to do business with you under the

3    terms of this new contract.  We are modifying the new

4    contract.  You have a certain amount of time to tell us

5    if you don't want to do business with us under the terms

6    of the new contract.

7      If we don't hear from you within thirty days, we

8    will assume you want to do business with us under the

9    terms of the new contract.  Unilateral amendment but that

10   doesn't seem to be so bad, so unfair.

11     If you slide out the issue of notice -- and I

12   understand there's an interesting question with regard to

13   notice -- but isn't that basically what they said?

14     Here he had this old agreement.  We are changing it.

15   If you don't like it, you have a certain amount of time

16   to tell us you don't want to do business with us anymore.

17   If you continue to use our credit, we're going to assume

18   that you want to take on this new responsibility, this

19   new term of the agreement.

20     They didn't hear anything.  There we are.  It is a

21   unilateral agreement but it seems to me under those

22   circumstances it would be hard for you to argue, forget

23   it.  I have a right to continue to do business with you

24   under the terms of the old agreement.  I don't agree to

25   any modification and you have to continue to give me

1    credit under those old terms not under the new terms.

2    Now that seems to be a big stretch.

3              MR. BLUVER:   That would be a different set of

4    facts and it may result in a different response from me,

5    and I'm cognizant of that.

6         I want to ask you if I could to step back for a

7    second and then I will try because I don't want to avoid

8    a question.

9         As I understood the papers that were submitted by

10   MBNA on this point, it really stems, if you would, the

11   authority to enter into this amendment -- the authority

12   for them to make this unilateral change stems back from

13   the 1987 agreement and they point to an amendment clause

14   that was contained in Exhibit 1 to Ms. Fisher's affidavit

15   that was filed in opposition or in support of the

16   defendant's position.   And the amendment clause says as a

17   consumer might reasonably expect it is about halfway down

18   the first major chunk.

19             THE COURT:   It says here important amendments

20   to your account agreement.

21             MR. BLUVER:   I'm reading under "We may amend

22   this agreement by notifying you of the amendment."

23             THE COURT:   That's Exhibit A?

24             MR. BLUVER:   I believe it is the second page of

25   the premium card agreement, Exhibit A.

1        THE COURT:  Yes, I see it.

2        MR. BLUVER:  And if you look at that, Your

3   Honor, it says, yes, we can amend this agreement by

4   notifying you of the amendment and then the substantive

5   sentences afterward all have to do with changes in the

6   finance relationship.

7        And I suggest to the Court that that's significant

8   because it is consistent with what an average consumer,

9   an average -- and a bank who's issuing credit, I think

10  it's consistent that an average consumer would expect

11  that from time to time the finance relationship is going

12  to have to change based on economic conditions.

13       But there's nothing in the amended clause that says

14  in sum and substance that we reserve the right to change

15  and alter the entire relationship about how we might deal

16  with disputes between one another, or how we may or what

17  rights you may have if you challenge conduct that we have

18  engaged in.

19       And I think it's significant counsel referenced the

20  Delaware statute which is correctly noted of course as

21  Delaware Title 5, Section 952, which we pulled a copy off

22  of a computer this afternoon just to check its enactment

23  date and its enactment is 1999.

24       Why is that significant?  I suggest it's significant

25  because in 1999 Delaware said that it was okay for the

1    companies registered in Delaware, such as MBNA, to have

2    the right to unilaterally amend their agreement to add

3    such clauses as the one that's at issue here and that

4    it's not offensive to Delaware public policy.  Indeed, is

5    it not only offensive, it is the law in Delaware.  It is

6    not, however, the law in Massachusetts.  And why does

7    this matter?

8        It matters, Your Honor, because despite the

9    assertion that the result would be the same if you apply

10   Massachusetts law as opposed to Delaware law, I believe

11   that that assertion when scrutinized by you doesn't hold

12   up.

13       And that the result of a unilateral amendment after

14   the fact under Massachusetts' line of cases would be

15   subjected to a type of analysis, such as that was engaged

16   in by this Court case or other courts, where they look to

17   see the relationship of the parties, how the fundamental

18   -- the amendment changing the fundamental relationship

19   between the parties and if it was, was there notice?

20   Notice does become important, the ability to agree or not

21   agree.  Was there ample -- any consideration, forget

22   ample consideration, for the change?

23       And our primary -- or I guess our sort of threshold

24   argument to you is that when looking at the formation --

25   and I'm choosing words carefully here because in another

1    section of their papers they said if we challenge the

2    enforceability of the arbitration agreement and the

3    contract, and I think they mean the 1987 agreement, even

4    that is a subject for arbitration.

5        But Massachusetts federal court and state court

6    cases -- and we did bring to your attention, I hope I'm

7    pronouncing it correctly, the Erin or Arent v. Shearson

8    American Express case 633 F.Supp. 770.  It was decided by

9    the district court of Massachusetts in 1995.

10       It said when a court is looking at the formation of

11   a contract provision, as opposed to the enforceability, it

12   is permissible to engage in judicial scrutiny.  And when

13   you engage in judicial scrutiny, it's important to look

14   at the basis of the formation.  And one of the bases of

15   the formation of the arbitration clause is the fact that

16   MBNA wants this Court to apply Delaware law.  And there's

17   a good reason why they want Delaware law to apply because

18   Delaware law, if you agree that it applies, I think ends

19   the inquiry.  Because Delaware law's policy is codified

20   at 952 here would say, we're done.  This statute says you

21   can do it.

22       We don't think, and we've suggested to you, that

23   Massachusetts law (A) should apply.  And (B) the result

24   is different because it's offensive to policy here in

25   Massachusetts.

1      THE COURT:  Let me stop you there.  I do from

2  time to time get these choice of law cases, and I'm

3  having a hard time understanding why Delaware law

4  wouldn't apply here just applying the traditional choice

5  of law criteria.

6      That is, MBNA is a Delaware corporation.  MBNA was

7  obviously one of the parties to the contract.  MBNA, I

8  don't think there's any dispute, informed Mr. Diamond

9  that Delaware law would apply at the time the contract

10  was promulgated.

11      Other than the fact that Mr. Diamond happens to live

12  in Massachusetts, and the fact that Massachusetts has a

13  policy which is different from Delaware, I'm having a

14  hard time understanding why I should choose -- why I

15  would applying those traditional criteria choose

16  Massachusetts law over Delaware law, particularly when

17  we've got a company, many companies are, which does

18  business in all 50 states, probably other places also,

19  and is interested and I think there's at least some

20  argument from a public policy point of view that there's

21  a value in that interest in having one's state's

22  jurisdiction apply rather than having to deal with the

23  common-law of 50 states and perhaps foreign countries as

24  well in determining what its rights and obligations are.

25      Is this case different from that?  I mean, is Mr.

1    Diamond different from anybody in California or Montana

2    or Ohio or Maine or Florida or any elsewhere where

3    there's a state law that's slightly different from

4    Delaware?

5              MR. BLUVER:  I think he is.  I think as a

6    consumer -- I think as between a consumer in

7    Massachusetts and a consumer in Delaware, he stands in

8    different shoes in relationship to the credit issuing

9    bank.  And that as between the two, I don't think it's

10   unreasonable to suggest that the bank and its resources

11   have the ability to understand and to know what the

12   policy is in various jurisdictions and to act accordingly

13   within that given jurisdiction.

14             THE COURT:  But if your argument is correct

15   then, and I hear it, if your argument is correct, I don't

16   see how Mr. Diamond would be any different from anybody

17   in any one of the other 50 states who had a beef with

18   MBNA and whose state law was more favorable to him than

19   Delaware's law.

20             MR. BLUVER:  It happens all the time.  One of

21   the cases that we discussed for a slightly different

22   reason, but I think I will get to it, is the appeals

23   court case out of Massachusetts, the <u>Connecticut National</u>

24   <u>Bank of Hartford case v. Richard Kommit</u>, K-O-M-M-I-T,

25   which was decided by Justice Perretta in 1991.  The cite

1    is 31 Mass. App. Court 348.

2        In that case there was a Connecticut issuer.  There

3    was a Massachusetts consumer gambling in New Jersey.

4    There was a choice of law provision.  The choice of law

5    provision said Connecticut.  Connecticut, however, like

6    Massachusetts, finds that gambling -- an extension of

7    credit for gambling is void as against public policy.

8    Whether that's a good thing or bad thing sort of in

9    response to some of your introductory remarks, I don't

10   know but that happens to be the law in Massachusetts and

11   the law in Connecticut.

12       So the Connecticut Bank in the <u>Kommit</u> case looking

13   -- and New Jersey of course is where Atlantic City.   In

14   the <u>Kommit</u> case the New Jersey -- I'm sorry -- the

15   Connecticut Bank who had a choice of law said --

16   Connecticut argued in Massachusetts that New Jersey law

17   should apply because that was where the transaction

18   occurred, and the Massachusetts Appeals Court said that

19   analysis is no longer the analysis that we follow.  I'll

20   butcher the Latin, lex loci, but that we look at the

21   circumstances around the transaction.

22       And in that <u>Kommit</u> case, Justice Perretta agreed

23   with the party's choice of law and said Connecticut law

24   applies.  But in his analysis -- I think this is the

25   reason that we cited it to you is for the analysis, he --

1       THE COURT:  She.

2       MR. BLUVER:  I'm sorry.  She looked to

3  determine whether or not the choice of law in Connecticut

4  would be offensive to Massachusetts and having found that

5  Massachusetts substantive law and Connecticut substantive

6  law in this particular issue were identical for all

7  intents and purposes identical, there was no offense and

8  he was going to allow the parties -- she was going to

9  allow the parties to go forward using the choice of law

10  provision notwithstanding that in that case the proponent

11  of the choice of law had asked for New Jersey law.

12       I don't think it's too much of a stretch for what

13  I'm saying here is that it is -- while ordinarily parties

14  of equal bargaining can choose what law is going to

15  govern, I don't think it's a stretch and I would agree

16  with you, Judge, that if you had arm's length business

17  arrangements, that parties ordinarily could contract for

18  a choice of law.

19       But when there's unequal bargaining, as there is in

20  this case, I don't think it's any dispute, when there is

21  a situation that exist where one party can't really

22  dictate the terms or enter into any meaningful

23  negotiation, I don't think the court automatically has to

24  pay homage to the choice of law that exists in the

25  agreement.  That like Justice Perretta did in the Kommit

1    case, it's worthy of inquiry as to whether or not if the

2    court adopts the choice of law provision in the contract,

3    would that be -- I don't know the jargon -- offensive to

4    public policy, would it be consistent with how

5    Massachusetts' consumers should be treated?

6        So using that I am going to make this leap that says

7    given that Massachusetts law doesn't favor -- except in

8    some very circumscribed experiences or circumstances to

9    allow unilateral after the fact amendments that

10   fundamentally change the relationship, that choosing

11   Delaware law -- notwithstanding that MBNA inserted it

12   into this contract, which is a contract of adhesion, that

13   the court has to adopt it and can allow the 1987

14   agreement to govern the outcome of the parties relative

15   to do we owe the money, whether or not money is owed,

16   whether or not interest rates are going to change, but it

17   doesn't have to adopt all of the amendments in their

18   totality if by doing so they alter the fundamental rights

19   that citizens have here in the Commonwealth of

20   Massachusetts.

21       And that may be a long way to get to that question

22   that you asked, but I think at bottom, as between a

23   nationally -- a national bank issuing credit all across

24   the country and between a consumer in any one of the

25   various jurisdictions in which MBNA does business, it

1    seems fairer to put the burden on the institution issuing

2    the credit to insure that the manner in which disputes,

3    because that's what we're dealing with here, are dealt

4    with are consistent with the citizen's rights in that

5    particular jurisdiction.

6         It sure would be easier and I don't mean -- and I

7    never mean to make sort of off-the-cuff argument when we

8    know ever since we were first-year law students or back

9    in college there's a reason why multi-national and

10   national corporations incorporate in Delaware.

11        There are tax reasons there.  I mean, it's always

12   been a place who prides itself on being the host state in

13   the United States to encourage national corporations

14   because it has laws that are favorable to those

15   corporations.  That doesn't mean that when they come into

16   different jurisdictions, that they get necessarily the

17   benefit of those situations, those statutes, those laws,

18   here in this particular case in the Commonwealth.

19        Again with the exception of these employment context

20   cases, which I think are quite circumscribed, I don't

21   think that a Massachusetts court applying Massachusetts

22   law would allow a party to unilaterally alter the

23   relationship as MBNA tried to do in 1999.

24        And I think it's significant that the amendment was

25   at least allegedly sent out in 1999 at exactly or about

1    the time that the statute was enacted.  I don't think

2    that is a coincidence.

3            THE COURT:  Okay.

4            MR. BLUVER:  The other thing I did, Your Honor

5    -- there was, as you know, a very well written and quite

6    extensive reply brief submitted by MBNA.  To the extent

7    it would help your clerks as you look at these issues,

8    we've kind of gone through the cases that were cited and

9    it's really not so much a memorandum.

10    We really looked at cases specifically.  We believe

11    we cited them accurately to you, at least if not so much

12    technically for the holding in terms of what the outcome

13    was but to draw your attention to what the analysis was

14    as in the Kommit case.  The holding of the case was the

15    choice of law provision of the parties holds Connecticut

16    law applies.  But the analysis is what's key and what the

17    reasoning that the court undertook to reach that

18    conclusion is really the main reason why we cited the

19    Kommit case.  So with your permission, I'd like to hand

20    this up to you.  I have a copy for counsel.

21            THE COURT:  Sure.  I'm assuming that I've got

22    the substance of the memorandum in the remarks that

23    you've just made now.

24            MR. BLUVER:  You do, Judge.  Just to the extent

25    either you or your assistants were looking at particular

1   cases, just rather than go through it case by case, we
2   have tried to at least address some of the issues that
3   were specifically raised by MBNA in its reply brief.
4           THE COURT:  Okay.  Well, thank you.  I have
5   such a strong feeling about the defendant's motion to
6   dismiss that I know that my decision is going to be a
7   painful one for the plaintiff but I might as well just
8   tear the bandage off here and get the pain over with in
9   one swoop because I do feel quite convinced that the
10  defendant's position is the correct one with regard to
11  the arbitration, and I'm going to rule orally on the
12  motion to dismiss and let you see whether my brothers and
13  sisters upstairs in the First Circuit east of here in the
14  First Circuit agree with me.
15      This was a noble effort on behalf of the plaintiff.
16  He's got himself into a bit of a mess here and
17  plaintiff's counsel are doing absolutely the best they
18  can to extricate him from the problem that he's in.  But
19  my very strong feeling, I'm sorry to say from the
20  plaintiff's point of view, is that to the extent that
21  he's going to be extricated from the problem, it's going
22  to have to take place in the context of arbitration.
23      I want to just lay out very briefly what my reasons
24  are for concluding that.  First of all, I am convinced
25  that Delaware law applies here.  I understand that there

1    is a difference in the bargaining power of the two
2    entities, but if I was to accept that as the main
3    argument, it would simply give anyone who was an
4    individual the right to opt out of any contractual choice
5    of law provision on the ground that that person was in a
6    weaker position at the time that the contract was entered
7    into.  I don't believe that's the law.  I don't believe
8    it's fair.
9        The defendant made it very clear if you want to use
10   our credit services, you're going to have to recognize
11   that Delaware law applies.  If you don't like it, you can
12   go down the street and get a card from someone else that
13   may use a different law.
14       Even if I was to step back and use the choice of law
15   provisions, this is a particularly tough situation for
16   the plaintiff to argue that some law other than Delaware
17   applies.  MBNA is a Delaware corporation.  It informed
18   the plaintiff that they were going to be using Delaware
19   law at the time the contract was entered into.
20       Mr. Diamond lives in Massachusetts.  He has that in
21   his favor, like probably tens of thousands of other
22   people, hundreds of thousands of MBNA's customers.
23       He's not a citizen of Delaware.  Massachusetts' law
24   is more perhaps, although the defendant disagrees, but
25   perhaps for purposes of argument we can say it's somewhat

1    more favorable to the plaintiff.  But again that sort of
2    begs the question, the whole idea -- the whole problem is
3    what law applies, and any time a plaintiff has a better
4    law in his hometown, he's going to be asserting that law.
5         The actual credit was extended somewhere out there
6    in god knows where in cyber space.  The gentleman is
7    sitting on his computer participating in the gambling.
8    It's not like he bought a car down the street here in
9    Massachusetts and that the transaction might be governed
10   by the law of Massachusetts.
11        So wherever this transaction occurred where he found
12   himself the target of these credit charges, it was
13   perhaps defined as just about anywhere out in cyber
14   space.
15        So I think even applying the traditional rules that
16   are used to determine the choice of law, the best
17   argument is that Delaware law really applies.  If
18   Delaware law applies, the plaintiff is clearly out here.
19        In addition, I believe that the original agreement
20   was valid.  All of its terms were valid.  They were
21   without any dispute disclosed to the plaintiff.  The
22   agreement in its original form gave the defendant the
23   right to unilaterally modify the agreement.  The
24   defendant took advantage of that right that it had in
25   1999.

1          I was concerned about this issue of notice.

2     However, I am persuaded that regular procedures were

3     followed, contact with Mr. Diamond was maintained

4     continuously.  There isn't any argument that he changed

5     his address or changed his residence or ever had any

6     problem staying in touch with MBNA, and I think under the

7     circumstances the presumption of proper notice is

8     sufficient to create a record justifying summary

9     judgment.

10         The consideration was the continuation of the

11    extension of credit, and I believe that a unilateral

12    amendment to an at-will contract in these circumstances

13    is valid.

14         Mr. Diamond, assuming that he received notice and I

15    am presuming that for purposes of summary judgment, had

16    the opportunity to opt out and obtain his credit services

17    from some other entity if he wanted to.

18         Under these circumstances my conclusion is that the

19    arbitration agreement contained in the 1999 amendment is

20    valid, does cover this situation, and I'm not going to be

21    doing anybody any favors by pretending that I'm going to

22    go back here and change my mind by thinking about it for

23    another three or four months and give you something in

24    writing and leaving this case in limbo.

25         I'm not going to change my mind for better or worse.

1    I'm quite convinced that that is the proper way to

2    approach this case.  I'm not particularly happy to do

3    that.

4        Mr. Diamond is in a somewhat sympathetic position as

5    kind of a David in conflict with a Goliath.  One's heart

6    is always with the Davids of this world rather than the

7    Goliaths.  But the fact of the matter is I think he's out

8    of luck here and it's not going to help anybody for me to

9    pretend otherwise.

10        So for the reasons that I've just summarized, I'm

11    going to allow the defendant's motion to dismiss and I'm

12    going to order that the parties proceed to arbitration.

13    I will put this order in writing within the next -- well,

14    actually I'll put this in writing.  I'm going to be away

15    next week so the actual written memoraliziation of my

16    ruling will not come out probably for another ten days or

17    two weeks.  It will only be a page or two and at that

18    point judgment will enter for the defendant and the clock

19    will begin to run on the appeal.

20        It won't begin to run as the words are coming out of

21    my mouth at this moment here at four p.m. on October

22    17th.  It will be in the form of a written ruling with

23    formal judgment which you will probably be receiving

24    sometime towards the end of this month.

25        I'm just sorry to say that if somebody is going to

1    find that this arbitration agreement isn't enforceable,

2    it's going to have to be the Court of Appeals, not Judge

3    Ponsor.   I just feel that it is enforceable under these

4    circumstances.   I do thank both of you very much for your

5    very thorough briefing and your very helpful arguments

6    but I'm afraid that's where I come out.   All right.

7    Thank you very much.   The court is in recess.

8

9                    (Court recessed at 4:00.)

10

11

12    UNITED STATES OF AMERICA
      DISTRICT OF MASSACHUSETTS
13    CITY OF SPRINGFIELD

14

15         I, Alice Moran, do hereby certify that the

16    foregoing is a true and accurate transcription of my

17    stenographic notes to the best of my knowledge and

18    ability.

19         Certified on December 1, 2003.   My commission

20    expires on April 8, 2005.

21

22

23                         _____
                           Alice Moran, CSR, RPR, RMR
24                         Official Federal Court Reporter

25